Slip Op. No. 19-64

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **GUIZHOU TYRE CO., LTD. AND GUIZHOU TYRE IMPORT AND EXPORT CO., LTD.**, et al., | |
| Plaintiffs, | **Before: Timothy C. Stanceu, Chief Judge** |
| v. | **Consol. Court No. 17-00100** |
| **UNITED STATES,** | |
| Defendant. | |

## OPINION AND ORDER

[Ordering reconsideration of determination concluding an administrative review of an antidumping duty order on off-the-road tires from the People's Republic of China]

Dated:  May 24, 2019

*Douglas J. Heffner*, Drinker Biddle & Reath, LLP, of Washington, D.C., for plaintiff Xuzhou Xugong Tyres Co., Ltd.  With him on the brief was *Richard P. Ferrin*.

*Richard P. Ferrin*, Drinker Biddle & Reath, LLP, of Washington, D.C., for plaintiff Trelleborg Wheel Systems (Xingtai) Co., Ltd.  With him on the brief was *Douglas J. Heffner*.

*Ned H. Marshak*, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY, argued for plaintiffs Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd.  With him on the brief were *Jordan C. Kahn*, *Elaine F. Wang*, and *Brandon M. Petelin*.

*Brandon M. Petelin*, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, D.C., for plaintiff Qingdao Qihang Tyre Co., Ltd.  With him on the brief were *Ned H. Marshak*, *Elaine F. Wang*, and *Jordan C. Kahn*.

*Brandon M. Petelin*, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, D.C., for plaintiff Qingdao Free Trade Zone Full-World International Trading Co., Ltd.  With him on the brief were *Ned H. Marshak*, *Elaine F. Wang*, and *Jordan C. Kahn*.

*Ned H. Marshak*, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY, for plaintiff Aeolus Tyre Co., Ltd.  With him on the brief were *Brandon M. Petelin*, *Elaine F. Wang*, and *Jordan C. Kahn*.

*Robert K. Williams* and *Lara A. Austrins*, Clark Hill PLC, of Chicago, IL, for plaintiff Weihai Zhongwei Rubber Co., Ltd.

*John J. Todor*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant.  With him on the brief were *Chad A. Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director.  Of counsel on the brief was *Paul K. Keith*, Attorney, Office of the Chief Counsel For Trade Enforcement & Compliance, U.S. Department of Commerce.

Stanceu, Chief Judge:  In this consolidated action, eight plaintiffs contest an administrative determination the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department"), issued to conclude a periodic review of an antidumping duty order on off-the-road ("OTR") tires from the People's Republic of China ("China" or the "PRC").[1]  Ruling that the determination is contrary to law in certain respects, the court remands the determination to Commerce for appropriate corrective action.

## I. Background

### A. The Contested Determination

The determination contested in this litigation (the "Final Results") is *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 18,733 (Int'l Trade Admin. Apr. 21, 2017) ("*Final Results*").  *See also Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Amended Final Results of Antidumping Duty Administrative*

---

[1] Consolidated under the lead case, *Guizhou Tyre Co. and Guizhou Tyre Import and Export Co. v. United States*, Court No. 17-00100, are *Aeolus Tyre Co. v. United States*, Court No. 17-00102; *Qingdao Free Trade Zone Full-World International Trading Co. v. United States*, Court No. 17-00103; *Xuzhou Xugong Tyres Co. v. United States*, Court No. 17-00104; *Trelleborg Wheel Systems (Xingtai) Co. v. United States*, Court No. 17-00111; *Qingdao Qihang Tyre Co. v. United States*, Court No. 17-00113; and *Weihai Zhongwei Rubber Co. v. United States*, Court No. 17-00123.  Order Granting Motion to Consolidate (June 16, 2017), ECF No. 24.

*Review; 2014-2015*, 82 Fed. Reg. 27,224 (Int'l Trade Admin. June 14, 2017) ("*Amended Final*

*Results*").  Incorporated by reference in the Final Results and the Amended Final Results is a

final "Issues and Decision Memorandum" containing explanatory discussion.  *Issues and*

*Decision Memorandum for Final Results of Antidumping Duty Administrative Review: Certain*

*New Pneumatic Off-the-Road Tires from the People's Republic of China; 2014-2015* (Int'l Trade

Admin. Apr. 12, 2017) (P.R. Doc. 308), *available at* https://enforcement.trade.gov/frn/summary/

prc/2017-08011-1.pdf (last visited May 21, 2019) ("*Issues and Decision Mem.*").

B. Proceedings Conducted by Commerce

Commerce issued an antidumping duty order (the "Order") on certain OTR tires from

China (the "subject merchandise") in 2008.  *Certain New Pneumatic Off-the-Road Tires From*

*the People's Republic of China: Notice of Amended Final Affirmative Determination of Sales at*

*Less Than Fair Value and Antidumping Duty Order*, 73 Fed. Reg. 51,624 (Int'l Trade Admin.

Sept. 4, 2008).  Commerce initiated the review at issue in this litigation, which was the seventh

periodic administrative review of the Order, on November 9, 2015.  *Initiation of Antidumping*

*and Countervailing Duty Administrative Reviews*, 80 Fed. Reg. 69,193 (Int'l Trade Admin.

Nov. 9, 2015).  The seventh review pertained to entries of subject merchandise made during the

period of review ("POR") of September 1, 2014 through August 31, 2015.  *Id.*, 80 Fed. Reg.

at 69,196.

Commerce published the preliminary results of the review on October 14, 2016.  *Certain*

*New Pneumatic Off-the-Road Tires From the People's Republic of China: Preliminary Results of*

*Antidumping Duty Administrative Review; 2014-2015*, 81 Fed. Reg. 71,068 (Int'l Trade Admin.

Oct. 14, 2016) ("*Prelim. Results*").  Commerce incorporated by reference a "Decision

Memorandum for Preliminary Results."  *Decision Memorandum for Preliminary Results of*

*Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2014-2015* (Int'l Trade Admin. Oct. 5, 2016), *available at* https://enforcement.trade.gov/frn/summary/prc/2016-24821-1.pdf (last visited May 21, 2019) ("*Prelim. Decision Mem.*").

In the Final Results, Commerce selected two "mandatory" respondents for individual examination: (1) Xuzhou Xugong Tyres Co., Ltd., Armour Rubber Co. Ltd., and Xuzhou Hanbang Tyre Co., Ltd. (collectively, "Xugong"), which Commerce treated as a single entity ("collapsed") for purposes of the review; and (2) Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd. (collectively, "GTC"), which Commerce also treated as a single entity. *Final Results*, 82 Fed. Reg. at 18,733-34 & nn.3-4.

Commerce concluded that Xugong, but not GTC, established independence from the government of China and therefore, under its practice, qualified for what Commerce terms a "separate rate," i.e., an antidumping duty rate other than the rate Commerce assigns to exporters and producers it considers to be part of the "PRC-wide entity." *Id.*, 82 Fed. Reg. at 18,734.[2]  In the Final Results, Commerce assigned a weighted-average dumping margin of 33.08% to

---

[2] In addition to the mandatory respondent Xugong, Commerce determined that nine other Chinese companies or groups of companies qualified for a "separate rate": Qingdao Qihang Tyre Co., Ltd. ("Qingdao Qihang"); Qingdao Free Trade Zone Full-World International Trading Co., Ltd. ("Full World"); Trelleborg Wheel Systems (Xingtai) China, Co. Ltd. ("Trelleborg"); Shiyan Desizheng Industry & Trade Co., Ltd.; Qingdao Jinhaoyang International Co., Ltd.; Sailun Jinyu Group Co., Ltd.; Weifang Jintongda Tyre Co., Ltd.; Zhongce Rubber Group Company Limited; and Weihai Zhongwei Rubber Co., Ltd. ("Zhongwei").  These nine exporter/producers were not individually examined in the seventh review and therefore did not receive an individually determined rate. *Final Results*, 82 Fed. Reg. at 18,735.

Xugong and assigned to GTC the PRC-wide rate, which in the seventh review was 105.31%. *Id.*,

82 Fed. Reg. at 18,735.[3]

Because Xugong was the only individually-examined respondent that Commerce

determined to be qualified for a separate rate, Commerce assigned to all other separate rate

respondents a rate of 33.08%, equivalent to the margin it calculated for Xugong. *Id.* Commerce

found that two respondents in addition to GTC failed to qualify for a separate rate and therefore

treated these two respondents as part of the PRC-wide entity, assigning them the rate of

105.31%: Aeolus Tyre Co., Ltd. ("Aeolus") and Tianjin Leviathan International Trade Co., Ltd.

("Leviathan"). *Id.*

On June 14, 2017, Commerce issued the Amended Final Results to correct a ministerial

error. *Amended Final Results*, 82 Fed. Reg. 27,224.  Specifically, the Amended Final Results

explained that Xugong correctly identified an error Commerce made in its calculation of

Xugong's margin for the Final Results by inadvertently using the incorrect sales figures as a

denominator to devise the indirect sales expense ratio. *Id.*  In response to the ministerial error

allegation, Commerce determined that the weighted-average dumping margin applicable to

Xugong was 33.14% rather than 33.08%. *Id.*, 82 Fed. Reg. at 27,225.  Commerce applied this

---

[3] The PRC-wide rate was carried over from the Department's determination in the fifth administrative review.  *See Final Results*, 82 Fed. Reg. at 18,735 n.16.  This PRC-wide rate was determined by calculating the average of the PRC-wide rate prior to the fifth review (determined in the investigation) and the individually-determined rate Commerce calculated for a respondent in the fifth review, Double Coin Holdings, Ltd. ("Double Coin"), which is not a party to this case.  *See Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2012-2013* (Int'l Trade Admin. Apr. 15, 2015), 80 Fed. Reg. 20,197, 20,199.  The 105.31% rate is based in part on the application of facts otherwise available and an adverse inference.  Double Coin challenged the Department's assigning it the 105.31% rate in the fifth administrative review.  *See China Mfrs. Alliance, LLC v. United States*, 43 CIT __, __, 357 F. Supp. 3d 1364, 1367 (2019).  In this case, no party challenges the basis for the PRC-wide rate, but GTC and Aeolus each challenge the Department's determination of failure to establish independence from government control.

margin to the other "separate rate" respondents. *Id.* The 105.31% rate applied to respondents Commerce found to be part of the PRC-wide entity in the Final Results was unchanged by the Amended Final Results. *Id.*

### C. The Parties to this Consolidated Case

The eight plaintiffs in this litigation include the two mandatory respondents, Xugong (to which Commerce assigned a rate of 33.14%) and GTC (consisting of Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd., to which Commerce assigned the 105.31% PRC-wide rate). The other five plaintiffs are Aeolus (to which Commerce also assigned the PRC-wide rate) and four separate rate respondents, to each of which Commerce assigned the 33.14% rate determined for Xugong in the Amended Final Results: Qingdao Free Trade Zone Full-World International Trading Co., Ltd. ("Full World"); Qingdao Qihang Tyre Co., Ltd. ("Qingdao Qihang"); Trelleborg Wheel Systems (Xingtai) China, Co. Ltd. ("Trelleborg"); and Weihai Zhongwei Rubber Co., Ltd. ("Zhongwei"). Defendant is the United States.[4]

### D. Proceedings before the Court

The consolidated cases each were commenced between May 4, 2017 and May 19, 2017. Before the court are the motions of seven plaintiffs for judgment on the agency record brought under USCIT Rule 56.2, all of which are opposed by defendant United States.[5] *See* Xugong's

---

[4] Titan Tire Corporation ("Titan") and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW") were defendant-intervenors in this case and the cases consolidated under it, *see* Order (May 30, 2017), ECF No. 20, and were also plaintiffs, *see* Order (June 16, 2017), ECF No. 24. They were severed as plaintiffs on June 26, 2017, Order (June 26, 2017), ECF No. 30, and withdrew as defendant-intervenors from this consolidated case on September 29, 2017, Order (Sept. 29, 2017), ECF No. 43.

[5] Plaintiff Zhongwei did not submit briefing in this case.

Mem. in Support of Mot. for J. on the Agency R. 1-2 (Jan. 30, 2018), ECF Nos. 48 (conf.),

49 (public) ("Xugong's Br."); Guizhou Tyre Co., Ltd.'s and Guizhou Tyre Import and Export

Co., Ltd.'s Mem. in Support of Mot. for J. on the Agency R. 1-2 (Jan. 30, 2018), ECF Nos. 51

(conf.), 52 (public) ("GTC's Br."); Aeolus's Mem. in Support of Mot. for J. on the Agency

R. 1-2 (Jan. 30, 2018), ECF Nos. 55 (conf.), 56 (public) ("Aeolus's Br."); Trelleborg's Mem. in

Support of Mot. for J. on the Agency R. 1-2 (Jan. 30, 2018), ECF No. 50; Qingdao Qihang's

Mem. in Support of Mot. for J. on the Agency R. 1-2 (Jan. 30, 2018), ECF No. 53; Full World's

Mem. in Support of Mot. for J. on the Agency R. 1-2 (Jan. 30, 2018), ECF No. 54; Def.'s Resp.

to Mots. for J. on the Agency R. 1-2 (June 1, 2018), ECF No. 58 ("Def.'s Br.").

       The court held oral argument on December 6, 2018.  Oral Argument (Dec. 6, 2018), ECF

No. 67.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

       The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980,

28 U.S.C. § 1581(c) (2012), pursuant to which the court reviews actions commenced under

section 516A of the Tariff Act of 1930 (the "Tariff Act"), *as amended* 19 U.S.C. § 1516a (2012),

including an action contesting a final determination that Commerce issues to conclude an

administrative review of an antidumping duty order.[6]  In reviewing a final determination, the

court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported

by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i).  Substantial evidence refers to "such relevant evidence as a reasonable mind

_____

       [6] All citations to the United States Code herein are to the 2012 edition and all citations to
the Code of Federal Regulations herein are to the 2016 edition, except where otherwise
indicated.

might accept as adequate to support a conclusion." *SKF USA, Inc. v. United States*, 537 F.3d

1373, 1378 (Fed. Cir. 2008) ("*SKF I*") (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229

(1938)).

       B. Summary of the Parties' Claims and the Court's Disposition of those Claims

Aeolus claims that Commerce erred in determining that Aeolus failed to rebut the

Department's presumption of *de facto* control by the government of the PRC.  Because the court

cannot conclude that Commerce considered certain record evidence relevant to its determination,

the court orders Commerce to reconsider its decision that Aeolus does not qualify for a separate

rate.

GTC claims that Commerce erred in determining that GTC failed to rebut the

presumption of *de facto* control.  As discussed below, defendant advocates that the court allow

Commerce to reconsider one aspect of the issue of whether GTC should be granted separate rate

status.  *See* Def.'s Br. 1-2.  While allowing Commerce to reconsider the aspect of the

determination as to GTC's separate rate status that defendant identifies, the court's Order directs

Commerce to reconsider that determination in the entirety.

Xugong claims that Commerce erred in making deductions from the prices used to

determine export price ("EP") and constructed export price ("CEP") of Xugong's subject

merchandise to account for the PRC's value-added tax ("VAT").  Concluding that the

antidumping duty statute does not permit the deductions Commerce made for VAT, the court

orders Commerce to redetermine Xugong's margin upon eliminating these deductions.

Full World, Qingdao Qihang, Trelleborg, and Zhongwei each claim entitlement to a new

antidumping duty rate that is adjusted for any change made to the rate to be assigned to separate

rate respondents.  The court awards this remedy to these plaintiffs.

### C. The Department's Decision to Deny Aeolus a Separate Rate

In the Issues and Decision Memorandum, Commerce stated that "[f]or the final results and based on record evidence, we continue to find that Aeolus is not eligible for a separate rate." *Issues and Decision Mem.* at 10.  Aeolus claims that this determination was not supported by substantial evidence.  *See* Aeolus's Br. 16-34.

### 1. The Department's Test for Separate Rate Status in Proceedings Involving Nonmarket Economy Countries

In antidumping duty proceedings involving nonmarket economy countries, including China, Commerce applies a rebuttable presumption that all companies within the nonmarket economy country are controlled by the government of that country.  *See AMS Assocs. v. United States*, 719 F.3d 1376, 1379 (Fed. Cir. 2013).  An exporter may overcome this presumption by convincing Commerce that it is subject neither to *de jure* nor to *de facto* government control over its export activities.  *Id.  De jure* independence, which is not at issue in this case, may be shown by legislation and other governmental measures in the nonmarket economy country demonstrating legal independence.  *See Sigma Corp. v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997).  To establish the absence of *de facto* control, Commerce requires an exporter to demonstrate that it (i) sets its prices independently of the government and other exporters, (ii) negotiates its own contracts, (iii) keeps the proceeds of its sales (apart from taxation), and (iv) selects its management autonomously.  *AMS Assocs.*, 719 F.3d at 1379; *see also Advanced Tech. & Materials Co. v. United States*, 37 CIT __, __, 938 F. Supp. 2d 1342, 1348-49 (2013); *Advanced Tech. & Materials Co. v. United States*, 36 CIT __, __, 885 F. Supp. 2d 1343, 1346-47 (2012); *Notice of Final Determination of Sales at Less Than Fair Value: Silicon Carbide From the People's Republic of China*, 59 Fed. Reg. 22,585, 22,587 (Int'l Trade Admin. May 2, 1994);

*Final Determination of Sales at Less Than Fair Value: Sparklers From the People's Republic of China*, 56 Fed. Reg. 20,588, 20,589 (Int'l Trade Admin. May 6, 1991).

<u>2. The Department's Conclusion that Aeolus Did Not Rebut the Presumption of Government Control Resulted from an Incomplete Analysis of the Record</u>

Commerce determined, and Aeolus does not dispute, that Aeolus: (1) is 42.58% owned by China National Tire & Rubber Co., Ltd. ("China National Tire"), a 100%-owned subsidiary of China National Chemical Corporation ("ChinaChem"), a state-owned enterprise ("SOE") supervised by China's State-Owned Assets Supervision and Administration Commission ("SASAC"), and (2) is 6.48% owned by other SOEs supervised by "local SASACs,"[7] making Aeolus's total SOE ownership 49.06%. *Issues and Decision Mem.* at 10. Aeolus claims that record information shows that the SOE shareholders cannot exercise control over Aeolus's business decisions despite the high level of SOE ownership. Aeolus's Br. 27-29.

When conducting a separate rate analysis for a company with less than a majority of SOE ownership, Commerce has considered whether the record contains "additional indicia of control" sufficient to demonstrate that the company lacks independence and therefore should receive a PRC-wide rate. *See, e.g.*, *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 42 CIT __, __, 284 F. Supp. 3d 1350, 1359 (2018). In the seventh review, Commerce found government control of Aeolus based on (1) a statement on Aeolus's website indicating that it is a state-owned enterprise and (2) the company's corporate policies governing how certain shareholders can select members of management. *See Issues and Decision Mem.* at 10-12 (citing

---

[7] Record evidence indicates that state-owned enterprises in China may be supervised either by the central State-Owned Assets Supervision and Administration Commission ("SASAC") of China's State Council or a local body representing the central SASAC in a particular region or city in China. *See* Aeolus Separate Rate Application 12-13, *appended to Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt to U.S. Department of Commerce re: Separate Rate Application* (Dec. 11, 2015) (C.R. Docs. 28-33) (P.R. Docs. 53-55).

*Letter From Stewart & Stewart for Sec'y Commerce* Attach. 3 (Dec. 30, 2015) (C.R. Doc. 38)

(P.R. Doc. 75) (stating that Aeolus is "[a] model state-owned enterprise")).[8]  Commerce found

that Aeolus's SOE shareholders exercised control over the selection of the company's board,

which in turn selected management, despite the various shareholder protections present in PRC

law and Aeolus's Articles of Association ("AoA").  *See id.* at 10-11.

Aeolus argues that Commerce failed to consider important contrary record evidence: a

"Rectification Report" it placed on the record, which, it argues, demonstrates Aeolus's

independence.  Aeolus's Br. 12-13 (citing *Letter from Grunfeld, Desiderio, Lebowitz, Silverman

& Klestadt to U.S. Department of Commerce* Ex. 1A (Jan. 8, 2016) (C.R. Doc. 39) (P.R.

Doc. 79) ("*Rectification Report Letter*")).  The court notes that the Issues and Decision

Memorandum makes no mention of the Rectification Report.

The Rectification Report originally was submitted by the Aeolus board of directors to the

Henan Security Regulatory Commission in China as part of a proceeding unrelated to the seventh

review and is dated January 13, 2014, i.e., before the commencement of the POR on

September 1, 2014.  *See Rectification Report Letter* 2-4, Ex. 1A.  On December 30, 2015,

petitioners placed on the record an English-language translation of the Rectification Report in

support of their argument that Aeolus was not independent of the government of China.  *Id.* at 2

(citing petitioners' submission).  According to petitioners, the Rectification Report indicated that

the SOE ChinaChem: (1) maintained direct control over Aeolus's operations, (2) could access

Aeolus's financial information at any time through software it shared with Aeolus, and

---

[8] The court provides citations to both the public and the confidential versions of record documents.  This Opinion and Order discloses only the information included in the public versions and information subsequently made public in the Issues and Decision Memorandum or public versions of the parties' filings.

(3) required Aeolus to submit "investment, key projects, and tender process" for ChinaChem's approval. *See id.* In its rebuttal submission dated January 8, 2016, Aeolus placed on the record its own translation of the Rectification Report, which it claimed was more accurate than petitioners' translation, and argued that the properly-translated Rectification Report actually supported Aeolus's independence. *Id.* at 2-4, Ex. 1A. Specifically, Aeolus claimed the Rectification Report demonstrates that, as of the commencement of the POR, the government control issues identified in the Rectification Report showed a "Rectification Status" of "[c]ompleted," i.e., that "the Rectification Report does not address current issues, but, instead, describes *past issues* that have been identified as improper connections between Aeolus and ChinaChem and that have now been rectified." *Id.* at 2, Ex. 1A. Aeolus argues that, as of the publication of the Rectification Report (i.e., before the POR), Aeolus's SOE shareholders could not access the company's financial information and that review and approval of key projects did not depend on the company's SOE shareholders but only on Aeolus's board of directors.[9]

---

[9] Aeolus's translation of the Rectification Report states that "ChinaChem fully respects the independence of a listed company and has never inquired about financial information of the Company [i.e., Aeolus]" and that:

> Regarding the Company's investment, key projects, and tender process being reviewed and approved by ChinaChem. ChinaChem and China National Tire & Rubber Corp. will strictly comply with the provisions of the *Company Law, Code of Corporate Governance for Listed Companies* and other relevant law and regulations, exert their investors' rights, fully respect the independence of a listed company, and let the Company's shareholders' meeting, board of directors and the management team perform their internal approvals on investments, key projects, and tender process based on their respective obligations, authority and rules of procedure.

*Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt to U.S. Department of Commerce* Ex. 1A (Jan. 8, 2016) (C.R. Doc. 39) (P.R. Doc. 79) ("*Rectification Report Letter*").

Because the Issues and Decision Memorandum does not refer to the Rectification Report, the court cannot conclude that Commerce considered the report or the evidence therein when determining that Aeolus was not independent of government control.  Commerce is tasked with weighing the record evidence, but it nonetheless must address significant contrary evidence when making determinations.  *See CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." (internal quotation marks and citation omitted)).  It did not do so in the administrative determination being challenged before the court.  Accordingly, the court is ordering Commerce to reconsider its separate rate determination as to Aeolus in light of all evidence on the record, including the evidence in the Rectification Report.  The court does not address Aeolus's remaining arguments at this time.

### D. The Department's Decision to Deny GTC a Separate Rate

Commerce stated that "[f]or the final results, we continue to find, based on record evidence, that GTC is not eligible for a separate rate."  *Issues and Decision Mem.* at 13.  Before the court, GTC contests this determination, arguing that it was not supported by substantial evidence.  *See* GTC's Br. 20-43.

### 1. The Department's Analysis

As it did with Aeolus, Commerce found *de jure* independence but concluded that GTC failed to demonstrate independence under its four-factor *de facto* test.  *Issues and Decision Mem.* at 6-9, 13-15.  Commerce found that the absence of government control had not been demonstrated as to Guizhou Tyre Co., Ltd.'s selection of management and as to its ability to distribute profits.  *Id.* at 14-15.  Commerce also found that, because Guizhou Tyre Import and Export Co., Ltd. was a wholly-owned subsidiary of Guizhou Tyre Co., Ltd., it too was subject to

government control.  *Id.* at 13-14.  On that basis, Commerce considered the combined entity, i.e.,

GTC, subject to government control and assigned it the PRC-wide rate.

Commerce found that Guizhou Tyre Co., Ltd.'s largest shareholder, Guiyang Industry

Investment (Group) Co., Ltd. ("GIIG"), was an SOE that was 100% owned and supervised by

the "Guiyang SASAC" (i.e., the local SASAC in Guiyang, China).  *Issues and Decision Mem.*

at 13.  Commerce further found that GIIG owned 25.20% of Guizhou Tire Co., Ltd. during the

POR and concluded that the Guiyang SASAC therefore was in a position to control the activities

of Guizhou Tyre Co., Ltd. as well as those of the wholly-owned subsidiary Guizhou Tyre Import

and Export Co., Ltd. (which Commerce collapsed with Guizhou Tyre Co., Ltd. for the purposes

of the review).  *Id.* at 13-14.

According to Commerce, record evidence showed that Guizhou Tyre Co., Ltd. "elected

members of its board of directors through shareholders' meetings not available to all

shareholders" and made decisions affecting the distributions of profits at these meetings.  *Id.*

at 14.  Commerce found that "[b]ecause GIIG circumvented a more inclusive board election

process, it was able to elect specific board members of its preference and preferred profit

distribution schemes [*sic*]."  *Id.*  Commerce concluded that "[b]ased on these findings, we do not

find any practical difference between holding shareholder elections to select board members, or

the Guiyang SASAC, through GIIG, directly appointing board members by direct decree"

notwithstanding certain shareholder protections in Guizhou Tyre Co., Ltd.'s Articles of

Association.  *Id.*  Commerce found it unavailing that shareholders with 10% ownership could

nominate director candidates of their choosing, noting that GIIG was the only shareholder with

sufficient ownership to meet that threshold.  *Id.*  Commerce also addressed the contention that

shareholder voting protections in Guizhou Tyre Co., Ltd.'s AoA, such as cumulative voting and

online voting, prevented GIIG from exercising *de facto* control over the election of directors and

selection of management.  Commerce characterized the protections as "unsuccessful," finding

that "GIIG was ultimately able to dominate GTC's decision-making process, despite such

safeguards, and appoint its preferred members to GTC's board, as well as control profit

distribution."  *Id.* at 15 (footnote omitted).

   2. The Court Remands the Department's Determination of Government Control as to GTC

         Defendant has requested a remand to reconsider its separate rate determination as to

GTC.  *See* Def.'s Br. 2, 20-21.  Rather than respond substantively to GTC's arguments,

defendant "respectfully request[s] a voluntary remand, without confessing error, for Commerce

to reconsider and explain its determination with respect to assigning a separate rate to GTC."  *Id.*

at 20.  Defendant explains that "[o]ne factor that Commerce relied on in [its] analysis was its

finding that, 'GTC [i.e., Guizhou Tyre Co., Ltd.] elected members of its board of directors

through shareholders' meetings not available to all shareholders.[']"  *Id.* at 21 (quoting *Issues*

*and Decision Mem.* at 14).  Defendant called that factual finding into question by explaining that

"[i]n its brief, however, GTC has identified that a particular shareholders' meeting [of Guizhou

Tyre Co., Ltd.] that Commerce found was not available to all shareholders was, in fact, publicly

noticed and available to all shareholders."  *Id.* (citing GTC's Br. 27-28).  Defendant concludes

that because "Commerce's understanding of such record evidence has the potential to impact the

analysis concerning whether to grant GTC a separate rate in the underlying review," the

Department's concern is "substantial and legitimate," justifying a remand in this case.  *Id.*

(citations omitted).  GTC does not oppose defendant's request but maintains its challenge to the

Department's separate rate decision in the entirety.  *See* Reply of Pls. GTC 2 (July 16, 2018),

ECF No. 61.

The court exercises its discretion in considering a request for a remand.  "[I]f the agency's concern is substantial and legitimate, a remand is usually appropriate." *SKF USA, Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001) ("*SKF II*").  The court agrees that the Department's concern in this case is "substantial and legitimate" and will order a remand for Commerce to reconsider and explain its separate rate analysis with respect to the collapsed GTC entity.  Because the factual finding defendant identifies was significant to the outcome, Commerce upon remand must reconsider its separate rate determination as to GTC in the entirety, i.e., in light of all record evidence.  The court does not reach any conclusions at this time regarding the other arguments GTC directs to that determination.

<u>E. Adjustment to Prices Used to Determine Export Price and Constructed Export Price for Irrecoverable Value-Added Tax</u>

Under section 731 of the Tariff Act, 19 U.S.C. § 1673, an antidumping duty is imposed "in an amount equal to the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise."  19 U.S.C. § 1673.  The amount by which the normal value exceeds the export price or constructed export price of the subject merchandise is referred to as the "dumping margin." *Id.* § 1677(35)(A).  The prices in some of Xugong's U.S. sales of subject merchandise during the seventh review were determined on the basis of export price; others were determined on the basis of constructed export price. *See Issues and Decision Mem.* at 37.

Section 772 of the Tariff Act, 19 U.S.C. § 1677a, directs Commerce to make various adjustments (upward and downward) to "[t]he price used to establish export price and constructed export price."  19 U.S.C. § 1677a(c).  In its regulations, Commerce refers to this

unadjusted price for determining EP and CEP as the "starting price."[10]  *See* 19 C.F.R.

§ 351.402(a).  Because the export price or the constructed export price (both of which are

sometimes identified as "U.S. price") is compared to normal value, an upward adjustment to the

starting price will reduce a dumping margin, and a downward adjustment will increase one.

   Xugong's claim pertaining to Chinese value-added tax turns on the meaning of a

provision in the Tariff Act that effectuates the "export tax" adjustment.  This provision, in

section 772(c)(2)(B) of the Tariff Act (19 U.S.C. § 1677a(c)(2)(B)), reduces the starting price for

determining EP or CEP by "the amount, if included in such price, of any export tax, duty, or

other charge imposed by the exporting country on the exportation of the subject merchandise to

the United States, other than an export tax, duty, or other charge described in section 1677(6)(C)

of this title."[11]  19 U.S.C. § 1677a(c)(2)(B).  The question before the court is whether the export

tax adjustment applies to Chinese value-added taxes present in the prices of the materials

Xugong used to produce the OTR tires it exported to the United States and not refunded (i.e.,

"recovered") due to exportation.  For the reasons discussed below, the court holds that it

does not.

---

[10] The starting price for determining export price is "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States."  19 U.S.C. § 1677a(a).  The starting price for determining constructed export price is "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter."  *Id.* § 1677a(b).

[11] The "export taxes, duties, or other charges" described in section 1677(6)(C) are those which are "levied on the export of merchandise to the United States [and] specifically intended to offset the countervailable subsidy received."  19 U.S.C. § 1677(6)(C).  The countervailable subsidy offset exception is not at issue in this case.

With respect to both EP and CEP sales, Commerce "reduce[d] Xugong's U.S. sales prices by eight percent, which is the percentage of irrecoverable VAT." *Issues and Decision Mem.* at 37 (footnote omitted). Commerce considered "irrecoverable VAT" to be value-added tax that is incurred on inputs used to produce subject merchandise and that is not avoided or recovered by reason of exportation of the finished good. *Id.* at 37-38 ("Irrecoverable VAT, as defined in PRC law, is a net VAT burden that arises solely from, and is specific to, exports. It is VAT paid on inputs and raw materials used in the production of exports that is non-refundable and, therefore, a cost." (footnotes omitted)).

Xugong contests the downward, margin-increasing adjustments Commerce made to Xugong's EP and CEP starting prices on two grounds. It argues that Chinese value-added tax is not an "export tax, duty, or other charge" within the meaning of 19 U.S.C. § 1677a(c)(2)(B). *See* Xugong's Br. 6-8. In the alternative, it argues that even were Commerce entitled to treat irrecoverable VAT as an "export tax" subject to the provision, Xugong did not incur irrecoverable VAT in the amount of eight percent of its U.S. prices. *See id.* at 9-14. Because Xugong is correct that the export tax adjustment does not apply to Chinese value-added tax present in the prices of materials Xugong used to produce subject merchandise (whether or not recoverable upon export), the court does not reach Xugong's alternative argument.

The export tax provision is one of several tax-related provisions in the Tariff Act that potentially affect a dumping margin. While the export tax adjustment potentially increases a dumping margin, two other tax-related adjustment provisions—a provision addressing import duties in the exporting country and the "home market tax" adjustment provision—may reduce a dumping margin. These other tax-related provisions lend context to the intended meaning of the export tax provision.

The three tax-related provisions stem from international trade commitments under which a "fair comparison" must be made between U.S. price and normal value and under which "due allowance" must be made for differences in taxation.[12]  The provision on import duties, set forth in section 772(c)(1)(B) of the Tariff Act, makes an upward adjustment to the EP or CEP starting price to account for import duties imposed by the exporting country that are refunded or avoided by reason of exportation.  *See* 19 U.S.C. § 1677a(c)(1)(B) (adding to the starting price "the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States").  Such import duties would include, for example, duties on materials used in

---

[12] The taxation-related provisions of the Tariff Act implement Article VI of the General Agreement on Tariffs and Trade ("GATT").  Article 2.4 of the Agreement on the Implementation of Article VI of the General Agreement on Tariffs and Trade, in the form in which it was effectuated by the Uruguay Round Agreements ("GATT 1994"), provides that:

> A fair comparison shall be made between the export price and the normal value.  This comparison shall be made at the same level of trade, normally at the ex-factory level, and in respect of sales made at as nearly as possible the same time.  Due allowance shall be made in each case, on its merits, for differences which affect price comparability, including *differences in* conditions and terms of sale, *taxation*, levels of trade, quantities, physical characteristics, and any other differences which are also demonstrated to affect price comparability.

Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994, Apr. 15, 1994, Marrakesh Agreement Establishing the World Trade Organization, art. 2.4, 1868 U.N.T.S. 201 (emphasis added) (footnote omitted).  In its original form, Article VI of the GATT ("Antidumping and Countervailing Duties") provided that "[d]ue allowance shall be made in each case for differences in conditions and terms of sale, for *differences in taxation*, and for other differences affecting price comparability."  General Agreement on Tariffs and Trade, art. VI(1), Oct. 30, 1947, 61 Stat. A-11, 55 U.N.T.S. 194 (emphasis added).  The "fair comparison" language is reflected in 19 U.S.C. § 1677b(a) ("In determining under this subtitle whether subject merchandise is being, or is likely to be, sold at less than fair value, a fair comparison shall be made between the export price or constructed export price and normal value.").

producing the subject merchandise in the exporting country that are refunded as drawback or avoided by use of a similar program.

The import duty adjustment provision implicitly presumes that import duties imposed by the government of the exporting country would be present in the U.S. price of the subject merchandise unless rebated or avoided due to the exportation of the good to the United States.  If rebated or avoided due to exportation, the import duties are added to U.S. price, thereby adjusting for a difference in taxation for purposes of the comparison with normal value and reducing the dumping margin accordingly.  If the import duties are "irrecoverable," i.e., if they are not rebated or avoided by reason of the exportation, the duties presumably are included in the U.S. price and also in the price of the foreign like product when sold for consumption in the home market (or other, i.e., third-country, comparison market), and, therefore, no upward adjustment (or, of course, downward adjustment) in the EP or CEP starting price is made under this provision.  The export tax provision is, in effect, the reverse: taxes the exporting government imposes on the exportation of the good are, by definition, taxes that would not be imposed on the good if sold for consumption in the domestic market.  If present in U.S. price (whether EP or CEP), and if not levied to offset a countervailable subsidy, they are removed from the starting price in the EP or CEP determination.

The provision allowing for the "home market tax" adjustment, in 19 U.S.C. § 1677b(a)(6)(B)(iii), is similar in operation, and in purpose, to the import duty adjustment.  If the home market tax is present in the price of the foreign like product and rebated or avoided on the subject merchandise, the provision adjusts the price comparison for the difference in taxation, thereby lowering the dumping margin.  The home market tax adjustment provision reduces normal value by:

> the amount of any taxes imposed directly upon the foreign like product or
> components thereof which have been rebated, or which have not been collected,
> on the subject merchandise, but only to the extent that such taxes are added to or
> included in the price of the foreign like product.

19 U.S.C. § 1677b(a)(6)(B)(iii).  This provision applies when normal value is determined from

the price at which the foreign like product is sold in the comparison market (the home market or,

where applicable, the third-country market).  An analogous provision in 19 U.S.C. § 1677b(e)

accomplishes the same purpose when normal value is determined by the constructed value

method.

The home market tax adjustment has been understood to apply to value-added taxes

imposed by the exporting country.  *See generally Federal-Mogul Corp. v. United States*, 63 F.3d

1572 (Fed. Cir. 1995).  The history of the home market tax adjustment is, therefore, instructive

on the treatment of value-added taxes under the antidumping duty statute.  Prior to the

amendment of the Tariff Act by the Uruguay Round Agreements Act, Pub. L. No. 103-465,

108 Stat. 4809 (1994) (the "URAA"), the home market tax adjustment was effectuated as an

addition to U.S. price rather than as a reduction to normal value.  In the pre-URAA version of the

statute (as codified by the Trade Agreements Act of 1979 ("TAA")), the home market tax

adjustment provision stood alongside the import duty provision and the export tax provision in

the same section, as follows:

> The purchase price [equivalent to today's "export price"] and the exporter's sales
> price [equivalent to today's "constructed export price"] shall be adjusted by
> being—
>
> (1)      increased by—
>
>                       * * *
>
>   (B) the amount of any import duties imposed by the country of exportation
> which have been rebated, or which have not been collected, by reason of the
> exportation of the merchandise to the United States;

(C) the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation;

\* \* \*

and

(2)      reduced by—

\* \* \*

(B) the amount, if included in such price, of any export tax, duty, or other charge imposed by the country of exportation on the exportation of the merchandise to the United States other than an export tax, duty, or other charge described in section 1677(6)(C) of this title.

19 U.S.C. § 1677a(d) (1982).  The opinion of the Court of Appeals for the Federal Circuit

("Court of Appeals") in *Federal-Mogul*, which referred to the home market tax provision as the

"adjustment for Home Market (HM) taxes," 63 F.3d at 1574, discussed the provision in the

context of a recoverable value-added tax.  The case, which arose under the TAA version of the

Tariff Act, 19 U.S.C. § 1677a(d) (1982), involved a value-added tax that was imposed by the

government of the home market country, Japan, on antifriction bearings that were manufactured

and sold in Japan but not on these products when exported to the United States.  *Federal-Mogul*,

63 F.3d at 1575.

Under the TAA version of the statute, it would have been unreasonable to interpret the

export tax adjustment to apply to value-added taxes imposed by the exporting country.  Having

effectuated an adjustment to U.S. price for value-added taxes in the home market tax provision,

Congress could not also have intended to adjust for them again, in the opposite way, in the

export tax provision.  The former, like the import duty provision, potentially reduced a dumping

margin (to the extent the tax was avoided or recovered upon export), and the latter potentially

increased one (to the extent the export tax was present in the U.S. price and not levied to offset a

countervailable subsidy).  The statute used language to describe the home market taxes ("taxes

imposed *in* the country of exportation *directly upon* the exported merchandise or components

thereof") and the import duties ("any *import* duties imposed by the country of exportation") that

differed from the language it used to describe the export taxes ("any *export* tax, duty, or other

charge imposed by the country of exportation *on the exportation* of the merchandise").

19 U.S.C. § 1677a(d) (1982) (emphasis added).  In short, the statute treated export taxes quite

differently than it treated import duties and home market taxes such as value-added taxes.

Having clearly distinguished export taxes from home market taxes (as well as from import

duties), Congress could not have intended to place home market taxes such as value-added taxes

within the scope of the export tax provision.

      The next question to be answered is whether the URAA, which placed the relevant

provisions of the Tariff Act into current form, brought value-added taxes within the ambit of the

export tax adjustment.  The court concludes that it did not.  The wording of the URAA version of

the export tax adjustment essentially was identical to the previous version, indicating a lack of

intent to broaden or otherwise alter the scope.[13]  Congress made no change in the provision for

the import duty adjustment, except to add the word "subject" before the word "merchandise,"

and also retained the home market tax adjustment, albeit in modified form.  But the modification

the URAA effected in the home market tax adjustment does not demonstrate a congressional

intent to address internal taxes such as value-added taxes in the export tax provision as opposed

to the home market tax provision.  Specifically, as discussed above, the URAA converted the

---

[13] The URAA revised "imposed by the country of exportation" to "imposed by the exporting country," added the word "subject" before the word "merchandise," and added a comma following "United States."  *Compare* 19 U.S.C. § 1677a(d)(2)(B) (1982) *with* 19 U.S.C. § 1677a(c)(2)(B).

§ 1677a(d)(1)(C) (1982) upward adjustment to United States price to a downward adjustment to

normal value, where it also potentially reduces a dumping margin for recoverable value-added

taxes.  The URAA did not alter substantively the TAA's treatment of recoverable home market

taxes in the determination of constructed value, retaining the exclusion of such taxes from the

valuation of materials.[14]  The legislative history of the URAA is a further indication that

Congress intended to leave the scope of the export tax adjustment unchanged.[15]

---

[14] *Compare* 19 U.S.C. § 1677b(e) ("For purposes of paragraph (1), the cost of materials shall be determined without regard to any internal tax in the exporting country imposed on such materials or their disposition that is remitted or refunded upon exportation of the subject merchandise produced from such materials.") *with* 19 U.S.C. § 1677b(e)(1) (1982) ("For the purposes of this subtitle, the constructed value of imported merchandise shall be the sum of— (A) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) . . . .").

[15] The Statement of Administrative Action accompanying the Uruguay Round Agreements Act explained that:

> New section 772 retains the distinction in existing law between "purchase price" (now called the "export price") and "exporter[']s sales price" (now called "constructed export price").
>
> * * *
>
> Under new section 772(c)(1), Commerce will calculate export price and constructed export price by adding to the starting prices: (1) packing costs for shipment to the United States, if not included in the price; (2) import duties that are rebated or not collected due to the exportation of the merchandise (duty drawback); and (3) countervailing duties attributable to export subsidies. Section 772(c)(2) requires that Commerce reduce export price to account for: (1) transportation and other expenses, including warehousing expenses, incurred in bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States; and (2) if included in the price, export taxes or other charges imposed by the exporting country. *These adjustments have not changed from current law.*

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103–316, Vol. 1 at 822-23 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4163 (emphasis added).  The Statement of Administrative Action described the change to the home (continued . . .)

In summary, Congress expressly confined the export tax provision to export taxes, duties, and other charges on the exportation of the subject merchandise to the United States.  The provision cannot permissibly be construed to apply to a domestic home market tax such as a value-added tax, whether or not recoverable due to export.  The Department's deductions from Xugongs' EP and CEP starting prices for Chinese value-added taxes were, therefore, unlawful.

*Qingdao Qihang Tyre Co., v. United States*, 42 CIT __, 308 F. Supp. 3d 1329 (2018) ("*Qingdao Qihang*") held, as the court does here, that the Department's applying the export tax adjustment provision to home market value-added taxes is incorrect and, contrary to the government's argument in that case, cannot be sustained as reasonable under the principle of deference established by *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).[16]  Below, the court explains why the reasoning Commerce included in the Issues and

_____

(. . . continued)
market tax provision (which, as discussed herein, converted the upward adjustment to U.S. price to a downward adjustment to normal value) as follows:

> The deduction from normal value for indirect taxes constitutes a change from the existing statute.  The change is intended to ensure that the dumping margins will be tax-neutral.  The requirement that the home-market consumption taxes in question be "added to or included in the price" of the foreign like product is intended to insure that such taxes actually have been charged and paid on the home market sales used to calculate normal value, rather than charged on sales of such merchandise in the home market generally.  It would be inappropriate to reduce a foreign price by the amount of the tax, unless a tax liability had actually been incurred on that sale.

*Id.* at 827-28, *reprinted in* 1994 U.S.C.C.A.N. at 4166.

[16] In holding that the Department's interpretation of the export tax provision was an unreasonable statutory construction, *Qingdao Qihang Tyre Co. v. United States*, 42 CIT __, 308 F. Supp. 3d 1329 (2018) ("*Qingdao Qihang*") reached a result opposite to those of certain prior decisions of this Court, which accorded deference to the Department's interpretation applying 19 U.S.C. § 1677a(c)(2)(B) to irrecoverable input VAT.  *See Qingdao Qihang*, 42 CIT at __, 308 F. Supp. 3d at 1346.  The prior decisions cited therein are *Diamond Sawblades Mfrs.'* (continued . . .)

Decision Memorandum for the review at issue in this case to support its interpretation of

19 U.S.C. § 1677a(c)(2)(B) does not alter the court's conclusion.

Commerce began its analysis by citing a 2012 Federal Register notice ("Methodological

Change") in which it announced a change in its interpretation of the export tax provision. *Issues

and Decision Mem.* at 37 (citing *Methodological Change for Implementation of Section

772(c)(2)(B) of the Tariff Act of 1930, as Amended, in Certain Non-Market Economy

Antidumping Proceedings*, 77 Fed. Reg. 36,481 (Int'l Trade Admin. June 19, 2012)

("*Methodological Change*")).  Commerce explained that "[i]n this announcement, the

Department stated that, when a NME [nonmarket economy] government has imposed an export

tax, duty, or other charge on subject merchandise or on inputs used to produce subject

merchandise from which the respondent was not exempted, the Department will reduce the

respondent's EP or CEP, accordingly, by the amount of the tax, duty or charge paid, but not

rebated." *Issues and Decision Mem.* at 37 (footnote omitted).  This explanation presents two

immediate problems.

First, while the export tax provision, in some circumstances, will reduce the EP or CEP

starting price for "an export tax, duty, or other charge," 19 U.S.C. § 1677a(c)(2)(B), it is not

precisely correct to say, as the Issues and Decisions Memorandum does, that it may apply to any

---

(. . . continued)
*Coal. v. United States*, 42 CIT __, __, 301 F. Supp. 3d 1326, 1331-35 (2018); *Aristocraft of Am., LLC v. United States*, 41 CIT __, __, 269 F. Supp. 3d 1316, 1321-26 (2017); *Jacobi Carbons AB v. United States*, 41 CIT __, __, 222 F. Supp. 3d 1159, 1186-88 (2017); *Juancheng Kangtai Chem. Co. v. United States*, 41 CIT __, __, 2017 WL 218196, at *10-14 (Jan. 19, 2017); *Fushun Jinly Petrochemical Carbon Co. v. United States*, 40 CIT __, __, 2016 WL 1170876, at *8-11 (Mar. 23, 2016).  *See also Aristocraft of Am., LLC v. United States*, 43 CIT __, __, 2019 WL 1945553, at *2-3 (Apr. 17, 2019).  Commerce cited *Fushun Jinly Petrochemical Carbon Co.* in the Issues and Decision Memorandum in support of its interpretation of the export tax provision. *Issues and Decision Mem.* at 40.

such tax, duty, or charge "on subject merchandise." *Issues and Decision Mem.* at 37.  Instead,

the export tax adjustment applies only to a tax, duty, or other charge "on the *exportation* of the

subject merchandise." 19 U.S.C. § 1677a(c)(2)(B) (emphasis added).  Commerce does not

demonstrate (from record evidence or otherwise) that China actually imposed a tax on the

exportation of OTR tires, or anything resembling one.  Nor does the export tax adjustment apply

to a tax, duty, or other charge on "inputs used to produce subject merchandise." *Issues and*

*Decision Mem.* at 37.  A tax applied to materials used in the domestic production of a good

subsequently exported, whether or not rebated or avoided, is by definition not a tax on the

exportation of the finished merchandise.  The Department's formulation, which imposes the

export tax provision "on subject merchandise or on inputs used to produce subject merchandise,"

*id.*, tracks the language of the home market tax provision (as originally enacted and as amended

by the URAA) rather than the export tax provision.  *See* 19 U.S.C. § 1677a(d)(1)(C) (1982)

(applying the home market tax adjustment for "the amount of any taxes imposed in the country

of exportation directly upon the exported merchandise or components thereof"); 19 U.S.C.

§ 1677b(a)(6)(B)(iii) (applying the home market tax adjustment for "the amount of any taxes

imposed directly upon the foreign like product or components thereof").

Second, nothing in 19 U.S.C. § 1677a distinguishes between market economy and

nonmarket economy countries.  While nonmarket economy countries are treated differently than

are market economy countries in the determination of normal value, *see* 19 U.S.C. § 1677b(c),

they are not treated differently in the determination of export price and constructed export price,

*see id.* § 1677a.  Nevertheless, Methodological Change is directed solely to nonmarket economy

countries.  Were the statute to treat irrecoverable VAT as subject to the export tax adjustment

(which it does not), Commerce would be required to adjust U.S. price for irrecoverable VAT in

all antidumping duty proceedings in which it occurred, whether involving merchandise from

market economy or from nonmarket economy countries.  Methodological Change does not

indicate that Commerce intends to adopt such a practice.

The reasoning in the Issues and Decisions Memorandum is flawed in other respects as

well.  Commerce opined as follows:

> In a typical VAT system, companies do not incur any VAT expense for
> exports.  Rather, upon export, they receive a full rebate of the VAT paid on inputs
> used in the production of exports ("input VAT"), and, in the case of domestic
> sales, the company can credit the VAT they paid on input purchases for those
> sales against the VAT they collect from customers.  That stands in contrast to the
> PRC's VAT regime, where some portion of the input VAT that a company pays
> on inputs used in production of exports is not refunded.  This unrefunded amount
> differs from the amount refunded on domestic sales, and thus amount[s] to a tax,
> duty, or other charge imposed on exports that is not imposed on domestic sales.

*Issues and Decision Mem.* at 37 (footnotes omitted).  The statement that input VAT not refunded

by reason of exportation (to which Commerce referred as "irrecoverable VAT") "amount[s] to a

tax, duty or other charge imposed on exports *that is not imposed on domestic sales*," *id.*

(emphasis added), can be read to suggest that domestic sales of OTR tires in China do not incur

VAT.  But Commerce did not actually reach a finding that these sales do not incur VAT, and had

it done so, it would have been contradicted by record evidence.  *See Xuzhou Xugong Tyres Co.,

Ltd., ("Xugong") Section C Questionnaire Response for the Administrative Review of New

Pneumatic Off-The-Road Tires from the People's Republic of China* 55, Ex. C-20(1) to C-20(3)

(Feb. 4, 2016) (C.R. Docs. 74-88) (P.R. Docs. 110-111).  As the court discussed above, a tax,

duty, or other charge that actually is subject to the export tax provision, which applies only to a

tax, duty, or other charge imposed on the *exportation* of a good, is one that, by definition, is not imposed on a domestic sale of the same good.[17]

Similarly, the Department's opining that the "unrefunded amount" of input VAT "differs from the amount refunded on domestic sales" is not accompanied by an actual finding that under the PRC VAT regime *any* amount of input VAT is refunded on domestic sales. Rather, if the PRC VAT regime operates domestically as does any normal VAT regime (and there is nothing in the record or in the Department's explanation indicating it does not), the domestic producer credits the amount of input VAT incurred in the prices of materials used in production of its goods against any amount of VAT payable to government on the sales of the finished goods (i.e., the "output" VAT).[18] In this way, the domestic producer would incur a value-added tax on the value added by that producer. Even though Commerce did not find that irrecoverable VAT does not occur on domestic sales in China, Commerce nevertheless reasoned, paradoxically, that "[i]rrecoverable VAT, as defined in PRC law, is a net VAT burden that arises solely from, and is specific to, exports." *Issues and Decision Mem.* at 38 (footnote omitted).

---

[17] In *Jiangsu Senmao Bamboo and Wood Indus. Co. v. United States*, 42 CIT __, 322 F. Supp. 3d 1308 (2018) ("*Senmao*"), this Court considered specifically the question of whether record evidence supported the finding of Commerce in that review that Chinese irrecoverable VAT "amounts to a tax, duty or other charge imposed on exports that is not imposed on domestic sales." *Senmao*, 42 CIT at __, 322 F. Supp. 3d at 1342. *Senmao* concluded that this finding, which was critical to the Department's rationale, was directly contradicted by the evidence on the administrative record of the review at issue in that case.

[18] In *Senmao*, there was record evidence that a Chinese producer could credit input VAT on all materials (whether in production for domestic consumption or export) against total output VAT (on both classes of sales). *Senmao*, 42 CIT at __, 322 F. Supp. 3d at 1342-45. In this case, Xugong argues that the record evidence shows that the output VAT rate on exported OTR tires is zero. Xugong's Mem. in Support of Mot. for J. on the Agency R. 7-8 (Jan. 30, 2018), ECF Nos. 48 (conf.), 49 (public) ("Xugong's Br."). Regardless, there is no evidence that the PRC imposes an export tax, duty, or other charge on the *exportation* of OTR tires.

Commerce reasoned, further, that because irrecoverable VAT "is VAT paid on inputs and raw materials used in the production of exports that is non-refundable and, therefore, a cost," *id.* (footnote omitted), irrecoverable VAT is "an 'export tax, duty or other charge imposed' on exports of the subject merchandise to the United States."[19]  Continuing on this line of reasoning, Commerce stated that "[t]he statute does not define the terms 'export tax, duty, or other charge imposed' on the exportation of subject merchandise" and that "[w]e find it reasonable to interpret these terms as encompassing irrecoverable VAT because the irrecoverable VAT is a cost that arises as a result of export sales."  *Id.*

The Department's rationale is, essentially, that the statute treats irrecoverable value-added tax as an export tax subject to the export tax adjustment because it is irrecoverable.  That is directly contrary to the treatment the statute accords to home market taxes.  As the court has explained, Congress, having addressed value-added taxes in the home market tax provision and export taxes in the export tax provision, could not have intended for value-added taxes (whether or not recoverable) to fall within both provisions.  Moreover, by identifying only recoverable home market taxes as qualifying for the home market tax adjustment, Congress indicated its

---

[19] Recently, Commerce adopted an entirely different method and rationale for applying the export tax provision to a good exported from China.  Rather than applying § 1677a(c)(2)(B) to what it considered to be irrecoverable *input* VAT, as it did in this case, Commerce applied the provision to *output* VAT and did so without regard to the credit for input VAT that the producer incurred on the purchase of materials used in the production of the exported merchandise.  *See Jacobi Carbons v. United States*, 43 CIT __, 2019 WL 1012796 (Mar. 4, 2019) ("*Jacobi I*"); *Jacobi Carbons v. United States*, 43 CIT __, 2019 WL 1049246 (Mar. 5, 2019) ("*Jacobi II*").  In reasoning that is at variance with the holding and reasoning in *Qingdao Qihang*, *Jacobi I* and *Jacobi II* upheld the Department's new construction as reasonable according to the deference principle of *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  *See Jacobi I*, 43 CIT at __, 2019 WL 1012796, at *8-16; *Jacobi II*, 43 CIT at __, 2019 WL 1049246, at *7-15.

awareness of the existence of irrecoverable home market taxes.  Nowhere in the statute did it

designate them as taxes subject to the export tax adjustment.

Nor does the statutory formulation "export tax, duty, *or other charge*," 19 U.S.C.

§ 1677a(c)(2)(B) (emphasis added), lend anything to the Department's analysis.  Commerce

itself regards Chinese value-added tax as a "tax" that is imposed on materials used domestically

to produce OTR tires, some portion of which, according to Commerce, may be avoided or

rebated by reason of subsequent exportation of the finished good.  But whether or not recovered

by reason of exportation, the value-added tax imposed by the PRC, as Commerce itself describes

it, cannot lawfully be deemed a tax "on the exportation of the subject merchandise" within the

intended meaning of 19 U.S.C. § 1677a(c)(2)(B).

The Department further stated that its "adjustment for irrecoverable VAT achieves what

is called for under section 772(c)(2)(B) of the Act [19 U.S.C. § 1677a(c)(2)(B)], as it reduces the

gross U.S. price charged to the customer to a net price received.  This deduction is consistent

with our longstanding policy, which is consistent with the intent of the statute, *i.e.*, that dumping

margin calculations be tax neutral."  *Issues and Decision Mem.* at 38 (citing, inter alia,

*Methodological Change*, 77 Fed. Reg. at 36,483).  This "tax-neutral" justification for the

Department's deduction is unavailing.  The statute itself specifies the tax-related adjustments that

Commerce is directed to make to adjust for differences in taxation, for purposes of the

comparison of EP or CEP to normal value.  The statute provides for a margin-reducing

adjustment for recoverable value-added tax (not applicable here, in this nonmarket economy

country proceeding, because normal value was not determined based on home market price or

other comparison market price).  It does not authorize Commerce to make a margin-*increasing*

adjustment for value-added tax that is not recoverable, whether or not the good is exported from

a nonmarket economy country.  Commerce may not rewrite the statute in a misguided attempt to

adjust U.S. price downward for home market taxes that it considers to be present in that price.

Nor is it free to bring about what it considers a "tax-neutral" result by any means it sees fit.  The

statute confines the export tax adjustment to taxes, duties, and other charges imposed on the

exportation of the good and does not apply it to home market taxes on the good or the materials

incorporated therein.  It is no more permissible for Commerce to adjust U.S. price downward for

irrecoverable value-added tax than it would be for Commerce to adjust U.S. price downward for

irrecoverable import duty that also may be present in the U.S. price.  In each case, the statute

speaks directly to the adjustment that is to be made.

In summary, Commerce has made downward adjustments in calculating the EP and CEP

for subject merchandise exported by Xugong based on an impermissible construction of the

export tax provision of 19 U.S.C. § 1677a(c)(2)(B).  Therefore, Commerce must correct this

error in responding to the court's Opinion and Order in this proceeding.

<u>F. The All-Others Rate as Applied to Separate Rate Respondents</u>

Trelleborg, Qingdao Qihang, Full World, and Zhongwei are parties to this litigation and

were assigned the all-others rate of 33.14% in the seventh administrative review.  Both in its

briefings and at oral argument, defendant indicated that Commerce does not oppose this claim,

should it be determined judicially that revision in the rates of the examined respondents is

required.  Def.'s Br. 28; Oral Argument (Dec. 6, 2018), ECF No. 67.  Because Trelleborg,

Qingdao Qihang, Full World, and Zhongwei contested the Final Results as plaintiffs, they will

qualify for relief that ultimately results from any recalculation of the individually-determined

rate applicable to Xugong or to an individually-determined rate for GTC, should one be

forthcoming.  Should Aeolus be determined to qualify for a separate rate, it also will qualify

for relief.

### III. Conclusion and Order

For the reasons discussed in the foregoing, the court remands to Commerce the decision

published as *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China:*

*Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 18,733

(Int'l Trade Admin. Apr. 21, 2017) ("*Final Results*") and amended as *Certain New Pneumatic*

*Off-the-Road Tires From the People's Republic of China: Amended Final Results of*

*Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 27,224 (Int'l Trade Admin.

June 14, 2017) ("*Amended Final Results*") for reconsideration according to the decisions the

court reaches in this Opinion and Order.  Therefore, upon consideration of all papers and

proceedings had herein, and upon due deliberation, it is hereby

**ORDERED** that Commerce shall submit a new determination upon remand ("Remand
Redetermination") in which it reconsiders its decisions not to assign separate rates to GTC and
Aeolus and redetermines the dumping margins for those respondents as required by its
reconsideration of those decisions; it is further

**ORDERED** that Commerce, in the Remand Redetermination, shall recalculate export
price and constructed export price for Xugong without making deductions for Chinese value-
added tax; it is further

**ORDERED** that Commerce will redetermine the weighted average dumping margin for
Xugong and also the rates to be assigned to all other qualifying separate rate respondents that are
plaintiffs in this action; it is further

**ORDERED** that Commerce will submit its Remand Redetermination within 90 days of
the date of this Opinion and Order; it is further

**ORDERED** that comments of plaintiffs on the Remand Redetermination must be filed
with the court no later than 30 days after the filing of the Remand Redetermination; and it is
further

**ORDERED** that the response of defendant to the aforementioned comments must be filed no later than 15 days from the date on which the last comment is filed.

/s/ Timothy C. Stanceu
Timothy C. Stanceu, Chief Judge

Dated:  May 24, 2019
           New York, New York