Slip Op. No. 21-60

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **GUIZHOU TYRE CO., LTD. AND GUIZHOU TYRE IMPORT AND EXPORT CO., LTD., et al.** | |
| Plaintiffs, | **Before: Timothy C. Stanceu, Judge** |
| v. | **Consol. Court No. 17-00100** |
| **UNITED STATES**, | |
| Defendant. | |

## OPINION AND ORDER

[Sustaining in part, and remanding in part, an agency decision issued in response to court order in litigation involving a review of an antidumping duty order on off-the-road tires from the People's Republic of China.]

Dated:  May 14, 2021

*Ned H. Marshak* and *Brandon M. Petelin*, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY, argued for plaintiffs Guizhou Tyre Co., Ltd., Guizhou Tyre Import and Export Co., Ltd., Aeolus Tyre Co., Ltd., Qingdao Free Trade Zone Full-World International Trading Co., Ltd., and Qingdao Qihang Tyre Co., Ltd.  With them on the brief were *Jordan C. Kahn* and *Elaine F. Wang*.

*Douglas J. Heffner* and *Richard P. Ferrin*, Drinker Biddle & Reath, LLP, of Washington, D.C., for plaintiffs Trelleborg Wheel Systems (Xingtai) Co., Ltd. and Xuzhou Xugong Tyres Co., Ltd.

*Robert K. Williams* and *Lara A. Austrins*, Clark Hill PLC, of Chicago, IL, for plaintiff Weihai Zhongwei Rubber Co., Ltd.

*John J. Todor*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant. With him on the brief were *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director.  Of counsel on the brief was *Paul K. Keith*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

Stanceu, Judge:  Before the court is a decision the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") issued in response to the court's opinion and order in *Guizhou Tyre Co., Ltd. v. United States*, 43 CIT __, 389 F. Supp. 3d 1350 (2019) ("*Guizhou I*"). The court sustains this decision in part and remands it in part.

## I. Background

Before the court are the *Final Results of Redetermination Pursuant to Court Remand* (Sept. 23, 2019), ECF No. 74 (conf.); (Oct. 10, 2019), ECF No. 81 (public) (the "*Remand Redetermination*").  Background on this litigation is presented in *Guizhou I*, 43 CIT at __, 389 F. Supp. 3d at 1353–55, and summarized and supplemented below.

Following an investigation, Commerce in 2008 issued an antidumping duty order (the "Order") on certain off-the-road tires from the People's Republic of China ("China" or the "PRC") under the authority of 19 U.S.C. § 1673d(a).[1]

---

[1] Citations to the United States Code are to the 2012 edition.

*Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Notice of Amended Final Affirmative Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 73 Fed. Reg. 51,624 (Int'l Trade Admin. Sept. 4, 2008) (the "*Order*").

In 2017, Commerce, under 19 U.S.C. § 1675(a), published the final results of the seventh periodic administrative review of the Order (the "Final Results"), which is the administrative decision plaintiffs contested in commencing this litigation according to the judicial review provisions of 19 U.S.C. § 1516a. *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 18,733 (Int'l Trade Admin. Apr. 21, 2017) (P.R. Doc. 312) ("*Final Results*").[2]  To correct certain ministerial errors (which are not at issue in this litigation), the Department later amended the Final Results.  *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 27,224 (Int'l Trade Admin. June 14, 2017) ("*Amended Final Results*").

---

[2] All citations to record documents are to public versions.  References cited as "P.R. Doc. __" are to documents that were on the record of the proceeding at issue in *Guizhou Tyre Co., Ltd. v. United States*, 43 CIT __, 389 F. Supp. 3d 1350 (2019) ("*Guizhou I*"), while references cited as "Remand P.R. Doc. __" are to documents placed on the agency record during the remand proceedings.

Commerce incorporated by reference in the Final Results a final "Issues and Decision Memorandum" ("Final I&D Memorandum") that contains explanatory discussion. *Issues and Decision Memorandum for Final Results of Antidumping Duty Administrative Review: Certain New Pneumatic Off-the-Road Tires from the People's Republic of China; 2014-2015* (Int'l Trade Admin. Apr. 12, 2017) (P.R. Doc. 308) ("*Final I&D Mem.*").

The seven plaintiffs in this consolidated case, all of which are respondents in the administrative proceeding below, include two "mandatory" respondents, i.e., respondents Commerce selected for individual examination in the seventh review. They were: (1) Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd. (collectively, "GTC"), which Commerce treated as a single entity; and (2) Xuzhou Xugong Tyres Co., Ltd., Armour Rubber Co. Ltd., and Xuzhou Hanbang Tyre Co., Ltd. (collectively, "Xugong"), which Commerce also treated as a single entity during the seventh review. *Final Results*, 82 Fed. Reg. at 18,733–34. In the Final Results, Commerce assigned Xugong an individual weighted-average dumping margin rate of 33.08%. *Id.* at 18,735. Commerce assigned GTC the rate that, under its practice, Commerce assigns to an exporter it considers to be part of an entity consisting of all exporters of the subject merchandise that it determines not to have rebutted its presumption of government control of export functions. Commerce referred to this entity in the

Final Results as the "PRC-wide entity." *Id*. For the Final Results, Commerce applied a "PRC-wide" rate of 105.31% to this entity and, thus, to GTC, *id.*, a rate Commerce carried over from prior reviews, *id.* at 18,735 n.16.

Plaintiff Aeolus Tyre Co., Ltd. ("Aeolus"), (Ct. No. 17-00102), another respondent Commerce determined not to have rebutted its presumption of government control over export functions, also was assigned the PRC-wide rate of 105.31% in the Final Results. *Id*.

Plaintiffs Qingdao Qihang Tyre Co., Ltd. ("Qingdao Qihang"), Qingdao Free Trade Zone Full-World International Trading Co., Ltd. ("Full World"), Trelleborg Wheel Systems (Xingtai) China, Co., Ltd. ("Trelleborg"), and Weihai Zhongwei Rubber Co., Ltd. ("Zhongwei"), are entities that Commerce determined in the seventh review to have rebutted its presumption of government control and therefore to have qualified for a "separate rate," i.e., a rate separate from the rate assigned to the PRC-wide entity. *Id*. Commerce did not examine these entities individually and, therefore, did not calculate an individually-determined rate for any of them. Instead, Commerce assigned a rate of 33.08% to Qingdao Qihang, Full World, Trelleborg, and Zhongwei based on the margin it determined for mandatory respondent Xugong. *Id*.

Commerce later corrected a ministerial error and amended Xugong's separate individual weighted-average dumping margin to 33.14%. *Amended*

*Final Results*, 82 Fed. Reg. at 27,225.  Commerce then applied Xugong's revised

rate to Qingdao Qihang, Full World, Trelleborg, and Zhongwei.  *Id*.  Commerce

made no change in the 105.31% rate it applied to the companies it determined to

be part of the PRC-wide entity.  *Id*.

On January 30, 2018, six plaintiffs—mandatory respondents Xugong and

GTC, and separate rate respondents Aeolus, Qingdao Qihang, Full World, and

Trelleborg—moved for judgment on the agency record under USCIT Rule 56.2.

Mots. for J. on Agency R., ECF Nos. 48–56 (conf. & public).[3]  In response to GTC's

motion, defendant requested a remand to allow Commerce to reconsider GTC's

eligibility for separate rate status.  Def.'s Resp. to Mots. for J. on the Agency R.

1-2 (June 1, 2018), ECF No. 58.  Defendant opposed the motions in all other

respects.  *Id*.

In *Guizhou I*, the court granted defendant's request for a remand to allow

Commerce to reconsider its separate rate determination as to GTC.  *Guizhou I*,

43 CIT at __, 389 F. Supp. 3d at 1360.  The court concluded that Commerce's

determination that Aeolus did not qualify for a separate rate was unsupported

by substantial evidence and remanded that determination to Commerce for

reconsideration in light of all record evidence.  *Id*. at __, 389 F. Supp. 3d at 1359.

---

[3] Plaintiff Zhongwei did not submit briefing in this case.

The court noted, in particular, that Commerce did not mention a "Rectification

Report" that Aeolus claimed demonstrated its independence from government

control. *Id*. at __, 389 F. Supp. 3d at 1358.  Additionally, the court held that

Commerce acted contrary to law in effecting reductions to Xugong's "U.S. price"

(export price or constructed export price) for Chinese value-added tax ("VAT"),

*id*. at __, 389 F. Supp. 3d at 1361, and directed Commerce to redetermine

Xugong's weighted average dumping margin without making deductions for

VAT, *id*. at __, 389 F. Supp. 3d at 1370.  Finally, because Full World, Qingdao,

Trelleborg, and Zhongwei timely contested the Final Results as plaintiffs, the

court ruled that these plaintiffs would be entitled to any relief that resulted from

the recalculation of Xugong's individually-determined rate.  *Id*. at __, 389 F.

Supp. 3d at 1370.

     Following the court's decision in *Guizhou I*, Commerce prepared a draft

remand redetermination and released it to the parties on August 9, 2019.  *Remand*

*Redetermination* 2 (citing *Draft Results of Redetermination Pursuant to Ct. Remand*

(Aug. 9, 2019) ("*Draft Results*")), upon which GTC and Aeolus commented before

the agency.  *GTC and Aeolus' Comments on the Department's Draft Remand*

*Redetermination* (Aug. 23, 2019) (Remand P.R. Doc. 5).

     In the instant Remand Redetermination, submitted on September 23, 2019,

Commerce, under protest, redetermined Xugong's margin by eliminating the

Department's previous VAT deductions from U.S. price, resulting in a recalculated margin of 16.78%. *Remand Redetermination* 3–4, 43. Based on Xugong's redetermined margin, Commerce assigned rates of 16.78% to Full World, Qingdao Qihang, Trelleborg, and Zhongwei. *Id.* at 43. Commerce again determined that Aeolus failed to rebut its presumption of government control. *Id.* at 14 (". . . there remains *de facto* government control over Aeolus . . ."). Commerce reached the same conclusion as to GTC. *Id.* at 16 (". . . we continue to find that GTC is ineligible for a separate rate in the underlying review because it is not free from *de facto* government control over its export activities.").

Six plaintiffs filed comments on the Remand Redetermination. Comments of Consol. Pl[s]. Xuzhou Xugong Tyres Co., Ltd. and Trelleborg Wheel Systems (Xingtai) Co., Ltd. on Final Results of Redetermination Pursuant to Ct. Remand from Slip Op. 10-64 (CIT May 24, 2019) (Nov. 22, 2019), ECF No. 83 ("Xugong's & Trelleborg's Comments"); [GTC's] Comments on Final Remand Redetermination (Nov. 22, 2019), ECF Nos. 84 (conf.), 85 (public) ("GTC's Comments"); Aeolus' Comments on Final Remand Redetermination (Nov. 22, 2019), ECF Nos. 86 (conf.), 87 (public) ("Aeolus's Comments"); Comments [of Full World & Qingdao Qihang] on Final Remand Redetermination (Nov. 22, 2019), ECF No. 88 ("Qingdao's Comments"). Thereafter, defendant responded to the parties'

comments.  Def.'s Resp. to Comments on Remand Results (Feb. 21, 2020), ECF

Nos. 97 (conf.), 98 (public) ("Def.'s Resp. to Comments").

As noted in *Guizhou I*, in this litigation no party challenged the legal basis

for the Department's assigning the 105.31% PRC-wide rate to all respondents it

determined to have failed to rebut its presumption of control by the government

of China.  *Guizhou I*, 43 CIT at __ n.3, 389 F. Supp. 3d at 1354 n.3.  Aeolus and

GTC instead have confined their challenges to the Department's determination

that each failed to rebut the presumption of *de facto* government control.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

Section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c) vests

the court with subject-matter jurisdiction of a civil action arising under

subsections 516A(a)(2)(A)(i)(I) and 516A(a)(2)(B)(iii) of the Tariff Act of 1930 (the

"Tariff Act"), *codified as amended*, 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I),

1516a(a)(2)(B)(iii), which together authorize judicial review of a final

determination in an antidumping duty administrative review proceeding

conducted under section 751(a), *codified as amended*, 19 U.S.C. § 1675(a).  In

reviewing a final determination, the court "shall hold unlawful any

determination, finding, or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i).  Substantial evidence refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting *Consol. Edison Co. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229 (1938)).

## B. Redetermined Margin for Xugong upon Elimination of the Unlawful Deduction for Chinese Value-Added Tax

Commerce, under protest, redetermined Xugong's individually-determined weighted-average dumping margin upon recalculating export price and constructed export price to remove the deductions it made from U.S. price for Chinese value-added tax, reducing the margin from 33.14% to 16.78%.[4] *Remand Redetermination* 3–4, 43.  Because the Department's elimination of the VAT deduction conforms to the court's remand order in *Guizhou I* and is based on the correct interpretation of the governing statutory provisions, and because Xugong raises no objection, the court sustains the Department's decision to assign the new margin of 16.78% to Xugong.

---

[4] Although stating that Commerce is removing its VAT deduction under protest, the Remand Redetermination states no reasons why Commerce disagrees with the court's holding and reasoning on this issue, as are set forth in *Guizhou I*.

### C. Redetermined Margins for the Unexamined Separate Rate Respondents Full World, Qingdao Qihang, Trelleborg, and Zhongwei

In the Remand Redetermination, Commerce applied the margin it redetermined for Xugong (16.78%) to the unexamined separate-rate respondents, i.e., Full World, Qingdao Qihang, Trelleborg, and Zhongwei. Full World, Qingdao Qihang, and Trelleborg expressly agree with the elimination of the VAT deductions and the assignment of this redetermined rate. Xugong's & Trelleborg's Comments 1–2; Qingdao's Comments 1. Defendant advocates that the court sustain the Remand Redetermination in the entirety, Def.'s Resp. to Comments 2, and, specifically, raises no objection to the comments of the separate rate respondents advocating that the court sustain the Remand Results as to the assignment of the 16.78% margin. Because Full World, Qingdao Qihang, and Trelleborg expressly concur, because Zhongwei filed no objection, and because the Department's decision to assign the 16.78% rate to Full World, Qingdao Qihang, Trelleborg, and Zhongwei conforms to the court's previous Opinion and Order, the court sustains this decision.

It is possible that Commerce, on remand, will revise the margin it assigned to GTC, a mandatory respondent, in further proceedings required by this Opinion and Order. Normally, Commerce would base the rate to be assigned to the separate rate respondents on the margins determined for the

mandatory respondents.  Nevertheless, Full World, Qingdao Qihang, and

Trelleborg, having commented that they should be assigned the rate of 16.78% in

accordance with the Department's Remand Redetermination, have waived any

claim that their rates should be redetermined in further proceedings.  Because it

filed no objection, Zhongwei also has waived any such claim.  By advocating that

the court sustain the Remand Redetermination in the entirety and by raising no

objection in its response to the comments of Full World, Qingdao Qihang, and

Trelleborg advocating that the court sustain the assignment of the 16.78% rate,

defendant also has waived any argument to the contrary.  Accordingly, the court

sustains the assignment of the 16.78% rate to the four unexamined separate-rate

respondents.

### D. Decisions on Separate Rate Status for Aeolus and GTC

In the seventh review, Commerce followed its usual practice for

antidumping duty proceedings involving countries it designates as nonmarket

economy ("NME") countries, such as China, by presuming all companies within

the country to be government controlled.  *Remand Redetermination* 6.  "Under this

presumption, exporters in an NME receive the country-wide rate, unless the

exporter can rebut this presumption by affirmatively demonstrating its

entitlement to a separate, company-specific margin by showing an absence of

government control, both in law and fact, with respect to its export activities."

*Id.* (citing *Sigma Corp. v. United States*, 117 F. 3d 1401, 1405 (Fed. Cir. 1997)).

For the Final Results, Commerce found that Aeolus and GTC had

demonstrated *de jure*, but not *de facto*, independence from government control

over their export activities. *Final I&D Mem.* 6, 8–9. In the Remand

Redetermination, Commerce again concluded that neither Aeolus nor GTC had

rebutted the Department's presumption. Accordingly, Commerce assigned to

both the PRC-wide rate of 105.31%, as it had in the Final Results. In explaining

the reasoning behind this decision, the Remand Redetermination states that:

> Typically, Commerce considers four factors in evaluating whether
> each respondent is subject to *de facto* government control of its
> export functions: (1) whether the export prices are set by or are
> subject to the approval of a government authority; (2) whether the
> respondent has authority to negotiate and sign contracts and other
> agreements; (3) whether the respondent has autonomy from the
> government in making decisions regarding the selection of
> management; and (4) whether the respondent retains the proceeds
> of its export sales and makes independent decisions regarding
> disposition of profits or financing of losses.

*Remand Redetermination* 7 (footnote omitted).[5] The Remand Redetermination

states, further, that "Commerce's separate rate test examines all four *de facto*

---

[5] In citing these factors, Commerce does not identify a statute or
regulation and relies instead on two of its own prior decisions: *Final
Determination of Sales at Less than Fair Value: Silicon Carbide from the People's
Republic of China*, 59 Fed. Reg. 22,585, 22,586–87 (Int'l Trade Admin. May 2, 1994)
(continued . . .)

criteria," *id*. at 41, but also contains, in the same paragraph, the contradicting

statement that "[i]f a respondent is unable to rebut one of the four *de facto* criteria,

the company is ineligible for a separate rate," *id*. at 42 (citing *Zhejiang Quzhou*

*Lianzhou Refrigerants Co., Ltd. v. United States*, 42 CIT __, 350 F. Supp. 3d 1308,

1313 (2018)).

Defendant argues in its response to comments that "Commerce may deny

a request for a separate rate if an applicant fails to demonstrate separation from

the government with respect to any one of the *de jure* or *de facto* criteria" and that

"if an applicant fails to establish any one of the *de jure* or *de facto* criteria,

Commerce is not required to continue its analysis and determine whether the

applicant has, or has not, established the other applicable criteria." Def.'s Resp.

to Comments 9 (citing *Yantai CMC Bearing Co. v. United States*, 41 CIT __, 203 F.

Supp. 3d 1317 (2017)). In addition to *Yantai CMC Bearing Co.*, defendant relies on

*Advanced Tech. & Materials Co. v. United States*, 37 CIT 1487, 938 F. Supp. 2d 1342

(2013), *aff'd*, 581 F. App'x 900 (Fed. Cir. 2014).[6] Def.'s Resp. to Comments 9.

---

(. . . continued)
and *Notice of Final Determination of Sales at Less Than Fair Value: Furfuryl Alcohol
from the People's Republic of China*, 60 Fed. Reg. 22,544, 22,545 (May 8, 1995).

[6] This summary affirmance, issued according to U.S. Court of Appeals for
the Federal Circuit Rule 36, is not a precedential decision. *See Advanced Tech. &
Materials Co. v. United States*, 581 F. App'x 900 (Fed. Cir. 2014).

Neither decision was based on facts analogous to those of the review at issue.

In *Advanced Tech. & Materials Co.*, the respondent attempting to rebut the

Department's presumption was majority-owned by an entity that was 100%

owned by a PRC government entity.  37 CIT at 1494, 938 F. Supp. 2d at 1348.

Similarly, in *Yantai CMC Bearing Co.*, the respondent at issue, Yantai CMC

Bearing Co. ("Yantai CMC"), had a "chain of ownership" that "extended to the

Chinese government because Yantai CMC is more than majority owned by CMC

[China National Machinery Import & Export Corporation], which is, in turn,

more than majority owned by Genertec, and Genertec is wholly-owned by the

State-owned Assets Supervision and Administration of the State Council

('SASAC')."  41 CIT at __, 203 F. Supp. at 1323 (citations omitted).

          In contrast, neither Aeolus nor GTC had an ownership structure in which

government entities owned a majority share during the POR.  As to Aeolus,

China Chemical Rubber Co., Ltd. ("China Chem Rubber") had a 42.58%

ownership share, the largest share of any company, and this shareholder was

100% owned by a state-owned enterprise, China National Chemical Corporation

("ChinaChem"), which was under the supervision of China's national State-

owned Assets Supervision & Administration Commission ("SASAC").  *Final I&D

Mem.* 10, *Remand Redetermination* 7 (citations omitted).  Commerce further found

that during the POR three other state-owned enterprises owned an additional

6.48% of Aeolus, resulting in a total ownership by state-controlled enterprises of 49.06%. *Final I&D Mem.* 10, *Remand Redetermination* 7. As to GTC, Commerce found according to record evidence that Guiyang Industry Investment (Group) Co., Ltd. ("GIIG") owned a 25.20% interest and was GTC's largest shareholder. *Final I&D Mem.* 13, *Remand Redetermination* 17. GIIG was entirely owned by the Guiyang Municipal State-owned Assets Supervision & Administration Commission ("Guiyang SASAC"). *Remand Redetermination* 17.

While explaining that failure to satisfy any one of the four stated factors is sufficient to deny a respondent separate rate status, the Remand Redetermination also states that "in cases where a respondent was not majority owned by the government, Commerce has examined the totality of the circumstances and made a reasonable inference that the respondent does not control its export activities by examining the four *de facto* criteria, as Commerce has done here." *Id.* at 42 (citations omitted). The court cannot agree that Commerce examined the four criteria. Instead of examining the four criteria, the Remand Redetermination presumes, without evidentiary support, that the Department's finding of a lack of autonomy in the selection of management was the factual equivalent of a finding that the Chinese government controlled what Commerce termed a company's "export activities," *Remand Redetermination* 6, or "export functions," *id.* at 7, during the POR. Nor can the court agree that, on this record, Commerce

made what can be described as a "reasonable inference."  Under the applicable

standard of review, the court may not sustain a factual finding that ignores

record evidence and relies upon speculation.[7]

    The court begins its substantial evidence review of the Department's

findings that Aeolus's and GTC's export functions were government controlled

by considering the method and purpose of an administrative review of an

antidumping duty order under the Tariff Act.  Under the administrative review

procedure of 19 U.S.C. § 1675(a), the Tariff Act employs a "retrospective" method

of antidumping duty assessment.  Duties are assessed following the finality of

the results of the review, upon liquidation of the entries of merchandise that are

subject to it.  Stated briefly, the purpose of the review is to determine,

retrospectively, whether and at what rate those entries are to be assessed

antidumping duties as a remedial measure for "price discrimination," i.e., the

sale of the subject merchandise in the United States at less than normal value.

*See* 19 U.S.C. § 1675(a)(2)(A) (directing Commerce to determine, in the review,

"the normal value and export price (or constructed export price) of each entry of

---

[7] In remanding to Commerce an administrative decision denying separate rate status, this Court, questioning the Department's analysis, inquired as to how the Department's finding of majority equity ownership by an entity Commerce found to be government-controlled "translates into control of export functions." *Jilin Forest Indus. Jinqiao Flooring Grp. Co., Ltd. v. United States* at 12, Slip Op. 21-49 (Apr. 29, 2021).

the subject merchandise, and . . . the dumping margin for each such entry").

Under this retrospective method, the entries subject to the review already have

occurred by the time Commerce conducts its review under 19 U.S.C.

§ 1675(a)(2)(A), during which Commerce, under its typical practice, determines a

weighted average dumping margin for the exporter by examining the data on the

exporter's prior sales that occurred during the POR, particularly, the prices at

which the exported subject merchandise was sold into the U.S. market.

      In an administrative review involving subject merchandise from a country

Commerce determines according to 19 U.S.C. § 1677(18) to be an NME country,

such as China, Commerce ordinarily determines normal value according to the

special procedures of 19 U.S.C. § 1677b(c), as it did in this review, under which

Commerce determines normal value by valuing factors of production according

to "surrogate" values obtained from market economy countries.  *See* 19 U.S.C.

§ 1677b(c)(1).  That leaves the "U.S. price" of the exported subject merchandise

(i.e., export price or, alternatively, constructed export price) as the only

determinant of a dumping margin that is dependent on prices grounded in

economic activity in China.  Because Commerce has identified a respondent's

"export functions" (or "activities") as the subject of its separate rate inquiry, the

court, in reviewing a decision placing an exporter within the Department's

"PRC-wide" entity consisting of all government-controlled exporters of the

subject merchandise, necessarily must review the Department's factual identification of the price discriminator, i.e., the party that controlled the setting of the U.S. price of the exported subject merchandise, during the POR.

In the seventh review, the Department's rationale for including Aeolus and GTC within the PRC-wide entity was that both were parts of a single entity composed of all Chinese exporters of the subject merchandise whose export functions were controlled by the PRC government, and to which Commerce assigned the single antidumping duty rate of 105.31%. *See Final I&D Mem.* 6–7. As the court has explained, by the time Commerce made its separate rate determinations for Aeolus and GTC, all sales and entries upon which the final results of the review were based already had occurred. In other words, if there was price discrimination, i.e., U.S. sales at less than normal value, to be remedied under the antidumping laws, it already had occurred by the time Commerce conducted the seventh review. In light of the retrospective method by which a review of an antidumping duty order is conducted and the purpose of the review, i.e., remedying price discrimination, the issue this case presents is whether the Department's inclusions of Aeolus and GTC within the PRC-wide entity were supported by valid factual findings that the Chinese government, rather than Aeolus or GTC, controlled the prices at which these companies' subject off-the-road tires were sold for export during the POR. Because

Commerce, in the Remand Redetermination, did not apply the first of its

factors—which inquires as to whether the export prices are set by or are subject

to the approval of a government authority—the court has no such finding of fact

to subject to judicial review under the substantial evidence standard.

    The issue presented affects the two respondents differently.  For GTC, a

mandatory respondent, a valid finding by Commerce that the Chinese

government, rather than GTC, set or controlled the prices at which GTC's subject

off-the-road tires were sold for export to the United States during the POR is

critical to a decision on whether GTC is to be assigned a rate other than one

based on an examination of GTC's own sales.  For Aeolus, which was not

individually examined, the issue is whether Aeolus, by setting its prices for

exported subject tires free of governmental control during the POR, qualifies for

a rate Commerce determines for an unexamined separate rate respondent.

    Because dumping is a comparison between normal value and export price

(or constructed export price), the absence of findings of fact on the issue of

whether the PRC government, as opposed to Aeolus or GTC, was the agent

controlling the price of the subject exported merchandise is a critical omission

from the Department's analysis.  This is all the more so because, as discussed

previously, the methodology by which Commerce, in practically all cases

(including this one), calculates dumping margins for Chinese exporters ensures

that there is no factual relationship between prices and costs in China and the

method of determining normal value. As the court also has explained, the

Department's determination of normal value according to NME-country

procedures relies on values obtained from market economy countries rather than

prices for inputs in China, leaving U.S. price as the only determinant of a

dumping margin that is dependent on prices grounded in economic activity

occurring in China. Despite this, in the seventh review both Aeolus and GTC

were assigned the PRC-wide rate of 105.31%, a rate that had no factual

relationship to the export prices or constructed export prices of the subject

merchandise that Aeolus and GTC exported to the United States or to the export

prices or constructed export prices (based on Xugong's sales) that Commerce

used to determine a collective rate for the separate rate respondents.

Under the separate-rate methodology Commerce applied to Aeolus and

GTC in the Final Results and again in the Remand Redetermination, the sole

reason export price and constructed export price became irrelevant to the

antidumping duty rate applied to Aeolus and GTC was the Department's

insistence that the government of China controlled the export functions of these

two respondents. That conclusion rings hollow in the absence of actual findings,

supported by substantial record evidence, on whether the PRC government, and

not the respondents, controlled the prices of the exported merchandise subject to

the review.  Here, not only did both exporters place information on the record

from which they argue that the Chinese government did not control their

activities generally, they also introduced evidence to support their specific

contentions that they maintained control over their own prices for the exported

subject merchandise.  *See* Aeolus's Comments 23–27, GTC's Comments 21–26.

Under the Department's "rebuttable presumption" method of determining

government control over export functions, the introduction of that evidence was

at least sufficient to require Commerce to make retrospective determinations,

based on a full consideration of the entire record, on the issue of whether the

PRC government actually did control these respondents' export pricing decisions

during the POR.

In challenging the Final Results, Aeolus argued that "Commerce relied

exclusively on SOE [state-owned-enterprise] ownership and petitioners' website

printouts to deny Aeolus' separate rate based only on the 'selection of

management' *de facto* criterion" instead of applying all four factors of its stated

analysis.  Mem. of Law in Supp. of Mot. for J. on the Agency R. of Consol. Pl.

Aeolus Tyre Co., Ltd. 20 (Jan. 30, 2018), ECF No. 56 ("Aeolus's Br.").  It argued,

further, that the 49.06% level of ownership by state-owned enterprises does not

establish government control over Aeolus's business decisions, let alone its

export activities, and that the Department's findings to the contrary, which

treated the level of ownership as "dispositive," were "mere speculation." *Id.*

at 15.  According to Aeolus, "[t]here is no evidence that the PRC government

interfered with Aeolus' export activities—the focus of Commerce's separate rate

test," *id.*, and "Commerce's finding that the PRC government controlled Aeolus'

export decisions is not supported by any record evidence; rather, it is based

entirely on speculation," *id.* at 24 (citation omitted).  Aeolus maintained that it

"submitted uncontroverted evidence that it: independently sets export prices;

has negotiating authority; selects management independently; retains the

proceeds of its export sales; and makes independent decisions regarding the

disposition of profits." *Id.* at 27.  Aeolus also challenged the Final Results on the

ground that Commerce failed to provide "the requisite explanation for its new

separate rate analysis," which Aeolus contends is at variance with the

Department's past practice. *Id.* at 32–34.

   Commerce found that "we continue to find that the Chinese government,

through an SOE, exerts control over Aeolus's management selection process,

through control of its board member selection process." *Remand Redetermina-*

*tion* 7 (citing *Final I&D Mem.* 10).  Commerce followed this finding with a lengthy

discussion of voting procedures for the election of directors and selection of

management, a discussion of access to the company's financial information, and

the Department's finding that the Rectification Report does not alter its ultimate

conclusion. *Id*. at 8–14.  Commerce opined that the Rectification Report

"describes steps taken to ensure that Aeolus has an independent accounting

system, but whether those steps are effective remains unaddressed in the

Rectification Report." *Id*. at 13.  Commerce concluded its analysis of *de facto*

government control with the conclusory statements that "the only purported

safeguard is ChinaChem's mere promise to not interfere with a listed company's

business operations" and that "[t]herefore . . . despite the Rectification Report

showing specific government control issues being 'rectified,' there remains *de*

*facto* government control over Aeolus by virtue of its board of directors and

management being nominated and appointed by its SOE shareholders." *Id*.

at 13–14.  The critical issue of control over pricing of subject exports during the

POR was left to speculation.

As to the issue of a separate rate for Aeolus, all of the Department's

findings in the Remand Redetermination pertained to the issue of selection of

directors and management and to government influence generally.  There is no

discussion of specific government control over the setting of prices of exported

subject merchandise during the POR.  Nor does the Remand Redetermination

point to specific record evidence contradicting the evidence Aeolus put forth in

its separate rate application on the issues of independence from the government

in the setting of export prices, the negotiating of contracts, the retention of export

sales proceeds, and the disposition of profits.  *See* Aeolus's Comments at 2, 26–27.

Without deciding whether Commerce permissibly reached findings under its

third factor, autonomy in selection of management, the court concludes that

Commerce reached an ultimate decision on Aeolus's separate rate application

that was unsupported by substantial record evidence on the whole.  The critical

flaw was the Department's failure to conduct the review so as to determine

whether the Chinese government, during the POR, controlled the prices of

Aeolus's subject merchandise that was sold for export to the United States and at

issue in the seventh review.  If it did not, the inclusion of Aeolus within the PRC-

wide entity lacked both an evidentiary basis and sound reasoning when viewed

according to the Department's own formulation of its separate rate inquiry,

which expressly identifies "export activities" and "export functions."

Regarding GTC, Commerce summarized its decision with the following

finding: "In the instant case, we find that GTC is not free from government

control in making decisions regarding the selection of its management and thus

is subject to *de facto* government control of its export functions."  *Remand*

*Redetermination* 17.  The Remand Redetermination explains, further, that "GTC's

board is responsible for the selection of senior management, which controls the

day-to-day decisions regarding the company's export activity."  *Id*. at 20

(footnote omitted).  As shown by the conclusory nature of both of these findings,

the Department's analysis of GTC's separate rate application in the Remand

Redetermination suffers from the same fatal flaws as does its analysis for Aeolus.

No specific evidence is presented, or addressed, on the critical issue of whether

the Chinese government controlled the prices of exports to the United States of

GTC's subject merchandise during the POR.  Almost all of the Department's

discussion in the Remand Redetermination pertained to the factor addressing

autonomy in selection of management.  One finding pertained to the fourth

factor ("makes independent decisions regarding disposition of profits or

financing of losses"), which was the finding that "Article 161 (IV) of GTC's AoA

[Articles of Association] states, 'The Board of Director shall put forward {an}

annual profit distribution proposal. . . .'  As a result, GIIG ultimately controls the

selection of GTC's senior management, as well as profit distributions through its

influence on GTC's board selection process."  *Id.* at 19 (footnotes omitted).  But

there is no discussion addressing the question of whether the Chinese

government controlled the prices of GTC's exported subject merchandise during

the POR.

GTC argues that the evidence shows, at most, that the PRC central

government has the potential to control, not that it actually controls, GTC's

affairs.  GTC's Comments 27.  GTC points out that the Department's decision to

treat GTC as part of the PRC-wide entity is unreasonable because Commerce

granted GTC separate rate status in the fifth periodic review, when GTC's

management and profit distribution structures were substantially similar to

those in the instant review.  *Id*. at 14–15.  GTC contends that Commerce neither

acknowledged nor explained the decision to employ a new *de facto* analysis,

rendering the Remand Redetermination contrary to law.  *Id*. at 28–32.

Without deciding whether Commerce was correct in its finding under its

third factor, autonomy in selection of management (a finding GTC, like Aeolus,

disputes), the court must set aside as insufficiently supported by substantial

evidence on the record the presumption or inference that the Chinese

government set or controlled the prices at which GTC sold subject off-the-road

tires to the U.S. market during the POR.  Commerce sidestepped the issue of

whether the record evidence supported a finding of control of those prices

during the POR by GIIG, the minority shareholder and government-controlled

entity.  Therefore, the standard of review requires the court to set aside, as

unsupported by substantial record evidence, the denial of separate rate status to

GTC as set forth in the Remand Redetermination.

As the court discussed previously, Commerce also ignored the issue of

control over pricing of exported subject merchandise during the POR in denying

separate rate status to Aeolus.  With respect to both plaintiffs, Commerce failed

to justify its application of its separate rate methodology for determining *de facto*

government control according to remedial purpose of the antidumping duty statute in general and the particular remedial purpose of 19 U.S.C. § 1675(a), which calls for a retrospectively-determined remedy when sales of exported subject merchandise are found to have occurred during the POR at prices lower than normal value.

### III. Conclusion and Order

The court sustains the following decisions in the Remand Redetermination: (1) to redetermine Xugong's individually-determined dumping margin upon recalculating export price and constructed export price to remove the deduction from U.S. price for Chinese value-added tax, (2) the resulting redetermined margin of 16.78% for Xugong, and (3) the decision to apply the rate of 16.78% to Full World, Qingdao Qihang, Trelleborg, and Zhongwei, who were unexamined separate-rate respondents.

The court remands to Commerce the Department's decisions in the Remand Redetermination to deny separate-rate status to Aeolus and GTC and orders that Commerce reach new decisions in accordance with this Opinion and Order.

Therefore, upon consideration of all papers and proceedings had herein, and upon due deliberation, it is hereby

**ORDERED** that the Remand Redetermination be, and hereby is, sustained with respect to the assignment of a redetermined weighted average dumping margin of 16.78% to mandatory respondent Xugong and the assignment of a rate of 16.78% to separate rate respondents Full World, Qingdao Qihang, Trelleborg, and Zhongwei; it is further

**ORDERED** that Commerce submit a second determination upon remand ("Second Remand Redetermination") in which it reconsiders its decisions not to accord separate rate status to Aeolus and GTC and revises the antidumping duty rates applied to these respondents as may be required by its reconsideration of those decisions; it is further

**ORDERED** that Commerce shall submit its Second Remand Redetermination within 90 days of the date of this Opinion and Order; it is further

**ORDERED** that comments of plaintiffs on the Second Remand Redetermination must be filed with the court no later than 30 days after the filing of the Second Remand Redetermination; and it is further

**ORDERED** that the response of defendant to the aforementioned comments must be filed no later than 15 days from the date on which the last comment is filed.

                                                   /s/ Timothy C. Stanceu
                                                  Timothy C. Stanceu, Judge

Dated:   May 14, 2021
              New York, New York