Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

A-570-912
Remand:  Slip Op. 21-60
POR:  9/1/2014-8/31/2015
**Public Version**
E&C/OIII:  BQ

***Guizhou Tyre Co., Ltd., et al. v. United States***
**Consol. Court No. 17-00100; Slip Op. 21-60 (CIT 2021)**

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.    SUMMARY

The Department of Commerce (Commerce) prepared these final results of

redetermination in accordance with the May 14, 2021, remand order of the U.S. Court of

International Trade (the Court), in *Guizhou Tyre Co., Ltd. & Guizhou Tyre Import & Export Co.,*

*Ltd., et al. v. United States*, Consol. Court No. 17-00100, Slip Op. 21-60 (CIT May 14, 2021)

(*Remand Order*).  These final results concern the final results of the administrative review of the

antidumping duty order on off-the-road (OTR) tires from the People's Republic of China

(China), covering the period of review (POR) September 1, 2014, through August 31, 2015.[1]

Previously, Commerce issued to interested parties the draft results of redetermination pursuant to

court remand.[2]

The *Remand Order* follows the Court's prior remand of the underlying review in *Guizhou*

*Tyre I* and our first remand redetermination.[3]  The Court sustained, in part, Commerce's

determination, explained in the *First Remand Redetermination*, to recalculate export price (EP)

---

[1] *See Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Final Results of
Antidumping Duty Administrative Review; 2014–2015*, 82 FR 18733 (April 21, 2017) (*Final Results*), and
accompanying Issues and Decision Memorandum (IDM), amended by *Certain New Pneumatic Off-the-Road Tires
from the People's Republic of China:  Amended Final Results of Antidumping Duty Administrative Review; 2014-
2015*, 82 FR 27224 (June 14, 2017).
[2] *See Guizhou Tyre Co., Ltd., et al. v. United States, Consol. Court No. 17-00100; Slip Op. 21-60*:  Draft Results of
Redetermination Pursuant to Court Remand, released on August 23, 2021 (Draft Results).
[3] *See Guizhou Tyre Co., Ltd. & Guizhou Tyre Import & Export Co., Ltd., et al. v. United States*, 389 F. Supp. 3d
1350 (CIT 2019) (*Guizhou Tyre I*); *see also Final Results of Redetermination Pursuant to Remand*, Court No. 17-
00100, Slip Op. 19-64 (CIT May 24, 2019) (*First Remand Redetermination*).

and constructed export price (CEP) for Xuzhou Xugong Tyres Co., Ltd., Armour Rubber Co.

Ltd., and Xuzhou Hanbang Tyre Co., Ltd. (collectively, Xugong) without making deductions for

Chinese value-added taxes (VAT), and resulting redetermination of the weighted-average

dumping margins for Xugong and for all other qualifying separate rate respondents that are

plaintiffs in the action.[4]  However, the Court remands to Commerce the decisions in the *First

Remand Redetermination* to continue to deny separate-rate status to Aeolus Tyre Co., Ltd.

(Aeolus) and Guizhou Tyre Co., Ltd., and Guizhou Tyre Import and Export Co., Ltd.

(collectively, GTC) and orders that Commerce reach new decisions in accordance with the

*Remand Order*.[5]

     Upon review, the Court noted that Commerce had not examined the four *de facto* criteria

for freedom of government control, and held that Commerce had improperly relied on its finding

that Aeolus and GTC lacked autonomy in the selection of management as the basis for the

finding that the respondents did not operate free of government control.[6]  According to the Court,

in light of the retrospective manner by which a review is conducted and the purpose of a review,

the issue before it was whether Commerce's findings that Aeolus and GTC were not eligible for

a separate rate were supported by valid factual findings that the Chinese government, rather than

the respondents, controlled the prices at which these companies sold OTR tires during the POR.[7]

The Court held that the presumption or inference that the Chinese government set or controlled

the prices at which GTC sold subject OTR tires to the U.S. market during the POR was

insufficiently supported by record evidence, specifically regarding whether the record evidence

supported a finding of control of those prices during the POR by Guiyang Industry Investment

---

[4] *See Remand Order* at 10, 12.
[5] *Id.* at 27-29.
[6] *Id.* at 16.
[7] *Id.* at 19, 28.

(Group) Co., Ltd. (GIIG), the relevant State-owned Assets Supervision & Administration Commission (SASAC).[8]  The *Remand Order* also concluded that Commerce ignored the issue of control over pricing of exported subject merchandise during the POR in denying separate rate status to Aeolus.[9]  Therefore, the Court held that Commerce failed to justify its application of its separate rate methodology for determining *de facto* government control with respect to both plaintiffs.[10]  The Court, thus, ordered that Commerce submit a second determination upon remand in which it reconsiders its decisions not to accord separate rate status to Aeolus and GTC and revise the antidumping duty rates applied to these respondents as may be required by its reconsideration of those decisions.[11]

As explained below, pursuant to the Court's *Remand Order*, we have reconsidered the record evidence with respect to each prong of the enumerated *de facto* separate rate criteria,[12] including the first prong which concerns whether the Chinese government, during the POR, controlled the prices of subject merchandise that was sold for export to the United States by Aeolus and GTC.  Based on our review of the record, we conclude that it does not contain affirmative evidence that the Chinese government "actually did control" the respondents' export pricing decisions (*i.e.*, the first prong).  Further, we find that there is no evidence to contradict statements and information in support of claims that Aeolus and GTC have authority to negotiate

---

[8] *Id*. at 27.

[9] *Id.*

[10] *Id.* at 27-28.

[11] *Id.* at 29.

[12] Typically, Commerce considers four factors in evaluating whether each respondent is subject to *de facto* government control of its export functions:  (1) whether the export prices are set by or are subject to the approval of a government authority; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.  *See Final Determination of Sales at Less Than Fair Value:  Sparklers from the People's Republic of China*, 56 FR 20588, 20589 (May 6, 1991) (*Sparklers*); *see also Final Determination of Sales at Less than Fair Value:  Silicon Carbide from the People's Republic of China*, 59 FR 22585, 22586-22587 (May 2, 1994) (*Silicon Carbide*).

and sign contracts and other agreements (*i.e.*, the second prong) and, for Aeolus, no explicit evidence to contradict a finding that the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses (*i.e.*, the fourth prong).  Commerce has, thus, revised its prior determination to make an explicit finding on each of the four prongs of the standard analysis with respect to *de facto* government control, in accordance with the *Remand Order*, acknowledging that there is no explicit evidence that the Chinese government "actually did control" export pricing.  However, we continue to find that both companies failed to establish autonomy in their selection of management (*i.e.*, the third prong), and that GTC further failed to rebut the presumption of control with respect to independent decision-making regarding disposition of its profits (*i.e.*, the fourth prong).  As Commerce's long-standing practice holds that if a respondent is unable to rebut one of the four *de facto* criteria, the company is ineligible for a separate rate, we, thus, continue to deny Aeolus and GTC a separate rate in this redetermination.

On August 23, 2021, we released the *Draft Results* to interested parties.[13]  On September 3, 2021, we received timely-filed comments from Aeolus and GTC (collectively, respondents).[14] We provide our final redetermination analysis, materially unchanged from the analysis released in the Draft Results, in Section II.  We address the arguments raised by Aeolus and GTC in the respondents' comments on the Draft Results in Section III.  As a result of our analysis and our consideration of the respondents' arguments, we have made no changes to the rate assigned to Aeolus and GTC.

---

[13] *See* Draft Results.
[14] *See* Aeolus and GTC's Letter, "GTC and Aeolus' Comments on the Department's Draft Remand Redetermination – Remand Redetermination Pursuant to Guizhou Tyre Co. v. United States, Consol. Court No. 17-00100," dated September 3, 2021 (Respondents' Comments).

4

## II.    FINAL ANALYSIS

1.  <u>Background</u>

   A)  *Aeolus Case and Litigation History*

In the *Final Results* of the underlying review, we determined, based on substantial record evidence, that a state-owned enterprise (SOE), China National Chemical Corporation, (ChinaChem), is Aeolus's largest and controlling shareholder.[15]  In the *Final Results*, we found that the record showed that Aeolus was 42.58 percent owned by its parent company (China Chemical Rubber Co., Ltd. (also known as, China National Tire & Rubber Corp.)), a company which is 100 percent owned by an SOE (*i.e.*, ChinaChem) and supervised by a SASAC.[16]  Additionally, we found three other shareholders of Aeolus to be SOEs that are supervised by SASACs.[17]  As such, we found the total SOE ownership in Aeolus to be 49.06 percent.[18]  We found that the website printouts provided by Titan Tire Corporation ("Titan") and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC (the USW) (the petitioners) in which Aeolus states that it is under the control of an SOE, specifically, under the control of ChinaChem, to be

---

[15] *See Final Results* IDM at 10 (citing *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Preliminary Results of Antidumping Duty Administrative Review; 2014-2015*, 81 FR 71068 (October 14, 2016) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 16; and Memorandum, "Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Preliminary Denial of Separate Rate," dated October 5, 2016 (Preliminary Separate Rate Memo) at 2).

[16] *Id.* (citing Aeolus's Letter, "Separate Rate Application in the Seventh Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated December 11, 2016 (Aeolus's SRA) at 13; and Aeolus's Letter, "Separate Rate Application Supplemental Questionnaire Response in the Seventh Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated August 2, 2016).

[17] *Id.* (citing Aeolus's SRA at 13).

[18] *Id.*

reliable.[19]  Thus, we found that the website information corroborated the ownership information provided by Aeolus in its separate rate application.[20]

Furthermore, we found that, based on information contained in Aeolus's Articles of Association (AoA), the company did not demonstrate that it was free from *de facto* government control over its export activities because its AoA allows its majority shareholders to control the selection of its board of directors, a board which, in turn, selects Aeolus's general manager and deputy general manager.[21]  Thus, we found that Aeolus did not demonstrate an absence of government control in making decisions regarding the selection of its management.[22]  Based on these findings, we concluded that Aeolus was not eligible for a separate rate in the *Final Results* of the underlying review.[23]

During litigation, Aeolus argued, *inter alia*, that Commerce failed to consider important contrary record evidence in its determination not to grant Aeolus a separate rate.[24]  Notably, Aeolus argued that Commerce failed to consider a "Rectification Report" Aeolus placed on the record, which, it argued, demonstrates its independence from the Chinese government.[25]

In *Guizhou Tyre I*, the Court held that Commerce failed to address significant contrary evidence when making its determinations in the underlying review.[26]  Specifically, the Court held that, because Commerce did not refer to the Rectification Report in the *Final Results* of the underlying review, it could not conclude that Commerce considered the report or the evidence

---

[19] *Id.* (citing Petitioners' Letter, "Administrative Review of the Antidumping Duty Order on New Pneumatic Off-The-Road Tires from China (A-570-912):  Petitioners' Rebuttal Information and Deficiency Comments on Aeolus' Separate Rate Application," dated December 30, 2016 at Attachment 3).
[20] *See* Aeolus's SRA at 13 and Exhibit 11.
[21] *Id.* (citing Preliminary Separate Rate Memo at 2).
[22] *Id.* at 11-12.
[23] *Id.* at 12.
[24] *See Guizhou Tyre I*, 389 F. Supp. 3d at 1357-58.
[25] *Id.*
[26] *Id.* at 1358-59.

6

therein when determining that Aeolus was not free from government control over its export

activities.[27]  As such, the Court ordered Commerce to reconsider its separate rate determination

concerning Aeolus in light of all evidence on the record, including the evidence in the

Rectification Report.[28]

In the *First Remand Redetermination*, we re-evaluated the determination to deny

Aeolus's separate rate in light of all evidence on the record, including the evidence in the

Rectification Report, as ordered by the Court.  Upon redetermination, we found that certain

record evidence did not address or otherwise mitigate the fact that Aeolus's SOE shareholder

effectively selected its board of directors.[29]  Further, we determined that, despite the

Rectification Report showing specific government control issues being "rectified," there

remained *de facto* government control over Aeolus by virtue of its board of directors and

management being nominated and appointed by its SOE shareholders, and we continued to deny

Aeolus a separate rate on this basis.

Aeolus challenged Commerce's finding regarding its failure to rebut the presumption of

*de facto* government control before the Court, resulting in the *Remand Order*.

B) *GTC Case and Litigation History*

In the *Final Results*, we determined, based on substantial evidence, that GTC was not

eligible for a separate rate.  Specifically, we found that Guiyang SASAC, through its 100

percent-owned affiliate, GIIG, an SOE which owns 25.20 percent of GTC, is GTC's single

largest and *de facto* controlling shareholder.[30]  Furthermore, we found that even with less than a

majority number of shares in GTC, Guiyang SASAC, through its 100 percent-owned affiliate

---

[27] *Id.*
[28] *Id.*
[29] *See First Remand Redetermination* at 5-6.
[30] *See Final Results* IDM at 13.

7

GIIG, remained in a position to control the export activities of Guizhou Tyre Import and Export

Corporation (GTCIE) through its control of GTC.[31]

In the *Final Results*, we found that record evidence showed that GTC "elected members

of its board of directors through shareholders' meetings *not available* to all shareholders" and

made decisions affecting the distributions of profits at these meetings.[32]  Specifically, we found

that the AoA allowed GTC to circumvent a more inclusive board election process; GTC was able

to elect specific board members of its preference and its preferred profit distribution scheme.[33]

Also, we found that GTC's AoA failed to insulate GTC from government interference

through its prescribed nomination processes for the selection of GTC's board of directors and

senior management.  Specifically, we found that GTC's nomination and voting processes for

directors and management under Articles 40, 43, 83, and 117 of the AoA allowed Guiyang

SASAC, through GIIG, to influence the board nomination process even with a less than majority

number of voting shares.[34]  Thus, we found that GTC was not eligible for a separate rate in the

*Final Results*.[35]

However, during litigation, GTC explained that the particular shareholders' meeting of

GTC referenced in the *Final Results*, which we found was not available to all shareholders, was

publicly announced and open to all shareholders.[36]  Because this finding of fact called into

---

[31] *Id.* at 13-14; *see also Certain New Pneumatic Off-The-Road Tires from the People's Republic of China; Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 73 FR 9278, 9283 (February 20, 2008), unchanged in *Certain New Pneumatic Off-The-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 40485 (July 15, 2008).  Commerce previously collapsed GTC and GTCIE into a single entity in the initial investigation.  This decision has been unchallenged in each subsequent review, including the instant review; thus, Commerce continues to treat GTC and GTCIE as a single entity in this review.
[32] *See Final Results* IDM at 14 (emphasis added).
[33] *Id.* (citing Preliminary Separate Rate Memo at 2-3; and GTC's Letter, "Supplemental Section A Questionnaire Response, dated September 13, 2016 (GTC's 3rd SAQR)).
[34] *Id.* (citing GTC's 3rd SAQR at 2, Exhibits 2, 4, and 6-8; and Preliminary Separate Rate Memo at 2-3).
[35] *Id.* at 15.
[36] *See Guizhou Tyre I*, 389 F. Supp. 3d at 1360.

question our understanding of the record evidence and had the potential to impact the analysis concerning whether to grant GTC a separate rate in the underlying review, we requested a voluntary remand to reconsider and explain our determination concerning whether to grant a separate rate to GTC.

The Court granted our request for a remand.  Specifically, the Court stated that "{Commerce's} concern, in this case, is 'substantial and legitimate' and will order a remand for Commerce to reconsider and explain its separate rate analysis with respect to the collapsed GTC entity."[37]  As such, the Court ordered Commerce to "reconsider its separate rate determination as to GTC in the entirety, *i.e.*, in light of all record evidence."[38]  The Court did not reach any conclusions regarding the other arguments GTC made concerning the underlying results of the review.[39]

In the *First Remand Redetermination*, we reconsidered our separate rate determination regarding GTC in the entirety, *i.e.*, in light of all record evidence, including the evidence related to the July 16, 2015, interim shareholders' general meeting.  After reconsidering all of the evidence on the record, we continued to find that GTC was ineligible for a separate rate in the underlying review because it was not free from *de facto* government control over its export activities.[40]  Specifically, we continued to find that GIIG, through its 25.20 percent ownership stake, controlled GTC's board nomination process.  As GTC's board is responsible for the selection of senior management, we determined that it controlled the day-to-day decisions regarding the company's export activity.[41]  Hence, we continued to find that Chinese law and

---

[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *See First Remand Redetermination* at 19-20.
[41] *Id.* (citing GTC's Letter, "Supplemental Section A Response," dated May 25, 2016 at Exhibit 1 (citing GTC's AoA at art. 134)).

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

GTC's AoA shareholders' safeguards in place during the POR were ineffective at preventing influence by an SOE that is a controlling shareholder, *i.e.*, GIIG.[42]

GTC challenged Commerce's finding regarding its failure to rebut the presumption of *de facto* government control before the Court, resulting in the *Remand Order*.

C) *Remand Order*

The *Remand Order* identifies specific issues with respect to the standard of analysis applied in evaluating whether the respondents sufficiently rebutted the presumption of government control pursuant to the *de facto* separate rate criteria enumerated, the completeness of the analysis applied, and the level of support for Commerce's decision to deny the separate rate for Aeolus and GTC as laid out in the *Final Results* and the *First Remand Redetermination*. The *Remand Order* first identifies a purported contradiction between Commerce's statements in the *First Remand Redetermination* that Commerce's separate rate test examines all four *de facto* criteria, as established in *Sparklers* and modified in *Silicon Carbide*,[43] and the statement that, if a respondent is unable to rebut one of the four *de facto* criteria, a company is ineligible for a separate rate.[44]

The *Remand Order* then takes issue with Commerce's reliance on case precedent which holds that Commerce may deny a request for a separate rate if an applicant fails to demonstrate separation from the government with respect to any one of the *de jure* or *de facto* criteria and that, if an applicant fails to establish any one of the criteria, Commerce is not required to

---

[42] *Id.* (citing GTC's 3rd SAQR at Exhibit 6).
[43] *See supra* n. 11.
[44] *See Remand Order* at 13-14 (citing *First Remand Redetermination* at 41 (wherein Commerce cited *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F. Supp. 3d 1308, 1320-21 (CIT 2018) (*Zhejiang Quzhou*) to establish this practice)).

Filed By: Brendan Quinn, Filed Date: 9/24/21 3:09 PM, Submission Status: Approved

continue its analysis with respect to the remainder of the criteria.[45]  The Court concluded that

neither decision was based on facts analogous to those of the instant review.  Specifically, the

Court identifies that in *Advanced Tech.*, the respondent at issue was majority-owned by an entity

that was 100 percent owned by a Chinese government entity and that, in *Yantai CMC*, the

respondent at issue had a chain of ownership where its majority owner was wholly-owned by the

SASAC; in contrast, in the instant review, neither Aeolus nor GTC had an ownership structure in

which government entities owned a majority share during the POR.[46]

      The Court then notes its disagreement with Commerce's statement from the *First

Remand Redetermination* that it made a reasonable inference that the respondents do not control

their export activities by examining the four *de facto* criteria.  Specifically, the Court explains

that Commerce did not examine the four criteria and, instead, made a determination that the

Chinese government controlled each respondent's export activities on the sole basis of the

finding of lack of autonomy in the selection of management for each respondent.  The Court

concludes, as a result, that Commerce's presumption that a lack of autonomy in management

selection equated to government control of export activities was "without evidentiary support."[47]

Further, the Court does not agree that Commerce's finding was based on a reasonable inference,

and notes that it cannot sustain a factual finding that ignores record evidence and relies upon

speculation.[48]

---

[45] *See Remand Order* at 14 (citing Commerce's prior reliance on *Yantai CMC Bearing Co. Ltd. v. United States*, 203 F. Supp. 3d 1317, 1326 (CIT 2017) (*Yantai CMC*) (recognizing that "Commerce requires that exporters satisfy all four factors of the *de facto* control test in order to qualify for separate rate status" and sustaining Commerce's decision not continue with the separate rate analysis where one of the factors is not met); *Advanced Technology & Materials Co., Ltd., et al. v. United States*, 938 F. Supp. 2d 1342 (CIT 2013) (*Advanced Tech. II*),  *aff'd* in *Advanced Technology & Materials Co., Ltd. v. United States*, Case No. 2014-1154 (Fed. Cir. Oct. 24, 2014) (*Advanced Tech III*)).
[46] *Id*. at 14-15 (citing *Advanced Tech II*, 938 F. Supp. 2d at 1348; *Yantai CMC*, 938 F. Supp. 2d at 1348).
[47] *Id*. at 16.
[48] *Id*. at 16-17.

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

The remainder of the *Remand Order* expands on what the Court describes as the "critical flaw" in Commerce's implementation of its *de facto* separate rate analysis; specifically the failure to conduct the review so as to determine whether the Chinese government, during the POR, controlled the prices of the respondents' subject merchandise that was sold for export to the United States in the underlying review.[49]  According to the Court, because Commerce has identified a respondent's export functions or activities as the subject of its separate rate inquiry, a review of any decision placing an exporter within the China-wide entity must necessarily take account of Commerce's identification of the price discriminator (*i.e.*, whether Commerce's inclusions of Aeolus and GTC within the China-wide entity were supported by valid factual findings that the Chinese government, rather than Aeolus or GTC, controlled the prices at which these companies' subject off-the-road tires were sold for export during the POR).[50]  The *Remand Order* thus concludes that, because the *First Remand Redetermination* did not apply the first of its factors of the *de facto* analysis – which inquires as to whether the export prices are set by, or are subject to the approval of, a government authority – the Court has no such finding of fact to subject to judicial review under the substantial evidence standard.[51]  The Court notes that both Aeolus and GTC placed information on the record in support of statements that the Chinese government did not control their activities, generally, and that they specifically maintained control over their own prices.  As a result, the Court concluded that under Commerce's "rebuttable presumption" method of determining government control over export functions, the introduction of that evidence was at least sufficient to require Commerce to make a determination (based on a full consideration of the entire record) on whether the Chinese

---

[49] *Id.* at 25-26.
[50] *Id.* at 18-19.
[51] *Id.* at 20.

12

government actually did control these respondents' export pricing decisions during the POR, which Commerce failed to provide.[52]

With respect to the respondent-specific findings in the *First Remand Redetermination*, the Court notes that, for Aeolus, all of Commerce's findings pertained to the issue of selection of directors and management (*i.e.*, the third factor of the *de facto* analysis) and to government influence generally.  The Court also noted that there is no discussion of specific government control over the setting of prices of exported subject merchandise during the POR, nor does Commerce identify specific record evidence contradicting the evidence Aeolus put forth in its separate rate application on the issues of independence from the government in the setting of export prices, the negotiating of contracts, the retention of export sales proceeds, and the disposition of profits (*i.e.*, evidence related to the first, second, and fourth factors).[53]  The Court held that Commerce's analysis of GTC's separate rate application in the Remand Redetermination suffers from the same "fatal flaws" as does its analysis for Aeolus:  it focuses on autonomy of selection of directors and management (the third factor) and on government influence generally, as well as a finding regarding GTC's independence in decisions regarding the disposition of profits (the fourth factor), but there is no discussion addressing the question of whether the Chinese government controlled the prices of GTC's exported subject merchandise during the POR.[54]  Thus, the Court concludes, because Commerce "sidestepped" the issue of whether the record evidence supported a finding of control of those prices during the POR by government-controlled entities and minority shareholders for each respondent, the presumption or inference that the Chinese government set or controlled the prices at which Aeolus and GTC

---

[52] *Id.* at 22.
[53] *Id*. at 24-25.
[54] *Id.* at 26.

13

sold subject OTR tires to the U.S. market during the POR was unsupported by substantial record evidence.  As a result, the Court set aside the denial of separate rate status for Aeolus and GTC without deciding whether Commerce was correct in its finding under its third factor (autonomy in selection of management).[55]  The Court, therefore, remanded to Commerce the decisions in the *First Remand Redetermination* to deny separate-rate status to Aeolus and GTC and ordered that Commerce reconsider its decisions not to accord separate rate status to Aeolus and GTC, reach new decisions in accordance with the *Remand Order*, and revise the antidumping duty rates applied to these respondents as may be required by its reconsideration of those decisions.[56]

2.  Analysis

It is Commerce's policy to assign exporters of the subject merchandise from a non-market economy (NME) country a single rate unless an exporter can affirmatively demonstrate an absence of government control, both in law (*de jure*) and in fact (*de facto*), with respect to its export activities.  To establish whether a company is sufficiently independent to be entitled to a separate, company-specific rate, Commerce analyzes each exporting entity in an NME country under the test established in *Sparklers*,[57] as amplified by *Silicon Carbide*.[58]  Commerce typically considers four factors in evaluating whether a respondent is subject to *de facto* government control of its export functions:  (1) whether the export prices are set by, or are subject to the approval of, a government agency; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and, (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding the

---

[55] *Id.* at 25 and 27.
[56] *Id.* at 28-29.
[57] *See Sparklers*, 56 FR at 20589.
[58] *See Silicon Carbide*, 59 FR at 22586-89.

14

disposition of profits or financing of losses.[59]  As established in numerous proceedings, if a respondent is unable to establish autonomy from the government under one the four *de facto* criteria, that company fails to rebut the presumption of government control and is ineligible for a separate rate.  In other words, Commerce's practice is to deny a request for a separate rate if an applicant fails to demonstrate separation from the government with respect to any one of the factors (the aforementioned *de facto* factors)[60] and that if an applicant fails to establish any one of the criteria, Commerce is not required to continue its analysis with respect to the remainder of the criteria.[61]

As discussed in the *Final Results*, as modified in the *First Remand Redetermination*, and summarized in the Background section above, Commerce's determination to deny the separate rate request for Aeolus and GTC focused predominantly on the finding that record information specific to each respondent reflected a measure of control on behalf of relevant SOE shareholders in the selection of the board of directors and management for each firm. Commerce, thus, concluded that these respondents had not adequately substantiated autonomy in the selection of directors and management (the third factor).  Failure to establish this prong of the criteria meant that the respondents failed to rebut the presumption of government control and, thus, Commerce reasonably determined that record evidence indicated a measure of control, or

---

[59] *See Silicon Carbide*, 59 FR at 22586-89; *see also Furfuryl Alcohol*, 60 FR at 22545.
[60] Commerce applies the same approach with respect to its *de jure* analysis.  Commerce considers the following *de jure* criteria in determining whether an individual company may be granted a separate rate:  (1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses; (2) any legislative enactments decentralizing control of companies; and (3) other formal measures by the government decentralizing control of companies.  *See Sparklers*, 56 FR at 20589.  In the underlying proceeding, Commerce found that the record supported a finding of absence of *de jure* governmental control for GTC and Aeolus based on evidence provided for each of these three factors.  *See Preliminary Results* PDM at 14-15, unchanged in *Final Results*.
[61] *See Zhejiang Quzhou* 350 F. Supp. 3d at 1320-21; *see also Yantai CMC* 203 F. Supp. 3d at 1326; and *Advanced Tech II* 938 F. Supp. 2d 1342.

15

potential for control, of relevant Chinese-government entities over the operations of the

companies as a whole, including their export activities.

The *Remand Order* first notes concerns with the relevance of the case precedent cited in

favor of the proposition that failure to establish any one prong of the analysis is a sufficient basis

to find that a respondent has not rebutted the presumption of government control, and precludes

analysis of any of the other factors (*i.e.*, the *Advanced Tech. II*, *Yantai CMC,* and *Zhejiang*

*Quzhou* cases).  The Court notes that in each underlying case, the SOE shareholder maintained

majority ownership of the relevant respondent, whereas in the instant case, Aeolus and GTC's

SOE shareholders own less than 50 percent of each respondent.

We note that the degree of government ownership is not a distinguishing factor in

applying the *de facto* analysis.  Nowhere in the language of the *de facto* framework (*i.e.*, the four

prongs), the *Sparklers* or *Silicon Carbide* precedent establishing the standard, nor the *Advanced*

*Tech. II*, *Yantai CMC, Zhejiang Quzhou*, *etc.* cases establishing that a respondent must rebut the

presumption for all factors, is there any mention of a threshold for government ownership in

applying this relevant analytical framework.  The relevance of the level of government

ownership entered into Commerce's overall separate rate analysis following the determination in

the *Advanced Tech.* litigation, where the Court held that majority ownership by a government

entity, either directly or indirectly, rules out a respondent's ability to demonstrate an absence of

*de facto* control.[62]  Accordingly, majority ownership by a government entity is a consideration

---

[62] *See Advanced Technology & Materials Co., Ltd., et al. v. United States*, 885 F. Supp. 2d 1343 (CIT 2012)
(*Advanced Tech I*), remand *aff'd* in *Advanced Tech II*, *aff'd* in *Advanced Tech III* (collectively, *Advanced Tech*)
("Specifically, as a result of litigation challenging Commerce's separate rate determinations in the diamond
sawblades proceedings, Commerce has clarified its practice with regard to evaluating NME companies' *de facto*
independence from government control.  This revised practice, which was sustained by this Court and subsequently
affirmed by the Court of Appeals, holds that 'where a government entity holds a majority ownership share, either
directly or indirectly, in the respondent exporter {or producer},' such majority ownership holding 'in and of itself'
precludes a finding of *de facto* autonomy.")).

16

only in the sense that such a fact pattern establishes control of a respondent by a government entity to preclude any further analysis of the *de facto* criteria, and is plainly not a qualifying factor in the application thereof.  Though the cases cited involved majority government-owned entities, various other cases involving non-majority government-owned respondents have denied a separate rate based on the respondent's inability to rebut the presumption of government control with respect to only one factor of the *de facto* criteria.[63]  Indeed, in the *Silicon Carbide* decision, which established Commerce's four factor standard of analysis for *de facto* control, Commerce found certain respondents ineligible on the basis of a failure to substantiate just one of the factors and without mention of level of government ownership.[64]

The *Remand Opinion* then explains that, although Commerce claimed in the *First Remand Redetermination* that it examined the totality of the circumstances and made a reasonable inference that the respondent did not control its export activities by examining the four *de facto* criteria, the Court cannot agree that Commerce examined the four criteria. According to the Court, instead of examining the four criteria, the *First Remand Redetermination* presumes, without evidentiary support, that the finding of a lack of autonomy in the selection of management was the factual equivalent of a finding that the Chinese government controlled what Commerce termed a company's export activities or functions.  Relatedly, the Court identifies a purported contradiction between Commerce's statements in the *First Remand Redetermination*

---

[63] *See, e.g., 53-Foot Domestic Dry Containers from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value; Final Negative Determination of Critical Circumstances*, 80 FR 21203 (April 17, 2015) (*Containers*), and accompanying IDM at Comment 10; and *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018*, 85 FR 23756 (April 29, 2020), and accompanying IDM at Comment 6, *aff'd I.D.I. International Development And Investment Corporation v. United States*, Court No. 20-00107, Slip Op. 21-82 (CIT July 6, 2021) (*IDI v. United States*).

[64] *See Silicon Carbide*, 59 FR 22586-22587 at Comment 2 ("Respondents Hainan and Shaanxi have failed to establish their eligibility for separate rates because, at verification, these companies failed to produce bank records necessary to prove their retention of proceeds from export sales.  Therefore, these respondents did not meet an important criterion for separate rates.").

that Commerce's separate rate test examines all four *de facto* criteria, as established in *Sparklers* and modified in *Silicon Carbide*,[65] and the statement that if a respondent is unable to rebut one of the four *de facto* criteria, a company is ineligible for a separate rate.[66]  Thus, the Court concludes that Commerce's findings with respect to Aeolus and GTC (which the Court understood to be that each company's failure to establish that they operate autonomously in management selection suggested a sufficient measure of the government's control over export activity) without direct evidence of the Chinese government's control was impermissibly speculative and, by not examining each of the four *de facto* criteria, the Court may not sustain a finding that ignores record evidence.

First, we clarify that Commerce did not find that a lack of autonomy in management selection equates to a direct finding of government control of export activities.  Rather, Commerce found that record evidence indicating a lack of autonomy in management selection did not satisfy the third prong of the *de facto* analysis and, thus, that GTC and Aeolus were unable to rebut the presumption of government control.  Our *de facto* criteria explicitly lay out that it is a standard by which we evaluate whether a respondent has affirmatively rebutted the presumption of government control or potential control of export functions/activities.  Notably, under the presumption of government control (which has been upheld repeatedly by the courts)[67] Commerce does not affirmatively establish in each instance that the government is actually controlling the respondent's export activities, including pricing decisions.  Rather, it is the *burden of the respondent to rebut the presumption* by providing sufficient evidence to establish

---

[65] *See Sparklers*, 56 FR at 20589; *see also Silicon Carbide*, 59 FR at 22586-87.

[66] *See Remand Order* at 13-14 (citing *First Remand Redetermination* at 41 (wherein Commerce cited *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F. Supp. 3d 1308, 1320-21 (CIT 2018) (*Zhejiang Quzhou*) to establish this practice)).

[67] *See, e.g.*, *China Manufacturers Alliance, LLC v. United States*, 1 F.4th 1028, 1030 (Fed. Cir. 2021) ("Our court has previously approved Commerce's application of a presumption of government control over exporters in NME countries{.}"); and *IDI v. United States*, Slip Op. 21-82 at 3.

18

that it operates autonomously from the government in certain key aspects (*i.e.*, those enumerated in the *de facto* criteria).  In the *Final Results* and *First Remand Redetermination*, we indeed discuss how control of the board and appointment of management equates to potential control of the company's operations (which necessarily includes export operations).  While there is no evidence that the SOE owners directly exercised their control on the respondents' export activities, we consider the *de facto* criteria as indicative of whether the government controls or has the potential to control export functions.  Specifically, our finding that neither Aeolus nor GTC have autonomy in the selection of management allows for the reasonable inference, in light of the presumption of government control in NME country proceedings, that their respective government shareholders maintain the potential to control the export operations of each company because the management of a firm controls its operations —including its export functions.  In *Jiasheng I*, the Court ruled that Commerce could "make reasonable inferences from the record evidence" when examining the totality of the circumstances in determining whether a respondent had demonstrated *de jure* and *de facto* control of its export activities.[68]  In *IDI vs. United States*, the Court ruled that Commerce's determination that an exporter is potentially controlled by the government – in the sense that the government has the ability to exercise actual control (even without exercising it) – suffices to establish that the exporter has failed to demonstrate its independence from *de facto* government control.[69]

---

[68] *See Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*, 28 F. Supp. 3d 1317, 1339 (CIT 2014) (*Jiasheng I*) (quoting *Certain Cut-to-Length Carbon Steel Plate from Ukraine*, 62 FR 61754, 61759 (November 19, 1997), and *Sigma* at 1405 (citation omitted), respectively; and *Daewoo Elecs. Co. v. United States*, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (explaining that substantial evidence may include "reasonable inferences from the record") (quotation marks and citation omitted))).

[69] *See IDI v. United States*, Slip Op. 21-82 at 20 ("A puppet master is no less in control when the strings are slack.") (citing *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 284 F. Supp. 3d 1350, 1359 (CIT 2018) (*An Giang II*)).

19

We understand the Court's concern with the apparent contradiction between statements that the underlying determination assessed the record with respect to each factor and the totality of evidence with respect to control or potential for control, and Commerce's reliance on precedent indicating that if a respondent is unable to rebut the presumption of government control under one of the four *de facto* criteria, a company is ineligible for a separate rate. Although our explanation could have been clearer, we respectfully disagree that Commerce need detail its evaluation of the record evidence with respect to all four factors in cases such as this. The analytical framework specifies four areas which may indicate *de facto* government control of export functions.  Commerce examines the record, as it did in the instant case, to determine whether a respondent has provided sufficient evidence to rebut the presumption of government control that applies in non-market economy country proceedings.  Crucially, a respondent must provide evidence to establish autonomy from government control with respect to all four factors in the *de facto* analysis in order to demonstrate that it operates free of government control.  For this reason, Commerce's discussion in the underlying review and in the prior remand focused on the criterion where the proffered record information contradicted the respondents' assertions that they operated autonomously with respect to the third factor and, thus, our finding that the respondents were unable to rebut the presumption of government control.  The Court has addressed this precise question in the recent *IDI vs. United States* ruling and upheld this approach, holding:

> {Commerce was not obligated to} review evidence pertaining to the remaining
> elements that were no longer material after {Commerce} concluded that IDI
> failed to establish the third element {of the *de facto* test}… Here, Commerce
> found that IDI was unable to demonstrate "that the government neither actually
> selects management nor directly or indirectly involves itself in the day-to-day
> management of the company."  As the four-part test for *de facto* control requires
> the exporter to satisfy all four elements to demonstrate independence, Commerce
> was entitled to stop there: "Because Plaintiffs failed to satisfy one *de facto*

20

criterion, Commerce had no further obligation to continue with the analysis." Contrary to IDI's argument, Commerce did not act contrary to law by declining to consider evidence pertaining to the remaining elements that were unnecessary to address.[70]

Though the determination for both Aeolus and GTC concentrated on record information related to the third prong, Commerce's finding for each respondent reviewed additional indicia of control, generally.  For example, Commerce evaluated the percentage of ownership by the SOE as the largest individual shareholder of each respondent and relevant documents, meeting notes, by-laws, articles of association, and voting actions suggestive of potential for control, generally, as well as information regarding the influence of the SOE-appointed board in GTC's decisions regarding the disposition of profits.[71]  This is precisely the totality of circumstances referenced in the *First Remand Redetermination*.  To the extent that conclusions with respect to the record evidence regarding specific factors were not expressly discussed in the *Final Results* and *First Remand Redetermination*, as discussed above, this reflects Commerce's practice that a respondent must satisfy all four factors to rebut the presumption of government control that applies in NME country proceedings and, thus, further discussion of other factors is moot when a respondent is unable to satisfy any single criterion.

Nevertheless, in compliance with the conclusion in the *Remand Order* that failure to address these factors constituted a critical flaw in Commerce's analysis, we explain here that the

---

[70] *See IDI v. United States*, Slip Op. 21-82 at 17-19 (citing *Zhejiang Quzhou* 350 F. Supp. 3d at 1321; *Shandong Rongxin Imp. & Exp. Co. v. United States*, 203 F. Supp. 3d 1327, 1348 (CIT 2017) (*Rongxin II*); and *Shandong Rongxin Imp. Exp. Co. v. United States*, 331 F. Supp. 3d 1390, 1400–3 (CIT 2018)).  Critically, the underlying facts of the *IDI v. United States* case mirrored those of the instant litigation, where the largest minority shareholder of the respondent in question was an SOE, and the respondent's separate rate was denied based on a failure to rebut the presumption with respect to autonomy of management selection.

[71] As the Court did not take up the merits of the factual findings with respect to Commerce's analysis of the third factor for each respondent, the fourth factor with respect to GTC, nor the level of relative government ownership or record information otherwise indicative of potential for control, generally, we do not further discuss these findings in this redetermination and instead incorporate the relevant discussion from the *Final Results* and *First Remand Redetermination* by reference, herein.

21

record evidence provided by Aeolus and GTC demonstrated that the general manager and the export sales manager(s)) set export prices for each entity,[72] and there was no indication of direct involvement or approval on behalf of any government authority regarding price-setting (the first factor).  Moreover, both GTC and Aeolus provided sufficient evidence to demonstrate that each company has authority to negotiate and sign contracts and other agreements on its own behalf (the second factor).[73]  Further, the record with respect to Aeolus reflected that the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses (*i.e.*, the fourth factor).[74]

Finally, the *Remand Order* explains that because Commerce did not address the first of its *de facto* factors – which inquires as to whether the export prices are set by, or are subject to, the approval of a government authority – the Court has no such finding of fact to subject to judicial review under the substantial evidence standard that the Chinese government, rather than Aeolus or GTC, controlled the prices at which these companies' subject OTR tires were sold for export during the POR.  Implicit in the Court's discussion is the apparent conclusion that the first factor is the preeminent consideration in the *de facto* analysis, and that a lawful finding that a respondent has failed to rebut the presumption of *de facto* government control must necessarily rely upon evidence indicative of government influence on export pricing (and that affirmative evidence demonstrating a firm's independence in export price setting is alone sufficient to rebut the presumption of control).  As explained above, however, the four factors, together, relate to the determination of whether a respondent has rebutted the presumption that the Chinese

---

[72] *See* GTC's Letter, "Section A Questionnaire Response," dated January 16. 2016 (GTC's SAQR), at 9-10 and Exhibit A-5; *see also* Aeolus's Letter, "Separate Rate Application in the Seventh Administrative Review of the Antidumping Duty Order on Certain New Pneumatic Off-the-Road Tires from the People's Republic of China," dated December 11, 2016, at Exhibit 12.
[73] *See* GTC's SAQR at 9; *see also* Aeolus's SRA at 20 and Exhibit 12.
[74] *See* Aeolus's SRA at 22-23 and Exhibits 10 and 14.

government exerts control over the export functions of a firm.  An approach whereby the only relevant consideration is whether export prices are set by, or are subject to, the approval of a government entity would be inconsistent with the *de facto* analytical framework, because it would make the remaining three factors irrelevant.

As noted above, Commerce examined the totality of evidence.  To the extent that we made no explicit finding with respect to the first factor in the *Final Results* and *First Remand Redetermination*, we have clarified above that both Aeolus and GTC provided sufficient evidence to demonstrate that company officials set export prices, and there is no indication of explicit involvement or approval authority in this process by any government entities, and no party provided information on the record to contradict this finding.[75]  Nevertheless, because failure to establish autonomy with respect to one prong of the analysis means that a respondent has not met its burden to rebut the presumption of government control, our findings related to the first factor do not otherwise overcome Commerce's findings that Aeolus and GTC failed to establish autonomy from government control in making decisions regarding the selection of management, which are corroborated by the totality of evidence indicative of potential for control.

Further, limiting the examination of the *de facto* analysis primarily to the existence of evidence of direct government involvement in price-setting necessarily ignores other aspects of export activities where the government may exert control, such as influence over export quantities/quotas, terms of sale, financing, customer relationships, contract negotiation,

---

[75] Accordingly, we respectfully disagree with the Court's conclusion that our underlying determination included an insufficiently supported presumption or inference "that the Chinese government set or controlled the prices at which {Aeolus and GTC} sold subject off-the-road tires to the U.S. market during the POR was unsupported by substantial record evidence."  *See Remand Order* at 25 and 27.  We made no such presumption or inference with respect to the first factor; rather, our discussion focused on the respondents' inability to establish autonomy from government control with respect to the selection of management.

23

transportation, customs requirements, management directives, selection of export markets, export-related investment, *etc*.[76]  A standard requiring evidence of direct government involvement in price-setting before finding government control would be almost impossible to meet, requiring that a "smoking gun" document exist on the record showing direct involvement on behalf of a government authority in price-setting for an individual firm.  Even in a hypothetical situation where government involvement in price-setting is direct and unambiguous, actual affirmative documentation of such activity is unlikely to exist, and the ability of Commerce to compel that any such information to be provided to the record extremely limited. It is for precisely this reason that Commerce evaluates the four factors, as well as any other information on the record that supports sustaining the presumption of government control, and may determine that failure to establish independence from the government in any one such factor is sufficient to demonstrate failure to rebut the presumption of control.

In compliance with the *Remand Order*, we have re-evaluated the record with respect to each of the four prongs of the *de facto* analysis, including the first prong with respect to independence from government influence in export price-setting.  We continue to find that record information specific to each respondent reflects a measure of control on behalf of relevant SOE shareholders in the selection of the board of directors and management for each firm and, thus, does not adequately substantiate autonomy of each firm in the selection of directors and management during the POR, as corroborated by additional indicia of control generally (such as the percentage of ownership by the SOE as the largest individual shareholder of each respondent

---

[76] *See* Policy Bulletin 05.1 at 1-2 ("{T}he test focuses on controls over the decision-making process on export-related investment, pricing, and output decisions at the individual firm level."); *see also, e.g.*, *Final Determination of Sales at Less Than Fair Value:  Certain Cut-to-Length Carbon Steel Plate from Ukraine*, 62 FR 61754, 61757 (November 19, 1997); and *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review*, 62 FR 61276, 61279 (November 17, 1997).

and relevant documents, meeting notes, by-laws, articles of association, and voting actions suggestive of potential for control), as well as information regarding influence of the SOE-appointed board in GTC's decisions regarding the disposition of profits.  We determine this evidence to be sufficient to find that neither GTC nor Aeolus rebutted the presumption of government control or potential for control over their export functions.

## III.    DISCUSSION OF RESPONDENTS' COMMENTS

Aeolus and GTC's Comments on the Draft Results were not separated out into distinct issues, but rather presented in five sections of substantive comment (Sections IV-VIII).

The respondents acknowledge Commerce's statement that because the Court did not take up the merits of the factual findings underlying the separate rate analysis applied, the Draft Results do not further discuss these findings in this redetermination, instead incorporating the relevant discussion from the *Final Results* and First Remand Redetermination by reference. However, the respondents note that, as the Federal Circuit requires that litigants exhaust all arguments anew for each remand,[77] Commerce must identify the specific bases on which it is continuing to deny the respondents' separate rates, and that lacking such specificity, it is necessary to incorporate their own briefings on the underlying separate rate analysis (at Exhibits 1-3 of Respondents' Comments).  Moreover, the respondents assert that the "strained" findings that the Draft Remand incorporates to justify denying a separate rate for Aeolus and GTC do not withstand scrutiny and thus compel reiteration of the respondents' prior arguments on the instant record in response to the Draft Remand.

Accordingly, the respondents' comments may be bifurcated into two parts:  1) Comment directly rebutting the findings of the Draft Results (Section IV, which details the purported

---

[77] *See* Respondents' Comments at 31 and 48 (citing *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1384 (Fed. Cir. 2008); and *AIMCOR v. United States*, 141 F.3d 1098, 1111-12 (Fed. Cir. 1998)).

inconsistency between the Draft Results and relevant precedent and the *Remand Order*, and Section VII, which asserts that GTC and Aeolus established, and the Court held, that the presumption of state control was sufficiently rebutted), and 2) reiteration of comments previously submitted in the respondents' briefs challenging the *Final Results* and First Remand Redetermination (Section V, rebutting Commerce's factual findings denying GTC's separate rate, Section VI, rebutting Commerce's factual findings denying Aeolus's separate rate, and Section VIII, regarding purported contradictions between the separate rate analysis applied and prior segments).

For the sake of clarity, in summarizing and addressing the comments, below, we have bifurcated respondents' arguments into two sections:  A) Comments on the Distinct Findings of the Draft Results (addressing Sections IV and Section VII of Respondents' Comments together as a single comment), and B) Reiteration of Respondents' Comments In Response to the *Final Results* and First Remand Redetermination (addressing Sections V, VI, VIII, each as separate comments).

## A.  Respondents' Comments on the Draft Results

**Comment 1:   The Draft Results are Inconsistent with and Cannot be Reconciled to Applicable Precedent, Misapply the Relevant Presumption, and Misconstrue and Fail to Address the *Remand Order***

*Respondents' Comments*
- The standard set up by Commerce's separate rates practice is to determine whether a respondent can demonstrate the absence of *de jure* and *de facto* governmental control over its export activities.[78]  This analysis relies upon a holistic inquiry, examining the totality of circumstances, and Commerce has repeatedly held that government ownership alone does not preclude eligibility.[79]  Indeed, in numerous cases, Commerce has granted separate rates to

---

[78] *See* Respondents' Comments at 5-6 (citing, *e.g.*, *Sparklers*, 56 FR at 20589; *Silicon Carbide*, 59 FR at 22586-89; *Furfuryl Alcohol*, 60 FR at 22545; and Policy Bulletin 05.1).
[79] *Id.* at 7 (citing, *e.g.*, *Jiasheng I*, 28 F. Supp. 3d at 1339 (CIT 2014); and *Silicon Carbide*, 59 FR at 22586-89).

26

respondents with even 100 percent government ownership.[80]  Whereas respondents bear the burden of rebutting the presumption of government control, the Court has held that this presumption vanishes when a party produces a "minimum quantum of evidence" against it.[81]

- In numerous prior proceedings, the CIT requires separate rate denials be based on actual government control as opposed to mere potential for control.[82]  The Court confirmed this principle here in the *Remand Order*, and invalidated the denial of separate rates for GTC and Aeolus because both respondents submitted sufficient evidence to rebut the presumption of state control, and Commerce was unable to affirmatively demonstrate that the Chinese government controlled their export pricing decisions during the POR.[83]

<u>The Draft Results Misconstrue the Remand Order and Applicable CIT Precedent</u>

- Accordingly, the continued denial of the separate rate for GTC and Aeolus in the *Draft Results* disregards the CIT's express directive that:  (a) Commerce must find state control over export activities to deny separate rate status; (b) the presumption of state control was rebutted, requiring Commerce to provide affirmative evidence of state control; and (c) precedent involving majority SOE-owned respondents is readily distinguished and inapposite to the facts underlying GTC and Aeolus' separate rate applications.
  - First, the Draft Results claim that the CIT erroneously interpreted Commerce's separate rate analysis in stating that "Implicit in the Court's discussion is the apparent conclusion that the first factor is the preeminent consideration in the *de facto* analysis, and that a lawful finding that a respondent has failed to rebut the presumption of *de facto* government control must necessarily rely upon evidence indicative of government influence on export pricing… An approach whereby the only relevant consideration is whether export prices are set by, or are subject to, the approval of a government entity would be inconsistent with the *de facto* analytical framework, because it would make the remaining three factors irrelevant."[84]
    - The fundamental problem with this attempt to correct the CIT is that the focus on export price-setting comes directly from Commerce's own longstanding practice:  *i.e.*, the purpose of the separate rate analysis has always been to determine whether a respondent can demonstrate the absence of *de jure* and *de facto* governmental control over its export activities.[85]
    - Critically, the *Remand Order* invalidated the separate rate denials of GTC and Aeolus "{b}ecause Commerce has identified a respondent's 'export functions'

---

[80] *Id.* at 8 (citing, *e.g.*, *Notice of Final Determination of Sales at Less Than Fair Value:  Hot-Rolled Carbon Steel Flat Products from the People's Republic of China*, 66 FR 49632 (September 28, 2001), and accompanying IDM at Comment 1).

[81] *Id.* at 9 (citing *Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1037 (Fed. Cir. 1992) (*Aukerman*)).

[82] *Id.* at 9-11 (citing *Jiasheng I*, 28 F. Supp. 3d at 1339 n.160 and 1348-50 (CIT 2014); *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 121 F. Supp. 3d 1263, 1269 (CIT 2015) (*Jiasheng II*); *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 203 F. Supp. 3d 1256, 1291- 92 (CIT 2017) (*An Giang I*); and *Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 519 F. Supp. 3d 1224 (April 29, 2021) (*Jilin Forest*)).

[83] *Id.* at 11-13 (citing *Remand Order* at 7-8).

[84] *Id.* at 14-15 (citing, *e.g.*, *Sparklers*, 56 FR at 20589; *Silicon Carbide*, 59 FR at 22586-89; *Furfuryl Alcohol*, 60 FR at 22545; *Jilin Forest* at 5; and *Shandong Huanri (Gr.) Gen. Co. v. United States*, 493 F. Supp. 2d 1353 at 1357 (CIT 2007) (*Shandong Huanri*)).

[85] *Id.* at 14.

(or 'activities') as the subject of its separate rate inquiry."[86]  The CIT did not graft an additional analytical requirement as the Draft Results insinuate; the CIT merely required that the separate rate denials in AR7 be tethered to the respondents' export functions – in accordance with longstanding practice.  In this sense, the Draft Results refuse to heed a direct judicial finding, not an implicit one, that the denial of the separate rate for the respondents must be "supported by valid factual findings that the Chinese government, rather than Aeolus or GTC, controlled the prices at which these companies' subject {OTR} were sold for export during the POR."[87]

- Rather than suggest that export pricing is the long relevant inquiry, the CIT found that Commerce could not ignore this overarching purpose of the separate rate analysis in denying separate rates for GTC and Aeolus.  The Draft Results concede that "there is no evidence that the SOE owners directly exercised their control on the respondents' export activities" because "Aeolus and GTC provided sufficient evidence to demonstrate that company officials set export prices, and there is no indication of explicit involvement or approval authority in this process by any governmental entities, and no party provided information on the record to contradict this finding."[88]  The Draft Results thereby correctly and candidly acknowledge that there is no explicit evidence that the Chinese government 'actually did control' export pricing.  Accordingly, the *Remand Order* leaves Commerce no room to deny separate rates for GTC and Aeolus, yet the Draft Results do exactly that, by recasting the CIT's mandate as "{a}n approach whereby the only relevant consideration is whether export prices are set by, or are subject to, the approval of a government entity."[89]

- The Draft Results err in its reading of the CIT's concern that "{b}ecause Commerce, in the {First Remand}, did not apply the first of its factors— which inquires as to whether the export prices are set by or are subject to the approval of a government authority—the court has no such finding of fact to subject to judicial review under the substantial evidence standard," as an indication that the critical flaw was a mere failure to address these factors, and that the remedy required on remand was to be more clear in acknowledging and addressing these factors.[90]  It defies credulity to treat the *Remand Order* as merely requesting confirmation that the record is devoid of any indicia of state control with respect to export activities in order to deny the separate rates.  Rather, the CIT was clear that such findings were a legal prerequisite to denying the separate rates in stating the continued denials must be "supported by valid factual findings that the Chinese government, rather than Aeolus or GTC, controlled the prices at which these companies' subject {OTR} tires were sold for export during the POR."[91]  The critical omission found by the

---

[86] *Id.* at 15 (citing *Remand Order* at 18).
[87] *Id.* (citing *Remand Order* at 9).
[88] *Id.* at 15-16 (citing the Draft Results at 18 and 22-23).
[89] *Id.*
[90] *Id.* at 17-18 (citing *Remand Order* at 20).
[91] *Id.* at 16-18 (citing *Remand Order* at 19).

CIT was not merely the absence of findings of fact on the issue but instead the absence of "valid factual findings that the Chinese government, rather than Aeolus or GTC, controlled the prices at which these companies' subject {OTR} tires were sold for export during the POR" themselves.[92]

## Commerce Misconstrued the Legal Standards with Respect to the Rebuttable Presumption and Is Required, but Failed, to Present Affirmative Evidence of Control

*Respondents' Comments*

- The Draft Results err by misconstruing the analytical framework in which the presumption of control operates, including various statements which incorrectly suggest that the respondents are required to conclusively establish a lack of state control.[93]  However, the party against whom a presumption operates need not "establish," "demonstrate," or "satisfy" the presumed fact (*i.e.*, prove separation from government control), rather, once GTC and Aeolus submitted the "minimum quantum of evidence" creating "genuine dispute" as to whether they were state controlled during the POR, the presumption vanished.[94]  The respondents surpassed this minimal evidentiary threshold, proved independence with respect to price setting and sales negotiating, and sufficiently satisfied this standard with respect to management selection and profit disposition.
  - The Draft Results improperly conflate "sufficient evidence" to rebut the presumption – *i.e.*, the "minimum quantum" – with evidence to conclusively "establish" the presumed fact – *i.e.*, that GTC and Aeolus operate autonomously from the government.[95]
  - The Draft Results ignore the CIT, having found that GTC and Aeolus did in fact provide the requisite "sufficient evidence" to cast doubt upon their being state controlled, and Commerce thus became obligated to "affirmatively establish in each instance the government is actually controlling the respondent's export activities, including pricing decisions" before denying the separate rate.  Commerce was thus required to adequately establish state control, and the "measure of control" was insufficient.
    - Commerce's finding that Aeolus and GTC failed to establish autonomy from government control in making decisions regarding the selection of management thus:  1) misconstrues the operation of presumptions, as discussed above; 2) ignores contrary record evidence to rebut this factor, as detailed separately; and 3) disregards the CIT *Remand Order* findings that Aeolus and GTC rebutted the presumption of state control in all respects.
    - The Draft Results claim that the *Remand Order* establishes "{a} standard requiring evidence of direct government involvement in price-setting before finding government control would be almost impossible to meet, requiring that a 'smoking gun' document exist on the record showing direct involvement on behalf of as government authority in price-setting for an

---

[92] *Id.*
[93] *Id.* at 18-19 (citing Draft Results at 14-15, 21, 23, 24).
[94] *Id.* at 19-20 (citing *Aukerman*, 960 F.2d at 1037 (Fed. Cir. 1992)).
[95] *Id.* at 21.

individual firm."[96]  Commerce's complaint about supposed difficulties obtaining the requisite evidence to deny separate rates for GTC and Aeolus is both incorrect and irrelevant.  Governmental price-setting is expected to be documented, and Commerce can readily solicit such information in response to questionnaires – in the form of narrative responses, in the event documentation does not exist.  Even if such information were difficult to obtain, that does not relieve Commerce from its obligation to affirmatively demonstrate state control.  Commerce faults the requirement for direct evidence of government involvement in price setting as ignor{ing} other aspects of export activities where the government may exert control (such as influence over export quantities/quotas, terms of sale, financing, customer relationships, contract negotiation, transportation, customs requirements, management directives, selection of export markets, export-related investment, *etc.*), yet the Draft Results proffers no evidence of state control.  It is improper for the Draft Results to avoid the CIT's requirement for affirmative evidence of state control by listing potential ways in which state control could be exercised.[97]

- The Draft Results only identifies "voting actions suggestive of potential for control" and other "evidence indicative of potential for control."[98]  Such finding of potential control cannot be reconciled with the CIT's articulation of Commerce's practice: "Commerce's practice does not require a respondent to rebut the potential for government control, but rather actual control by the government entity."[99]  Indeed, the CIT expressly rejected this very position in the *Remand Order*, stating, "{The First} Remand Redetermination presumes, without evidentiary support, that Commerce's finding of a lack of autonomy in the selection of management was the factual equivalent of a finding that the Chinese government controlled what Commerce termed a company's "export activities".[100]  The Draft Results cannot credibly maintain the exact same reasonable inference of state control based on the exact same record which the CIT expressly found could not sustain a reasonable inference.

<u>Commerce's Denial of Separate Rates Disregards the CIT's Finding That Precedent Involving Majority SOE Ownership Precedent Is Inapposite to GTC and Aeolus</u>

- The Draft Results contradicts established CIT precedent by improperly discounting the fact that GTC and Aeolus had minority – and not majority – SOE ownership.  The Draft Results is incorrect that SOE ownership percentage is only relevant insofar as making it easier for Commerce to deny separate rates for majority SOE respondents.  Rather, SOE ownership percentage concomitantly makes it more difficult for Commerce to deny separate rates for minority SOE respondents; the CIT has affirmed the principle that "Commerce has required additional indicia of control prior to concluding that a respondent company could not rebut

---

[96] *Id.* at 22 (citing Draft Results at 23-24).
[97] *Id.* at 22-23.
[98] *Id.* at 23 (citing Draft Results at 18-19, 20, and 23).
[99] *Id.* at 24 (citing *An Giang I*, 203 F. Supp. 3d at 1291-92 (CIT 2017)).
[100] *Id.* (citing *Remand Order* at 16).

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

the presumption of *de facto* government control where the government owns, either directly or indirectly, only a minority of shares in the respondent company."[101]  The Draft Results improperly denied separate rates for the respondents having minority SOE ownership without evidencing any state control, let alone the "additional indicia" required.

- The CIT has repeatedly found that substantially more evidence is required to deny separate rates for respondents having minority SOE ownership,[102] and the *Remand Order* expressly found that "the degree of government ownership is . . . a distinguishing factor in applying the *de facto* analysis," in finding that Commerce cannot rely on precedent involving majority SOE ownership to deny separate rates for GTC and Aeolus, as it did in the Draft Results. Accordingly, the Draft Results flout the *Remand Order* by continuing to deny companies their separate rates through invalidated reliance on prior cases where management selection was discussed as a factor in denying the separate rate for a majority government-owned respondent,[103] and further misplaces reliance on a single CIT ruling where management selection was a factor in the denial of the separate rate for a non-majority SOE owned firm (as well as other cases which the Court has not reviewed).[104]

- Commerce is incorrect in characterizing the *IDI v. United States* case as one which mirrors the instant litigation, where the largest minority shareholder of the respondent in question was an SOE, and the respondent's separate rate was denied based on a failure to rebut the presumption with respect to autonomy of management selection.  Rather, the IDI separate rate was denied based on specific factual findings including that "Commerce found that a government official and Communist Party member— referred to as Mr. X—represented the Vietnamese government on the boards of both IDI and its corporate parent, Company Y."[105] In that litigation, the Court rejected the respondent's claim that Commerce found only the possibility of state control and, unlike in the instant case, upheld that Commerce's finding that the Vietnamese government actually controls the respondent.  Commerce has not and cannot make findings that important managerial decisions for GTC, Aeolus, and their parent companies during the AR7 POR were made by both Chinese government officials and Communist party members.  However, assuming *arguendo* that the IDI decision is not limited to cases in which multiple government and party officials make important decisions for relevant respondent corporate entities during the POR, Commerce should not apply that decision to the facts in this case, as the *Remand Order* noted that none of the decisions relied upon by Commerce to deny the AR7 separate rates have precedential effect and the only precedent governing the Draft Results is the CIT *Remand Order* itself.[106]

---

[101] *See* Respondents' Comments at 25 (citing *An Giang II*, 284 F. Supp. 3d at 1359 (CIT 2018)).

[102] *Id.* at 26 (citing *Zhejiang Quzhou*, 350 F. Supp. 3d at 1318 (CIT 2018)).

[103] *Id.* (citing *Zhejiang Quzhou*, 350 F. Supp. 3d at 1320-21 (CIT 2018); *Yantai CMC*, 203 F. Supp. 3d at 1326 (CIT 2017); and *Advanced Tech II*, 938 F. Supp. 2d 1342 (CIT 2013)).

[104] *Id.* at 27 (citing *IDI v. United States*, Slip Op. 21-82 (CIT July 6, 2021)).

[105] *Id.* at 28-29 (citing *IDI v. United States*, Slip Op. 21-82 (CIT July 6, 2021)).

[106] *Id.* at 29 (citing *D&L Supply Co. v. United States*, 22 CIT 539, 540 (CIT 1998) (*D&L Supply*); *Advanced Tech III*, 581 F. App'x 900 (Fed. Cir. 2014); and *Nakornthai Strip Mill Pub. Co. v. United States*, 587 F. Supp. 2d 1303 (CIT 2008) (*Nakornthai*)).

31

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

GTC and Aeolus Rebutted the Presumption of Control

- The CIT *Remand Order* correctly found that both GTC and Aeolus had rebutted the presumption of state control.[107] This finding – based on extensive evidence submitted by GTC and Aeolus in AR7 – was "sufficient to put the existence of the presumed fact" – *i.e.*, government control – into genuine dispute.[108] Aeolus and GTC sufficiently rebutted the presumption of state control. As discussed in the prior remand proceeding (and resubmitted to the instant record, discussed below), record evidence demonstrates that GTC and Aeolus exceeded the "minimum quantum of evidence;" thus, the presumption completely vanished, and Commerce became obligated to affirmatively demonstrate that GTC and Aeolus were in fact controlled by the Chinese government, but did not do so.
  - This CIT has affirmed that "Commerce has required additional indicia of control prior to concluding that a respondent company could not rebut the presumption of *de facto* government control where the government owns, either directly or indirectly, only a minority of shares in the respondent company."[109] Yet that is precisely what Commerce has done, by relying on select facts that, at most, establish a mere potential for government control.
  - CIT rulings in consecutive reviews of the AD order on frozen fish fillets from Vietnam demonstrates how the presumption operates in the minority SOE ownership context. The respondent in that proceeding initially failed to overcome the presumption of government control by neglecting to submit AoA covering the entire POR, and the CIT found that it had not carried its "burden to populate the record with evidence rebutting the existence of *de facto* government control" because "restrictions placed on the minority government shareholder" in the AoA may have not extended throughout the POR.[110] However, in the subsequent review where Caseamex submitted its AoA for the entire POR, the CIT invalidated Commerce's separate rate denial because "the AoA precludes the minority government shareholder from exercising any independent influence on the Board of Directors or any manager . . . . Although Caseamex has the burden of rebutting government control, it has rebutted that presumption here."[111] *CASEAMEX* is, thus, entirely on point and compels granting a separate rate in AR7 to GTC and Aeolus, who like Caseamex have minority SOE ownership. It is undisputed that GTC and Aeolus submitted their AoA encompassing the entire POR. With such shareholder protections against majority SOE owner control in effect throughout the POR, GTC and Aeolus have rebutted that presumption. Given the schism depending on whether the SOE ownership is majority or minority recognized by the CIT in the *Remand Order* and prior precedent, Commerce misplaced reliance on instances involving majority SOE ownership; such precedent is wholly inapposite with respect to minority SOE ownership, such as GTC and Aeolus.[112]

---

[107] *Id.* at 62 (citing *Remand Order* at 21-22).

[108] *Id.* at 62 (citing *Aukerman* 960 F.2d at 1037 (Fed. Cir. 1992)).

[109] *Id.* (citing *An Giang II*, 284 F. Supp. 3d at 1359 (CIT 2018)).

[110] *Id.* at 63 (citing *An Giang II*, 284 F. Supp. 3d at 1359 (CIT 2018)).

[111] *Id.* (citing *Can Tho Import-Export Joint Stock Co. v. United States*, 415 F. Supp. 3d 1187, 1195 (CIT 2019) (*CASEAMEX*)).

[112] *Id.* at 64.

The Draft Results Cannot Lawfully Be Finalized

- Because the Draft Results do not comply with the CIT's explicit instruction to reach new decisions in accordance with this Opinion and Order, such noncompliance would prevent the Draft Results, if finalized, from being affirmed because the CIT "reviews remand determinations for compliance with the Court's *Remand Order*."[113]   Should Commerce continue to disagree with the judicial findings in the *Remand Order*, it should grant GTC and Aeolus separate rates under protest rather than unnecessarily drag out these proceedings.  It is improper for Commerce to re-litigate before the CIT issues for which the CIT has already ruled in favor of GTC and unlawful and unfair to further drag out this appeal and make the CIT invalidate separate rate denials for a third time – especially since this proceeding involves entries from more than 2014-2015, of a product for which the AD order was revoked more than two years ago.[114]

**Commerce's Position**:  The respondents assert that Commerce incorrectly interpreted the

directive of the *Remand Order* in characterizing the Court's reasoning as effectively requiring a

standard by which the primary consideration is whether export prices are set by, or are subject to,

the approval of a government entity.  As we explain in our final analysis, such a standard would

be inconsistent with the *de facto* analytical framework because it would make the remaining

three factors irrelevant.  The respondents contend that Commerce's attempt to re-state the CIT's

directive merely serves to set up a "straw man" argument to re-cast the clear mandate from the

Court.  However, the respondents later argue that the *Remand Order* requires a finding that the

Chinese government controlled export price-setting as a legal pre-requisite to denying the

separate rate of a respondent.[115]  The respondents cannot have it both ways—faulting Commerce

for stating that the *Remand Order* implies that the preeminent consideration is whether export

prices are set by the government, while simultaneously asserting that government control of

export prices is a legal prerequisite to denying a separate rate.  Moreover, Commerce's

discussion of the implications of the Court's reasoning is not meant to create a straw man or

---

[113] *Id.* at 30 (citing *Nakornthai*, 587 F. Supp. 2d at 1303 (CIT 2008)).
[114] *Id*. at 30-31 (citing *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China:  Final Results of Sunset Reviews and Revocation of Antidumping Duty and Countervailing Duty Orders*, 84 FR 20616 (May 10, 2019) (*OTR Tire Revocation*)).
[115] *See* Respondents' Comments at 16-18.

avoid the Court's mandate, but rather to clarify how Commerce considers the four factors in its separate rate analysis.  As we have explained, the four factors all relate to whether a respondent has rebutted the presumption that the Chinese government exerts control over the export functions of a firm.  Therefore, as noted above, substantial precedent supports Commerce's view that, if a respondent is unable to establish autonomy from the government under one of the four *de facto* criteria, that company fails to rebut the presumption of government control and is ineligible for a separate rate.[116]

Additionally, we disagree with the respondents' characterization of the *Remand Order* as unambiguous on certain conclusions or dictating a specific result.  The *Remand Order* is clear that the instant redetermination requires reconsideration of the separate rate decision and that any revisions to the AD rates are to be implemented only as may be required by such reconsideration.  Yet, the operative language of the remand does not dictate specific findings or restrict others, only specifying reconsideration in accordance with the opinion.  As part of this reconsideration, we have clarified certain aspects of our analysis and the separate rate test to address concerns raised by the Court.  Specifically, we have addressed the Court's statement that we did not apply the first factor, explaining that a respondent must submit evidence for all four factors and such evidence is considered but, because each factor must be satisfied to rebut the presumption of government control, we may not expressly discuss other factors in a decision memorandum when a respondent is unable to satisfy any single factor.  Additionally, we have addressed the Court's statement that Commerce "failed to conduct the review" so as to determine whether the Chinese government controlled the prices of subject merchandise that was sold for export by the respondents, explaining that the four factors, together, relate to the determination of whether a

---

[116] *See, e.g.*, *IDI v. United States*, Court No. 20-00107, Slip Op. 21-82 (CIT July 6, 2021); *Zhejiang Quzhou*, 350 F. Supp. 3d at 1320-21; and *Silicon Carbide*, 59 FR 22586-22587, and IDM at Comment 2.

respondent has rebutted the presumption that the Chinese government exerts control over the export functions of a firm.  Contrary to the respondents' assertions, these explanations are not part of an attempt to flout the CIT's findings or to refuse to comply with the *Remand Order*.

The respondents would have Commerce abandon its prior findings based on a supposition regarding the scope of the remand directive.  Specifically, Commerce made findings based on the record evidence for both GTC and Aeolus that the companies failed to establish their autonomy in the selection of management.  The *Remand Order* does not address these particular findings or rule on whether they are supported by substantial evidence.[117]  Moreover, the *Remand Order* does not expressly state that Commerce's established practice—where a company fails to rebut the presumption of government control if it fails to satisfy any one of the factors—is invalid or inconsistent with the law.  Rather, it merely concludes that the fact patterns in the cases cited by Commerce (*Advanced Tech.* and *Yantai CMC*) are distinguishable from those here.  Accordingly, we do not understand the Court to have invalidated the bases upon which Commerce found that GTC and Aeolus failed to rebut the presumption of government control.  Instead, the Court focused on the lack of specific evidence regarding Chinese government control of prices during the POR.[118]  We have responded to the Court's concerns by clarifying our practice and our findings in key respects, as detailed in the Final Analysis.

In contrast to the respondents' characterization of the Draft Results as "flouting" the order, Commerce has directly addressed the concerns identified in the *Remand Order* and explained more fully our existing practice, and thus, we believe that our redetermination here is fully compliant with the *Remand Order*.

---

[117] *See Remand Order* at 25-26.
[118] *Id.*

The respondents then argue that Commerce's decision to deny them separate rates is contrary to the manner in which the presumptions should operate. According to the respondents, a presumption vanishes upon introduction of evidence *sufficient to support a finding of the nonexistence of the presumed fact* (emphasis added).[119] Notwithstanding this claim, the respondents do not establish that Commerce misapplied the NME presumption in this case. Here, the respondents ignore that the evidence submitted by GTC and Aeolus did not establish that they operated autonomously from the government in selecting management. The respondents have therefore not met their burden in rebutting the presumption of government control, *i.e.*, that they must demonstrate autonomy from the government under each of the four *de facto* factors in the separate rate analysis.[120]

The respondents argue that Commerce erroneously applied the presumption of state control because Commerce erroneously treated GTC and Aeolus, respectively, under criteria reserved for exporters that are majority-owned by the government, whereas, in this case, state-owned entities own a minority of shares of each company. The respondents cite to *Jiasheng I* and *An Giang II* in arguing that Commerce requires additional indicia of government control where the government owns, either directly or indirectly, only a minority of shares in the respondent company and that, where the government owns a majority of shares, Commerce finds that government ownership, in and of itself, precludes a finding of *de facto* autonomy. We disagree with the respondents. In this administrative review Commerce has properly applied its separate rate analysis; in minority ownership situations, Commerce evaluates evidence related to the four *de facto* factors to determine whether there are indicia of government control or whether the respondents have established that they operate autonomously from the government.

---

[119] *See* Respondents' Comments at 19-20 (citing *Aukerman*, 960 F.2d 1020, 1037 (Fed. Cir. 1992)).
[120] *See First Remand Redetermination* at 26 and 32.

36

The respondents claim that the Draft Results further flout the *Remand Order* by continuing to deny their separate rates through invalidated reliance on prior cases where management selection was discussed as a factor in denying the separate rate for majority government-owned respondents, and further misplaces reliance on a single CIT ruling where management selection was a factor in the denial of the separate rate for a non-majority SOE-owned firm (as well as other cases which the Court has not reviewed).  However, as the Draft Results note, the degree of government ownership is not a distinguishing factor in applying the *de facto* analysis.  Nowhere in the language of the *de facto* framework (*i.e.*, the four prongs), the *Sparklers* or *Silicon Carbide* precedent establishing the standard, nor the *Advanced Tech.*, *Yantai CMC*, or *Zhejiang Quzhou* cases affirming Commerce's practice that a respondent must rebut the presumption for all factors, is there any mention of a threshold for government ownership in applying this relevant analytical framework.  For example, in, *Advanced Tech. II*, this Court sustained Commerce's denial of a separate rate to a respondent that failed to rebut the presumption of government control over its selection of management.[121]  Here, as in *Advanced Tech. II*, Commerce reasonably determined that Chinese-owned entities possessed the ability to appoint the companies' boards, and therefore, management.  Accordingly, *Advanced Tech. II* supports Commerce's determination that the respondents failed to rebut the presumption of government control.  Thus, majority ownership by a government entity is a consideration only in the sense that such level of ownership establishes control of a respondent by a government entity, and given that control, a respondent cannot demonstrate that they operate autonomously from the government under the four factors.  These are both crucial considerations for the Court.

---

[121] *See Advanced Tech II*, 938 F. Supp. 2d at 1350.

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

Moreover, the respondents too quickly dismiss the relevance of the cases cited with respect to minority ownership, noting that most were not subject to judicial review, without acknowledging the similarities to the separate rate analysis applied in the instant case.  Indeed, as noted in the Draft Results, one such non-reviewed case was the very *Silicon Carbide* decision which established Commerce's four factor standard of analysis for *de facto* control.[122]  The respondents then attempt to dismiss *IDI v. United States* as inapposite.  We disagree.  The respondents attempt to distinguish this case based on Commerce's finding in the underlying decision that the Vietnamese government actually did control management selection, whereas in the instant case, Commerce found only the potential for control.  However, this ignores the critical preface to the CIT's holding in that case.  In addressing the plaintiff's argument that Commerce determined the Vietnamese government only had the potential to control IDI and not that it actually controlled IDI, the Court explained:

> {E}ven if IDI's characterization of Commerce's decision were correct, {Commerce}'s determination that an exporter is potentially controlled by the government—in the sense that the government has the '*ability* to exercise actual control (even without exercising it)'—suffices to establish that the exporter has failed to demonstrate its independence from *de facto* government control.  A puppet master is no less in control when the strings are slack."[123]

Although Aeolus and GTC note that board members in the *IDI* case were members of Chinese Communist Party (CCP), whereas the SASAC-appointed directors for each respondent in the instant case are not, themselves, members of the CCP, this fact goes to the sufficiency of our determination in this review that the respondents failed to demonstrate autonomy in the selection of management.  On that substantive point, the Court has yet to render a decision in this

---

[122] *See Silicon Carbide*, 59 FR 22586-22587 at Comment 2 ("Respondents Hainan and Shaanxi have failed to establish their eligibility for separate rates because, at verification, these companies failed to produce bank records necessary to prove their retention of proceeds from export sales.  Therefore, these respondents did not meet an important criterion for separate rates.").
[123] *See IDI v. United States*, Slip Op. 21-82 at 20 (citing *An Giang II*, 284 10 F. Supp. 3d 1350, 1359 (CIT 2018)).

38

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

litigation.  Notably, the fact that the board members in *IDI* were party members was not a factor discussed by the Court as relevant to its decision that Commerce's separate rate analysis was lacking, nor was it relevant to the Court's statements that potential government control suffices to establish the exporter has failed to demonstrate its independence from *de facto* control. Finally, we note that in the *IDI* case, state-controlled actors held no ownership interest in the relevant respondent, whereas SOEs are the largest individual shareholders of Aeolus and GTC in the instant case.  Our characterization of the *IDI* case as "mirroring" that of the instant case was not an indication that all facts and considerations were precisely the same; no two cases are identical.  Regardless, Commerce maintains that the *IDI* case is indeed instructive in drawing reasonable inferences based on record evidence and relevant precedent when examining the totality of the circumstances.  Thus, we continue to find the precedent involving denial of separate rates (whether the firms are majority or minority owned) to be relevant to this case, and that these cases undermine the respondents' claim that Commerce erred in basing its decision on separate eligibility primarily on whether GTC and Aeolus operated autonomously from the government in making decisions regarding the selection of management.

The respondents erroneously conclude that the *Remand Order* made an explicit finding that Aeolus and GTC rebutted the presumption of state control in all respects.  We do not agree. The Court is clear that the "critical flaw" in Commerce's implementation of its *de facto* separate rate analysis regarded a failure in application of the first prong of the analysis with respect to export price-setting.  The Court was similarly clear that it did not decide on whether Commerce was correct in its finding under its third factor (autonomy in selection of management) or any other indicia.  The CIT did not reach the substantive question of whether Commerce's denial of the respondents' separate rates was supported by substantial evidence, and only held that the

separate rate denial could not be sustained given Commerce's presumed failure to address the first factor with respect to export price-setting.

The respondents assert that Commerce's "complaint" about supposed difficulties in obtaining the requisite evidence is both incorrect and irrelevant, as governmental price-setting is expected to be documented and Commerce can readily solicit such information in response to questionnaires – in the form of narrative responses, in the event documentation does not exist. We agree that Commerce has the authority to solicit such information and gather evidence.  Such information is solicited and scrutinized by Commerce, as it was in this case, which involved multiple rounds of questionnaires to each respondent regarding responses and documentation relevant to the separate rate analysis.  However, to require that Commerce identify record evidence that the Chinese government actually did engage in export price-setting before denying a separate rate would impose an unreasonable threshold on the *de facto* analysis and potentially result in companies improperly receiving a separate rate even when they do not operate autonomously from the government.  Under such a standard, Commerce would need to rely on direct evidence unambiguously demonstrating government involvement in price-setting as the pre-eminent consideration in whether the presumption remains.  This would result in granting a separate rate in situations, for example, where the government maintains direct and unambiguous control over a firm's export-price setting, and that control is exerted and even reflected in an extant agreement document, but not apparent in sales documentation and correspondence kept in the normal course of business (*i.e.*, the documentation Commerce requests that respondents provide with respect to this prong of the analysis).  In contrast, under Commerce's current separate rates analysis, which examines all four *de facto* factors and any additional indicia, Commerce would be able to consider all evidence probative to the government's actual control

40

or potential to control and deny the company a separate rate if the company failed to demonstrate autonomy from the government with respect to one or more of these factors.

The respondents suggest that Commerce is over-stating the standard that would be required, and that such affirmative evidence is only required to deny a separate rate where a firm otherwise provides sufficient information to reasonably rebut the presumption for each of the other factors, as respondents maintain they did here. As an initial matter, given the emphasis in the *Remand Order* on the necessity of examining the first factor, Commerce's concerns are legitimate. Additionally, even the standard outlined by the respondents is problematic, as illustrated by this case. Specifically, Commerce found that neither GTC nor Aeolus provided sufficient evidence to rebut the presumption of government control regarding autonomy in the selection of management, and the Court specifically did not render a decision on whether these determinations by Commerce are supported by substantial evidence. The contradiction is that Commerce is tasked with examining the first factor for affirmative evidence of actual control even though it already found that, taken as a whole, the respondents' proffered evidence is insufficient to rebut the presumption of government control and that finding that has not been specifically overturned. Though the respondents maintain otherwise, the Court is unambiguous that it made no such conclusions on the other factors.

Similarly, the respondents maintain that because the record only includes evidence suggestive of the potential for control for one or two factors and no direct evidence of control for any one factor, whereas other evidence for those factors supported finding that the respondents had rebutted the presumption, the decision to deny the separate rates for GTC and Aeolus could not be sustained. We do not agree. The CIT has recognized that Commerce may examine the totality of the circumstances and make reasonable inferences from the record evidence when

41

determining whether a respondent had demonstrated *de jure* and *de facto* control of its export

activities.[124]  We maintain that our analysis with respect to the third and fourth *de facto* factors

and additional indicia establishing the potential to control is sufficient to sustain the denial of the

separate rates for Aeolus and GTC in the instant case.  Because the Court did not yet decide on

the merits of Commerce's analysis of the remaining factors, we find it inappropriate to presume,

like the respondents do, that Commerce may not rely on such information in finding that Aeolus

and GTC have not rebutted the presumption of government control.

## B. Reiteration of Comments from the First Remand Redetermination

### Comment 2:  The Denial of GTC's Separate Rate is Unlawful

*Respondents' Comments*
- Commerce misplaces its reliance on GIIG having accounted for most of the votes electing the 6th Board of GTC, almost 2 years prior to the POR.  As Commerce itself recognized, such occurrences that "predate the POR . . . are thus not pertinent to this review."  Moreover, these board members were nominated by the Nomination Committee, and GIIG had no involvement with said nomination.  GTC directors, having been nominated by the board, and not shareholders, do not suggest government control.  GIIG had no role in the nomination process, and the protections against domination by any one shareholder enshrined in GTC's AoA disprove government control; it is irrelevant that the shareholders did not nominate candidates.[125]
- Commerce improperly overlooked the nomination process to equate shareholder voting with management selection, noting that, the nomination process withstanding, GIIG's votes effectively selected the board.  However, the extent to which other shareholders participated does not change the facts that:  (1) shareholders were not involved in the nomination process; and (2) the 2012 Meeting election complied with all legal requirements proscribed by GTC's AoA, the PRC Law, and Code for Listed Companies – including protections against domination by any one shareholder.  Rather than indicate impropriety, the 2012 Meeting reveals that GTC acted as an ordinary publicly listed company operating transparently and democratically through normal procedures, subject to legal restrictions.[126]
- In the prior review of this order, Commerce reviewed GTC as a mandatory respondent, conducted onsite verification, and found no discrepancies with GTC's qualification for a separate rate where the exact same board constitution was in place as in this review.  Since prior reviews granting GTC a separate rate, GIIG has *decreased* its investments in GTC between AR5 and AR 7, *i.e.*, GIIG's investment reduced from 33.36 percent to 25.20 percent, and the Guiyang SASAC ceased conducting performance reviews during that period

---

[124] *See, e.g.*, *Jiasheng I*, 28 F. Supp. 3d at 1339.
[125] *See* Respondents' Comments at 32-33.
[126] *Id*. at 33-34.

of time. Just as Commerce held that events prior to the POR are relevant (*i.e.*, the 2012 shareholders meeting installing the POR board members), it follows that Commerce's decision to grant GTC a separate rate in the prior review would too be specifically pertinent. Commerce's absolutist view confirms the unreasonableness of its attributing government control based only on the vote of a 25.2 percent SOE shareholder years before the POR. It strains credulity to conclude that the Chinese government controlled GTC in AR7 merely because years earlier a 25 percent shareholder – which was not involved in the nomination process and acted in accordance with extensive legal safeguards – voted to elect the board. According to Commerce, that company would remain ineligible for a separate rate for as long as that board remains install{ed}. In other words, the Chinese government is presumed to control GTC indefinitely by virtue of a vote by GIIG years before the POR. This unreasonable fiction defies common sense, agency practice, and Commerce's own findings in prior decisions.[127]

- The Draft Results improperly fixate on a July 2015 shareholder meeting to find control by GIIG, while ignoring the May 2015 shareholder meeting that disproves GIIG's control. At the May 15, 2015 meeting, two managerial candidates advocated by GIIG were voted upon but not elected due to dissenting votes from shareholders other than GIIG. If GIIG controlled GTC, it would have been able at that time to appoint its preferred members to GTC's board. Although, two months later, GIIG was able to elect its preferred members to GTC's board, the record only demonstrates that GIIG did so within the bounds of GTC's decision-making processes through the normal courses granted to all shareholders. Thus, there is no record evidence of any instance of control by GIIG.[128] GIIG having its favored proposals voted down by other shareholders disproves the Department's theory that GIIG controls GTC. The fact that between May and July 2015 GIIG garnered sufficient votes through ordinary corporate protocol to pass resolutions it favored does not mean that GIIG controlled the voting process. Commerce further misconstrued the record in emphasizing that GIIG's sole ability to convene shareholders meetings means GIIG can effectively hold re-votes on GIIG's favored proposals until such a time where such proposals would prevail. However, GIIG's success in July 2015 does not mean it can always have its way; other shareholders can, and during the POR, did vote down proposals favored by GIIG. Further, GIIG is not the only shareholder authorized to convene shareholders meetings.[129]

- Commerce unpersuasively claimed that the second and third largest shareholders would have been considered SOEs had they voted collectively to convene an interim meeting. The record demonstrates that shareholders holding lesser percentages could join together and request an interim meeting because they would collectively satisfy the ownership percentage threshold. Moreover, GTC's second and third largest shareholders were not SOEs; these shareholders are the individual fund shareholders – not the fund managers having custodial functions. Accordingly, Commerce properly did not consider the funds in its SOE ownership analysis.[130]

- The Draft Results misplace reliance on GTC's Chairman in a strained attempt to manufacture government control emphasizing that he serves as the proxy representing GIIG at GTC's shareholders' meetings. GTC's board chairman may have served as GIIG's proxy, but he did

---

[127] *Id*. at 34-35.
[128] *Id.* at 35-37.
[129] *Id.* at 37-38.
[130] *Id.* at 38-39.

43

not work for GIIG or any other governmental entity.  The fact that Ma Shichun served as GIIG's proxy does not mean that he was controlled by GIIG.  GIIG explicitly instructed Ma Shichun to vote GIIG's shares a certain way.  He was selected to vote GIIG's shares in this manner because he was the "Host" for all relevant meetings.  Commerce decades ago granted a separate rate when a board chairman acted as a proxy for the SOE shareholder.[131] Commerce did not – and could not – find overlapping management amongst GTC and GIIG, and the fact that Ma Shichun served as a proxy for GIIG does not constitute overlapping management.  Moreover, the fact that Ma Shichun was appointed as Chairperson at its 2012 Meeting – during which time Commerce recognized GTC's separate rate status – does not make him a state actor.  He personally owns shares in GTC and is not beholden to any other shareholder.  Commerce further misplaces reliance on Article 118 of GTC's AoA allowing the Chairperson to conduct unilateral company decisions.  That GTC's Chairman has the authority to temporarily act in emergencies does not indicate government control. Commerce also wrongly found indicia of government control because Ma Shichun was the former secretary of the party committee.  This prior role, however, was the committee within GTC, not the Chinese government.[132]

- Commerce failed to consider contradictory record evidence, including extensive legal requirements and safeguards prevent GIIG from dominating GTC management decisions, which include not only GTC's AoA but also relevant Chinese company laws and codes.[133] Commerce gave these protections short shrift, despite initially acknowledging that certain individual AoAs place safeguards against undue influence by large shareholders in the selection of GTC's senior managers.  Commerce belabored its findings based on cherry-picked facts to proclaim that those safeguards were unsuccessful in the instant case, as GIIG was ultimately able to dominate GTC's decision-making process and appoint its preferred members to GTC's board, as well as control profit distribution.  On the contrary, GIIG merely acted as an ordinary shareholder subject to legal restraints, as evidenced by its inability to pass preferred proposals at the May 2015 Meeting.  Finally, Commerce misread various other articles regarding the board of directors' ability to appoint management, issue a proposal for profit distribution, as such actions are subject to the vote of all shareholders, not just GIIG, and do not constitute affirmative evidence of GIIG control.[134]

- Commerce never identified instances in which GIIG exerted direct control over export activities over GTC.  Rather, Commerce repeatedly relied on conjecture to deny GTC's separate rate.  Separate rate denials must be based on actual government control as opposed to mere potential to control.[135]  In fact, Commerce has not pointed to any specific evidence that, in influencing the companies' operations pursuant to their duties as company officials (including through the selection of management and preparation of profit distribution plans), these persons were directing the companies' export pricing decisions based on the will of the Chinese government.[136]

---

[131] *Id.* at 40 (citing *Notice of Decision of the Court of International Trade:  Certain Cased Pencils from the People's Republic of China,* 70 FR 56889 (September 29, 2005)).

[132] *Id.* at 39-41.

[133] *Id.* at 42-43.

[134] *Id.* at 42-45.

[135] *Id.* at 46 (citing *An Giang I,* 203 F. Supp. 3d 1256, 1291- 92 (CIT 2017)).

[136] *Id.* at 45-47.

44

**Commerce's Position:** GTC challenges Commerce's finding that GTC failed to establish *de facto* independence from the Chinese government in selection of its board of directors. GTC challenges Commerce's findings regarding the board selection process, and finding of a lack of autonomy from the government despite granting GTC a separate rate in a prior administrative review. Further, GTC challenges Commerce's findings regarding the relationship between GTC and its SOE shareholders, and Commerce's alleged misinterpretation of record evidence. We disagree.

First, GTC asserts that the December 2012 meeting does not demonstrate government control. GTC states that the board selected at the 2012 meeting was nominated by the GTC board, and therefore, Commerce's conclusion that there were no nominations of directors without GIIG involvement is unsupported. GTC's arguments, however, take Commerce's statement out of context. Commerce was explaining that, under Article 83 of GTC's articles of association, the only shareholders who can nominate directors are those with ten percent or more of shares held individually or jointly. GTC's argument assumes that Commerce inferred GIIG was itself involved as a shareholder in nominating directors. To the contrary, Commerce specifically clarified that the board members elected at the December 2012 meeting [

].[137]

Thus, Commerce considered that the "board members [                    ] and GIIG had no direct role in the nomination process{.}"[138]

Nevertheless, Commerce emphasized that, once nominated, the candidates were elected by shareholder vote, with [                                                    ].[139]

---

[137] *See First Remand Redetermination* at 27.
[138] *Id.*
[139] *Id.*

45

GTC asserts Commerce's statement that the GTC board [                              ] does not indicate GIIG involvement in nominating board members.  GTC's argument ignores that Commerce based its finding on the fact that the board [                    ] and was then elected at a meeting where GIIG comprised [                              ].[140]

GTC asserts that it is irrelevant that shareholders did not nominate candidates because GIIG had no role in the nomination process and GTC's articles of association have protections against domination by any one shareholder that disprove government control.  GTC's focus on nomination, rather than the full process of board election, ignores that [

] at the meeting electing the nominated candidates.[141] GTC emphasizes that shareholders are able, pursuant to GTC's articles of association, to nominate board members, but at the same time, cites the fact that no shareholders were involved in nominating GTC's board.

GTC states that the December 2012 meeting complied with all legal requirements, and that the meeting, therefore, does not indicate impropriety.  GTC misconstrues the extent of Commerce's findings.  Commerce did not evaluate the legality of board election, nor did it find that GTC has done anything contrary to its articles of association.  Instead, Commerce found that GIIG effectively selected GTC's board.[142]  Such a finding need not be inconsistent with relevant Chinese law to demonstrate a lack of independence from the Chinese government.  GTC faults Commerce's reliance on the December 2012 meeting that elected the board in place during the period of review because the meeting itself took place prior to the current period of review. GIIG asserts that Commerce's reliance on the 2012 vote is unreasonable because it would result

---

[140] *Id.*
[141] *Id.*
[142] *Id.*

46

in an indefinite presumption of control based on a vote that took place years before the period of review.  To follow GTC's logic, however, would leave Commerce unable to consider government involvement in selecting a board if that involvement pre-dated the period of investigation or review at issue, even if the board remains the same during the period at issue.  Such a result would curtail Commerce's ability to consider the level of government control in a company—even significant government involvement in the selection of a company's board could not be considered as long as that involvement took place before the period of investigation or review.  As Commerce explained, however, the election that took place before the period of review is relevant to Commerce's analysis because it relates to the level of government involvement in the selection of the board members in place during the current period of review.[143]  Commerce therefore appropriately considered the level of government involvement in the selection of that board.

Next, GTC states that it is disingenuous for Commerce to deny GTC a separate rate in the seventh administrative review based on a December 2012 meeting when Commerce granted GTC a separate rate in the fifth administrative review, which was also after the December 2012 meeting.  GTC further argues that the case for independence would seem to be stronger in the seventh review than the fifth review, considering that GIIG's ownership percentage was reduced and that certain performance reviews are no longer performed.  GTC's arguments ignore the evolution of Commerce's separate rate analysis since the fifth administrative review.  Commerce explained that, following litigation before the CIT and the Federal Circuit, "it is Commerce's practice to examine whether the government might be able to exercise, or have the potential to exercise, control of a company's general operations through *minority* government ownership

---

[143] *Id.*

under certain factual scenarios."[144]  Thus, Commerce's differing conclusions between the fifth

and seventh administrative reviews are not unexplained, and instead reflect the reasonable

evolution of Commerce's analysis in response to court decisions.

GTC erroneously asserts that Commerce misconstrued GTC's relationship with its SOE

shareholders.  First, GTC argues that Commerce's finding is undermined because GTC's board

members do not hold positions in any government agency.  GTC's assertion misses the point.

Whether or not the board members work directly for GIIG or another government body does not

change the fact that they were effectively elected by GIIG.  The factor at issue, autonomy in the

selection of management, is implicated because GIIG elected the board that is responsible for the

selection of management.  GTC argues that board members and management owe fiduciary

duties to GTC, but government control does not require that officials act in favor of the

government in breach of a fiduciary duty to a company, it only requires that the company not

have the requisite independence from the government.  Here, an SOE exerted control over board

selection and, by extension, the selection of management, which demonstrated a lack of

independence from the government.

GTC focuses on a shareholder meeting in May 2015 where GIIG's preferred proposals

were voted down, arguing that it demonstrates GIIG did not, in fact, have the ability to

unilaterally impose its own agenda.  Commerce, however, considered the fact that GIIG is the

only company with enough shares individually to convene an interim shareholders meeting.[145]

Commerce concluded that, even though GIIG's proposals initially failed, GIIG was able to

---

[144] *Id.* at 24 and 40 (citing *Advanced Tech III*).
[145] *Id.* at 28.

convene an interim meeting only two months later where, representing the vast majority of votes present, GIIG passed the very proposals that failed previously.[146]

GTC emphasizes that GIIG was only able to enact its preferred proposals through the normal courses available to all shareholders. Although GIIG did not violate the law or GTC's articles of association, no other shareholder has the requisite shares to individually call an interim meeting—only GIIG.[147]  Accordingly, although GTC argues that there is no instance of control by GIIG, Commerce concluded that GIIG's ability to force an interim meeting to re-vote on its favored proposals that did not pass was evidence of GIIG's control, and this control related to proposals directly relevant to the factors Commerce considers when evaluating *de facto* independence, *i.e.*, profit distribution and selection of management.[148]

GTC argues that the fact that in a subsequent meeting GIIG garnered sufficient votes through normal corporate procedures does not mean that GIIG controls the voting process. The record suggests, however, that GIIG prevailed at the subsequent meeting because it [

], not because other shareholders who previously opposed GIIG's proposals changed their positions.[149]

GTC next argues that Commerce misconstrued the record because GIIG is not the only shareholder authorized to convene shareholder meetings—GTC's articles of association provide that shareholders holding ten percent individually or jointly can convene meetings, and the second- and third-largest shareholders owned 9.97 and 7.74 percent of shares, respectively.  This argument mischaracterizes Commerce's statement about GIIG's sole ability to convene meetings

---

[146] *Id.*
[147] *Id.*
[148] *Id.*
[149] *Id.* at 29 (citing GTC's Letter, "Supplemental Section A Questionnaire Response," dated May 25, 2016 (GTC's May 25, 2016 Supplemental Section A Questionnaire Response), at Exhibit A-7).

and does not, in fact, contradict Commerce's findings.  Commerce correctly understood that "GTC's {articles of association} allow{} '[



].'"[150]  Therefore, even though shareholders can join together to convene meetings, this fact does not contradict Commerce's statements, as GTC contends.  Instead, Commerce accurately concluded that GTC's status as the only individual shareholder with enough shares to convene interim meetings provided additional evidence of the potential for GIIG to control GTC's board.[151]

GTC asserts that Commerce mistakenly found the second- and third-largest shareholders to be SOEs.  GTC argues that these shareholders are not SOEs because they are the individual fund shareholders, not the fund managers having custodial functions.  Commerce found that these shareholders were SOEs because they were Chinese bank funds, and Commerce considers Chinese financial institutions to be an arm of the Chinese government.[152]  Commerce did not consider the SOE ownership together with GIIG's in its SOE ownership analysis because "the record did not indicate that the funds exercised their shareholder rights{.}"[153]  GIIG's distinction about fund shareholders versus fund managers does not disturb Commerce's finding that only GIIG has the requisite shares to individually call a shareholders meeting.  Moreover, Commerce only made the point about these shareholders being Chinese bank funds in response to GTC's suggestion that they could join their shares together to meet the [          ] threshold.[154] That these shareholders are individual fund shareholders and not fund managers with custodial

---

[150] *Id.* at 28 (quoting GTC's May 25, 2016 Supplemental Section A Questionnaire Response at Exhibit 1).
[151] *Id.* at 29.
[152] *Id.* at 30.
[153] *Id.*
[154] *Id.*

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

functions only undermines GTC's argument that they would jointly convene a shareholders' meeting.

GTC next contests Commerce's reliance on the relationship between GTC's chairman and GIIG.  GTC argues that Commerce "disingenuously conflated instruction for proxy voting with state control in denying the separate rate because 'GTC's Chairperson does, in fact, communicate with and receives suggestions regarding nominations and profit distribution from a government entity.'"[155]  First, Commerce did not rely on this relationship alone as sufficient to deny GTC a separate rate.[156]  Second, Commerce is not required to show *overlapping* management to deny a separate rate.  Rather, Commerce considers a company's autonomy in the *selection* of management.[157]  That GTC's chairman's status as proxy does not constitute overlapping management therefore does not invalidate Commerce's decision, as GTC claims.

Finally, GTC asserts that Commerce failed to consider record evidence.  We disagree.  Commerce addressed the means through which it found that GIIG exerted control while considering GIIG's less-than-majority ownership.[158]

Regarding Guiyang SASAC's statement that it does not have authority to make decisions for GTC, Commerce considered the information that GIIG was wholly-owned by Guiyang SASAC and therefore constitutes an SOE, and that GIIG voted on the election of the board in place during the period of review, as well as on the appointment of management and profit distribution.[159]  Therefore, GIIG, an SOE, was involved in making decisions at GTC.

---

[155] *See* Respondents' Comments at 40.
[156] *Id.* at 29.
[157] *See Advanced Tech II*, 938 F. Supp. 2d at 1345.
[158] *See First Remand Redetermination* at 17-18.
[159] *Id.* at 26-27.

51

Regarding the statements GTC highlights from its annual report about minority shareholders expressing their opinions and claims and abiding by laws and regulations, Commerce never found that minority shareholders were silenced, or that GTC failed to abide by relevant laws.  Rather, Commerce found that these protections were ineffective at preventing GIIG's control.[160]

GTC's argument that the board's selection of general manager and deputy managers does not mean GIIG controls selection of management relies on GTC's argument that there is no basis to conclude that GIIG controls board selection.  As already discussed, Commerce explained its finding that GIIG was the dominant voter at the meeting electing the board in place during the period of review.[161]  Regarding profit distribution, as GTC states, a plan would be put to a meeting open to all shareholders, but in this case, GIIG called an interim meeting once its preferred proposals failed.[162]

GTC insists that Commerce relied on conjecture in denying GTC a separate rate. Commerce's separate rate analysis, however, is consistent with its practice, which relies on the reasonable conclusion that, "{c}onsistent with normal business practices, we would expect any controlling shareholder, including a government, to have the ability to control, and an interest in controlling, the operations of the company, including the selection of management and the profitability of the company."[163]  This Court has stated that, "{i}n both its *de jure* and *de facto* determinations, Commerce may make reasonable inferences from the record evidence."[164] Therefore, we continue to find that we have appropriately considered the factor of autonomy in

---

[160] *Id.* at 18.
[161] *Id.*
[162] *Id.* at 28-29.
[163] *Id.* at 25 (citing *An Giang II*, 284 F. Supp. 3d at 1359).
[164] *See Jiasheng I*, 28 F. Supp. 3d at 1339.

management in considering whether GTC has independent control over export functions,

consistent with our separate rate practice.

## Comment 3:  The Denial of Aeolus's Separate Rate is Unlawful

*Respondents' Comments*

- Commerce provides no support for its finding that ChinaChem controls Aeolus's board selection process.  Commerce conflates actions by the board with actions of the SOE shareholder.[165]  Commerce's focus on the lack of public shareholder involvement in nominating directors is misplaced because SOEs also did not nominate the board, but rather the board was nominated by the existing board of directors.  Commerce misstates the record with its calculation of the shareholder vote.  Moreover, an SOE shareholder voting alongside others to elect the board does not change the fact that the process was transparent and democratic – subject to myriad protections afforded by Aeolus' AoA, the Chinese Company Law, and Code for Listed Companies.  Thus, Commerce's incorrectly characterizes shareholder meetings as being dominated by an SOE, maintaining that the mere presence of other "shareholders representing 51 percent ownership cannot be so characterized."  The fact that non-independent directors may remain as long as they are re-elected cannot be equated with domination by any one shareholder.  Commerce overlooked that shareholders may nominate director candidates by meeting the requisite percentage of shares individually or collectively.[166]
- The Draft Results incorrectly discount the Rectification Report, which constitutes compelling evidence of cessation of intertwined operations between ChinaChem and Aeolus before the POR of the seventh administrative review.  The Draft Results mischaracterized the Rectification Report as a voluntary restraint promised by ChinaChem and an unenforceable promise by an SOE.  Commerce ignores the explanation in the Rectification Report that it is being entered into as a means of compliance with a decision rendered by the Henan Security Regulatory Commission (Henan SRC), as the Henan SRC is analogous to the Securities and Exchange Commission (SEC).  The Rectification Report evidence established that the steps taken to ensure that Aeolus has an independent accounting system are effective.  The Rectification Report cannot plausibly be read to prove government control.  While Commerce emphasized the Report's reference to ChinaChem as the "controlling shareholder," that reference only connotes that it is the largest shareholder which must act in accord with strict legal requirements, as opposed to being able to dominate Aeolus as it sees fit.  It is unreasonable for Commerce to discredit the fact that the Rectification Report formally demarcated a separation between Aeolus and ChinaChem before the POR based on the absence of any reviewable steps that the Henan SRC took to monitor and ensure compliance.  Commerce further misplaced reliance on website printouts as additional indicia of control, arguing that the website was primarily for advertisement purposes and does not demonstrate control in the manner considered by Commerce under its separate rate test.[167]
- The Draft Results also misconstrue record evidence concerning Aeolus's Chairman.  Specifically, there is no record support for Aeolus describing its Chairman as a representative

---

[165] *Id.* at 23.
[166] *See* Respondents' Comments at 48-52.
[167] *Id.* at 52-56.

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

of China National Tire.  Also, government control is not evidenced merely because Aeolus's AoA grants its Chairman broad authorities, including [

].[168]

- Commerce failed to consider contrary evidence which ensures that all shareholders – including SOEs–abide by the standard procedures applicable to all investors, including extensive safeguards against control in its articles of association.  By declining to consider this evidence supporting Aeolus' entitlement to a separate rate in AR7, Commerce neglected its obligation to take into account whatever in the record fairly detracts from its weight.[169]

- The Draft Results thus rest only on speculative statements that ChinaChem could control Aeolus, whereas Aeolus has presented the *minimum quantum* of evidence necessary to shift the burden of proof to Commerce to affirmatively show *de facto* government control. Commerce impermissibly found Aeolus had failed to rebut the presumption of government control based on potential government control.[170]

**Commerce's Position**:  Aeolus challenges Commerce's findings regarding Aeolus's board selection process, Commerce's interpretation of the Rectification Report and other evidence concerning Aeolus's relationship with its SOE shareholder, ChinaChem, and Commerce's findings regarding Aeolus's control over its export activities.  We disagree.

Aeolus asserts that Commerce provides no support for its finding that ChinaChem controls Aeolus's board selection process.  Aeolus argues that Commerce's focus on the lack of public shareholder involvement in nominating directors is misplaced because SOEs also did not nominate the board, but rather the board was nominated by the existing board of directors. Commerce clarified that it had mistakenly conflated board nomination with selection, but Commerce concluded that an SOE effectively selected Aeolus's board because ChinaChem represented the vast majority of votes electing the board, whose members remained in place for the period of review.[171]  Therefore, contrary to Aeolus's assertion, Commerce explained its finding about how ChinaChem influenced the board selection process.

---

[168] *Id.* at 56-58.
[169] *Id.* at 58-59.
[170] *Id.* at 59-62.
[171] *See First Remand Redetermination* at 32-33.

54

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

Aeolus next contends that Commerce misstates the record with its calculation of the shareholder vote.  Aeolus asserts that the voting could have changed in the 19 days between the date of the vote and the date for which Aeolus provided shareholder information.  Aeolus points to no evidence of any change and, moreover, Commerce only relied on those specific calculations in establishing that ChinaChem was present at the vote in question.[172]  Aeolus has not asserted, and there is no record evidence to suggest, that ChinaChem's ownership percentage dropped or changed drastically during the period of review such that it would undermine Commerce's conclusion about ChinaChem's presence at the vote.  Therefore, we find that our conclusion about ChinaChem's participation in the vote remains supported by the information on the record, with no record evidence to contradict our finding.

Aeolus contests Commerce's characterization of shareholder meetings as being dominated by an SOE, maintaining that the mere presence of other "shareholders representing 51 percent ownership cannot be so characterized."[173]  Aeolus fails to rebut Commerce's characterization.  Other shareholders than ChinaChem were in attendance at meetings, but not all shareholders representing the 51 percent of shares not held by SOEs.  Instead, ChinaChem represented the vast majority of voting shares present at shareholder meetings.[174]

Aeolus next asserts that the fact non-independent directors may remain as long as they are re-elected cannot be equated with domination by any one shareholder.[175]  Commerce clarified its understanding that non-independent directors must be re-elected to continue serving, but that ChinaChem represented the vast majority of votes at the shareholder meetings re-electing them.  Therefore, Aeolus's argument does not contradict Commerce's finding that Aeolus's articles of

---

[172] *Id.* at 35.
[173] *See* Respondents' Comments at 51.
[174] *Id.*
[175] *Id.* at 17.

association [

].[176]

Aeolus also asserts that Commerce overlooked that shareholders may nominate director candidates by meeting the requisite percentage of shares individually or collectively.  As an initial matter, Commerce is not relying on a finding that ChinaChem is the only shareholder able to nominate director candidates.  Notably, as Commerce clarified, Aeolus's board, not its shareholders, nominated the director candidates.[177]  Aeolus does not contest Commerce's finding that "no public shareholder has ever nominated a director to the board, despite any mechanisms that may be in place [                                                                        ]."[178] Moreover, Commerce addressed this point in the *First Remand Redetermination*, explaining that, "because each board member was approved in ChinaChem-dominated shareholder votes, the fact that board members, not shareholders, nominate other potential board members does not undermine our finding that ChinaChem exercises control over the board selection process."[179]

Aeolus argues that Commerce misinterpreted the Rectification Report and other evidence concerning Aeolus's relationship with its SOE shareholder, ChinaChem.  However, Commerce interpreted the Rectification Report in context and concluded that the corrective actions outlined in the Rectification Report did not prevent ChinaChem's control of the board election process or establish Aeolus's independence from government control.[180]  Commerce acknowledged and considered the statements of the Rectification Report, and that it addressed certain connections between Aeolus and ChinaChem relevant to the separate rate inquiry.[181]  Commerce reasonably

---

[176] *See First Remand Redetermination* at 33.
[177] *Id.* at 33.
[178] *Id.* at 8.
[179] *Id.* at 32.
[180] *Id.* at 11.
[181] *Id.*

concluded that, given the report's lack of any details about enforcement mechanisms or compliance, and its mention of ChinaChem as Aeolus's controlling party, it fails to rebut Commerce's findings.[182]  Therefore, Commerce appropriately considered the impact of the Rectification Report.

Aeolus next faults Commerce's reliance on website printouts as additional indicia of control, arguing that the website was primarily for advertisement purposes and does not demonstrate control in the manner considered by Commerce under its separate rate test. Commerce did not, however, take the website statements alone to demonstrate control.  Rather, Commerce considered these website printouts as additional evidence corroborating its findings. Notably, Commerce devoted its analysis in the *Remand Results* to examining ChinaChem's actual influence over Aeolus's board selection, the Rectification Report, and the role of Aeolus's chairman, demonstrating that Commerce did not rely on the website printouts to the extent that Aeolus claims.

Aeolus argues that Commerce misconstrues the relationship between China National Tire and Aeolus's chairman, Wang Feng.  Commerce specifically clarified its understanding of this relationship in the final remand, explaining that it is unclear from the record whether the China National Tire representative who attends shareholders meetings and Wang Feng are the same, but that even if they are not the same, Wang Feng is still a board member of China National Tire, a [          ] owned subsidiary of ChinaChem, and holds the position of [

].[183]  Therefore, contrary to Aeolus's argument, Commerce has been clear about Wang Feng's connection to both companies.

---

[182] *Id.* at 36-37.
[183] *Id.* at 35.

57

Aeolus's emphasis on article 98(9) of its articles of association, providing that the Chairman "shall not harm interest of the company using their affiliation relationship" does not contradict Commerce's findings.  Commerce explained that the fiduciary relationship could influence the chairman's actions where it is in the interest of both companies.[184]  In other words, a decision need not be to Aeolus's detriment to be at the control of the Chinese government. Finally, although Aeolus notes that Wang Feng's role as [

] was within the company, not the Chinese government, China National Tire is itself a [          ] owned subsidiary of ChinaChem.  Aeolus further contends that Commerce failed to consider contrary evidence, particularly that ChinaChem is a minority shareholder.  We disagree.  Commerce directly considered this information in explaining the ownership of Aeolus and how, despite owning a minority of shares, "{t}he board elected during the {period of review} [


]."[185]

Aeolus further argues that Commerce ignored safeguards against control in its articles of association.  However, none of the articles of association cited by Aeolus contradict the facts relied upon by Commerce for its finding.  These articles, therefore, do not fairly detract from the weight of Commerce's determination.

Aeolus maintains that Commerce impermissibly found Aeolus had failed to rebut the presumption of government control based on potential government control.  Aeolus further argues that Commerce did not establish that Aeolus was actually controlled during the period of review because state-owned entities only controlled 49.06 percent of Aeolus's shares rather than

---

[184] *Id.* at 36.
[185] *Id.* at 8-9.

a majority and that Aeolus followed corporate formalities providing for appointment of management through the board of directors rather than directly by shareholders.  Aeolus is mistaken because Commerce appropriately considered the state-owned entity's ability to control Aeolus's export decisions through appointment of board members who would select management.

Commerce's separate rate analysis is consistent with its practice, which relies on the reasonable conclusion that, "{c}onsistent with normal business practices, we would expect any controlling shareholder, including a government, to have the ability to control, and an interest in controlling, the operations of the company, including the selection of management and the profitability of the company."[186]  The CIT has stated that, "{i}n both its *de jure* and *de facto* determinations, Commerce may make reasonable inferences from the record evidence."[187]

As the CIT has observed, in majority ownership situations, the ability to exert control *is* control, whether or not that ability is exercised.[188]  The Court observed that, because of Commerce's practice of requiring additional indicia of control in minority ownership situations, Commerce cannot rely solely on potentiality because "without more, 'potential control' suggests the potential to influence management rather than the potential to actually control management."[189]  Here, in addition to the evidence of 49.06 percent ownership by SOEs, Commerce identified the mechanism by which shareholders could select management and website printouts indicating government control.[190]  Therefore, Commerce has not relied on mere potentiality, without more, and Commerce's finding is consistent with its past practice.

---

[186] *Id.* at 25 (citing *An Giang II* 284 F. Supp. 3d 1350, 1359 (CIT 2018)).
[187] *See Jiasheng I*, 28 F. Supp. 3d 1317, 1339 (CIT 2014).
[188] *See An Giang II* 284 F. Supp. 3d 1350, 1359 (CIT 2018).
[189] *Id.*, 284 F. Supp. 3d 1350, 1360 (CIT 2018).
[190] *See Final Results* IDM at 9-12.

59

Commerce's Policy Bulletin states, "the Department considers four factors *in evaluating* whether each respondent is subject to *de facto* government control *of its export functions*{.}" (emphasis added).  Thus, Commerce considers these factors themselves indicative of control over export functions.  Therefore, Commerce's analysis of whether Aeolus has autonomy from government control regarding the selection of its management is part of how Commerce determines whether Aeolus is subject to government control of its export functions.  Commerce's longstanding analysis of these factors recognizes the reality that control in these factors entails control over export functions.  Therefore, we disagree with Aeolus's arguments that Commerce did not make the required finding that Aeolus was subject to government control of its export functions because Commerce's analysis of Aeolus's autonomy in selecting management was itself an analysis of whether the government controls Aeolus's export functions.

**Comment 4:  New Separate Rate Analysis Contradicts Findings in Prior Segments**

*Respondents' Comments*
- Commerce failed to acknowledge – let alone provide the requisite heightened justification for – its new separate rate analysis implemented in this administrative review that contradicted findings in prior segments, such as the fifth administrative review (AR5) where GTC was granted a separate rate despite significantly greater SOE ownership.
- Commerce myopically focuses on management selection, instead of examining the "totality of the circumstances."  Under the holistic approach, both respondents indisputably set their export prices without government approval and have independent authority to negotiate and sign contracts demonstrating their eligibility for a separate rate.  Commerce's new approach does not examine whether the government controls the companies' export activities, and instead focuses on management selection.[191]  By conceding that the respondents' export activities are conducted with complete independence from the Chinese government while denying their separate rates, Commerce has implemented a new separate rate policy.
- Commerce treated government ownership as dispositive, using a truncated analysis that relied upon SOE ownership percentages to deny separate rate status.  Decades ago, Commerce determined that ownership 'by all the people' in and of itself cannot be considered dispositive in establishing whether a company can receive a separate rate.[192]

---

[191] *See* Respondents' Comments at 64 (citing, *e.g.*, *Jiasheng I*, 28 F. Supp. 3d at 1339 n.160 (CIT 2014); and *Shandong Huanri*, 493 F. Supp. 2d at 1357 (CIT 2007)).

[192] *Id.* at 66 (citing *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Final Results and Partial Termination of Antidumping Duty Administrative Review*, 62 FR 6173, 6174 (February 11, 1997)).

- Commerce further based its separate rate denials on the mere "potential control" by the Chinese government, when it previously had required affirmative evidence of actual control. Commerce relied solely upon the government's potential to nominate a manager or a board member, deviating from its practice of requiring that the government either actually appoint management or be directly or indirectly involved in the management of the company.[193]

- Commerce has thus established a new separate rate analysis inconsistent with separate rate findings in the LTFV investigation and prior reviews and lacking reasonable explanation of the change in practice. Relevant precedent holds that Commerce only has discretion to change its policies so long as the agency's decisions are explained, yet Commerce failed to acknowledge implementing a changed policy, let alone provide the requisite adequate explanation for the change. Accordingly, because Commerce here provides no reasonable explanation for changing a practice that it has consistently followed, such a change is an unacceptable agency practice. Moreover, the U.S. Supreme Court requires that agencies show a more detailed justification when a new policy rests upon factual findings that contradict those which underlay its prior policy. Commerce's separate rate denials rest upon factual findings that contradict those made under *Sparklers* and *Silicon Carbide* – as evidenced by the fact that GTC was granted a separate rate in AR5, despite having significantly greater SOE ownership at that time.[194]

**Commerce's Position**: The respondents argue that Commerce's focus on one factor of its *de facto* control analysis is flawed because Commerce's practice is to evaluate the totality of the circumstances. GTC and Aeolus assert that, by not evaluating each factor, Commerce has departed from its separate rate analysis as established in *Sparklers* and *Silicon Carbide*, despite purporting to apply that analysis. However, we disagree because previous decisions of this Court and the Federal Circuit have upheld Commerce's methodology for application of the presumption of state control as applied here.

The respondents' arguments ignore the context in which Commerce stated that it "analyzes each exporting entity in an NME country under the test established in *Sparklers*, as further developed in *Silicon Carbide*."[195] After providing the separate rate factors, Commerce

---

[193] *Id.* (citing, *e.g.*, *Notice of Amended Final Results of Antidumping Duty Administrative Reviews: Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, from the People's Republic of China*, 71 FR 10009 (February 28, 2006), and accompanying IDM at Comment 3; *An Giang I*, 203 F. Supp. 2d at 1292; and *Jiasheng II 2015*, 121 F. Supp. 3d at 1269).

[194] *Id.* at 67-69 (citing 587 F. Supp. 2d 1303 (CIT 2008); *SKF USA, Inc. v. United States*, 630 F. 3d 1365, 1373 (Fed. Cir. 2011); *WelCom Prods., Inc. v. United States*, 865 F. Supp. 2d 1340, 1344 (CIT 2012); and *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)).

[195] *See First Remand Redetermination* at 38.

Barcode:4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

explained that it continues to evaluate its practice with regard to the separate rates analysis in light of the *Diamond Sawblades from China* antidumping proceeding, and Commerce's determinations therein.[196]

Moreover, both Policy Bulletin 5.1 and Commerce's restatement of the factors in the *First Remand Redetermination* provide that Commerce *typically* considers four factors in evaluating whether each respondent is subject to *de facto* government control.[197]  Therefore, contrary to the respondents' assertions, Commerce has not purported to follow one practice while following another.  Rather, Commerce explained the evolution and state of its practice.

The respondents argue that, since *Silicon Carbide* in 1994, Commerce has granted separate rates despite significant – and even 100 percent – ownership by SOEs.  The respondents thus suggest that, by identifying the test established in *Sparklers* and further developed in *Silicon Carbide*, Commerce was signaling a return to earlier practice in disregard of the developments in *Diamond Sawblades*.  Such a claim, however, is contradicted by Commerce's express statements in the *Final Results* and the *First Remand Redetermination*:  "{I}n recent proceedings, we concluded that where a government entity holds a majority ownership share, . . . the majority ownership holding in and of itself means that the government exercises, or has the potential to exercise, control over the company's operations generally";[198] and "{F}ollowing these cases, in evaluating whether a respondent has rebutted the presumption of government control, it is Commerce's practice to examine whether the government might be able to exercise, or have the potential to exercise, control of a company's general operations through *minority* government ownership under certain factual scenarios."[199]

---

[196] *Id.* at 39 and n.192.
[197] *Id.* at 38; *see also* Policy Bulletin 5.1 at 2.
[198] *See Final Results* IDM at 7-8.
[199] *See First Remand Redetermination* at 24.

Filed By: Brendan Quinn, Filed Date: 9/24/21 3:09 PM, Submission Status: Approved

4163794-01 A-570-912 REM - Remand  -  Slip Op. 21-60

The respondents argue that Commerce's application of the presumption of state control amounted to a "new separate rate methodology" that Commerce failed to disclose. Commerce's application of the factors for *de facto* control did not constitute a "new separate rate methodology" as GTC and Aeolus contend. Commerce followed its separate rate methodology as outlined in Policy Bulletin 05.1, the *Final Results*, and the *First Remand Redetermination*. Commerce explained that, following litigation before the CIT and the Federal Circuit, "it is Commerce's practice to examine whether the government might be able to exercise, or have the potential to exercise, control of a company's general operations through *minority* government ownership under certain factual scenarios."[200] Thus, as noted above, Commerce's differing conclusions between the fifth and seventh administrative reviews are not unexplained, and instead reflect the reasonable evolution of Commerce's analysis in response to court decisions. Commerce continued to follow its existing policy that "'all commercial entities in the country are presumed to export under the control of the state, and that no manufacturer would receive a separate antidumping duty rate unless it could demonstrate that it enjoyed both *de jure* and *de facto* independence from the central government."[201]

---

[200] *Id.* at 24 and 40 (citing *Advanced Tech III*).
[201] *See Diamond Sawblades*, 866 F.3d at 1310-11 (quoting *Sigma Corp. v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997)).

63

Barcode:4163794-01 A-570-912 REM - Remand - Slip Op. 21-60

## IV.   FINAL RESULTS OF REDETERMINATION

As a result of this remand redetermination, we have made no changes to the rate assigned to Aeolus and GTC.

Dated:  September 24, 2021

9/24/2021

X _____

Signed by: CHRISTIAN MARSH

_____

Christian Marsh
Acting Assistant Secretary
  for Enforcement and Compliance