**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE TIMOTHY C. STANCEU**

| | | |
|---|---|---|
| —————————————————————x | : | |
| GUIZHOU TYRE CO., LTD. and GUIZHOU TYRE IMPORT AND EXPORT CO., LTD., | : | |
| | : | |
| Plaintiffs, | : | Consol. Court No. 17-00100 |
| | : | |
| v. | : | **PUBLIC** |
| | : | **VERSION** |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| —————————————————————x | | |

## PLAINTIFFS' COMMENTS ON SECOND REMAND REDETERMINATION

Ned H. Marshak
Jordan C. Kahn
Elaine F. Wang
Brandon M. Petelin

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
599 Lexington Ave., 36th Floor
New York, New York 10022
**
1201 New York Ave., NW, Suite 650
Washington, DC 20005

*Counsel for Plaintiffs*
*Guizhou Tyre Co., Ltd. and*
*Guizhou Tyre Import and Export Co., Ltd.*

Dated: November 24, 2021

# TABLE OF CONTENTS

**BACKGROUND** ................................................................................................... 1

**STANDARD OF REVIEW** .................................................................................. 3

**ARGUMENT** ........................................................................................................ 4

**I.    THE SEPARATE RATE DENIAL DOES NOT COMPLY WITH *GTC*** ................... 4
   A.    PRECEDENT INVOLVING MAJORITY SOE OWNERSHIP IS INAPPOSITE ........................................................................................ 4
   B.    GTC REBUTTED THE PRESUMPTION OF STATE CONTROL ................... 11
   C.    THIS COURT REQUIRED EVIDENCE OF GOVERNMENT PRICE-SETTING ..................................................................................... 14
   D.    COMMERCE DOES NOT RELY ON EVIDENCE OF ACTUAL STATE CONTROL ........................................................................ 18

**II.   THE SEPARATE RATE DENIAL IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE** .............................................................................. 23
   A.    THE 2012 MEETING DOES NOT EVIDENCE GOVERNMENT CONTROL  23
   B.    THE 2015 MEETINGS DO NOT EVIDENCE GOVERNMENT CONTROL ... 25
   C.    RECORD EVIDENCE REBUTS THE PRESUMPTION OF STATE CONTROL ........................................................................... 27

**III.  COMMERCE UNLAWFULLY IMPLEMENTED A NEW ANALYSIS** .............. 28

**CONCLUSION** ................................................................................................. 31

# TABLE OF AUTHORITIES

**Cases**

*Advanced Tech. & Materials Co. v. United States*, 581 F.App'x 900 (Fed. Cir. 2014) .............. 10

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 284 F.Supp.3d 1350 (CIT 2018) ..................................................................................................................... 5

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United State*, 203 F.Supp.3d 1256 (CIT 2017) ................................................................................................................... 19, 21

*Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020 (Fed. Cir. 1992) ..................... passim

*D&L Supply Co. v. United States*, 22 CIT 539 (1998) ................................................. 10

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)........................................... 30

*Guizhou Tyre Co. v. United States*, 519 F.Supp.3d 1248 (CIT 2021) .................................. passim

*Guizhou Tyre Co. v. United States*, 389 F.Supp.3d 1350 (CIT 2019) ........................................... 2

*I.D.I. International Development and Investment Corp. v. United States*, 2021 WL 3082807 (July 6, 2021) ..................................................................................... 9, 10, 11

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 28 F.Supp.3d 1317 (CIT 2014) ....................................................................................................... 20, 21, 29

*Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 519 F.Supp.3d 1224 (CIT 2021) ........................................................................................................ 16, 17

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) ......................................... 20

*Nakornthai Strip Mill Pub. Co. v. United States*, 32 CIT 1272 (CIT 2008)..................... 3, 10, 30

*Shandong Huanri (Gr.) Gen. Co. v. United States*, 493 F.Supp.2d 1353 (CIT 2007)................. 16

*SKF USA, Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001)................................................... 30

*SKF USA, Inc. v. United States*, 630 F.3d 1365 (Fed. Cir. 2011)................................................. 30

*WelCom Prods., Inc. v. United States,* 865 F.Supp.2d 1340 (CIT 2012) ..................................... 30

*Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F.Supp.3d 1308 (CIT 2018).. 7

**Statutes**

19 U.S.C. § 1516a.................................................................................................................... 3

**Regulations**

19 C.F.R. § 351.303 .................................................................................................. 22

**Administrative Decisions & Publications**

*Cased Pencils from China*, 59 Fed. Reg. 55,625 (Nov. 8, 1994) ................................ 23

*Circular Welded Carbon Quality Steel Line Pipe from China*, 74 Fed. Reg. 14,514
    (Mar. 31, 2009) ...................................................................................................... 7

*De Facto Criteria for Establishing a Separate Rate in AD Proceedings Involving NME
    Countries*, 78 Fed. Reg. 40,430 (July 5, 2013) ...................................................... 29

*Furfuryl Alcohol from China*, 60 Fed. Reg. 22,544 (May 8, 1995) ............................ 16

*Heavy Forged Hand Tools from China*, 71 Fed. Reg. 54,629 (Sept. 14, 2006) .......................... 7

*Hot-Rolled Carbon Steel from China*, 66 Fed. Reg. 49,632 (Sept. 28, 2001) ............... 7

*New Pneumatic Off-the-road Tires from China*, 73 Fed. Reg. 40,485 (July 15, 2008)............ 1, 30

*New Pneumatic Off-the-road Tires from China*, 80 Fed. Reg. 20,197 (Apr. 15, 2015) ..... 1, 25, 30

*New Pneumatic Off-the-road Tires from China*, 82 Fed. Reg. 18,733 (Apr. 21, 2017) ............ 1, 2

*Oil Country Tubular Goods from China*, 75 Fed. Reg. 20,335 (Apr. 19, 2010) ........................... 7

*Silicon Carbide from China*, 59 Fed. Reg. 22,285 (May 2, 1994)........................................ passim

*Small Diameter Graphite Electrodes from China*, 81 Fed. Reg. 62,474 (Sept. 9, 2016) ............... 7

*Sparklers from China*, 56 Fed. Reg. 20,588 (May 6, 1991) ....................................... 16, 28, 29, 30

*Tapered Roller Bearings from China*, 62 Fed. Reg. 6173 (Feb. 11, 1997) ........................... 29, 31

*Utility Scale Wind Towers from China*, 77 Fed. Reg. 75,992 (Dec. 26, 2012)............................. 7

PUBLIC VERSION

Plaintiffs Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd. (collectively "GTC") hereby submit comments opposing the Final Results of Redetermination (Sept. 24, 2021), ECF109-110 ("2nd Remand") filed by the Department of Commerce ("Commerce" or "Department"). GTC challenges Commerce's continued separate rate denial in the seventh administrative review ("AR7") of the antidumping duty ("AD") order on new pneumatic off-the-road tires ("OTR") from the People's Republic of China ("China" or "PRC"), a nonmarket economy ("NME"). 2nd Remand at 1-4, 14-25, 33-42, 45-53.

## BACKGROUND

GTC was granted a separate rate in Commerce's less-than-fair value ("LTFV") investigation of OTR from China and the fifth administrative review ("AR5"). *OTR from China*, 73 Fed. Reg. 40,485, 40,487 (July 15, 2008) ("*LTFV Final*"); *OTR from China*, 80 Fed. Reg. 20,197, 20,198-99 (Apr. 15, 2015) ("*AR5 Final*"). During those periods, GTC was more than one-third owned by the state-owned enterprise ("SOE") Guiyang Industry Investment (Group) Co., Ltd. ("GIIG" or "GIIC"), a state-owned investment company under the supervision of the Guiyang Statute-Owned Assets Supervision and Administration Commission ("SASAC"). *LTFV Final* Issues and Decision Memorandum ("IDM") Comment 25; Letter from GDLSK to Commerce (Feb 23, 2016), P.R.124-25 ("RFI"), at 2, 6, Exhibit 1.

For the AR7 period of review ("POR") spanning September 1, 2014 – August 31, 2015, despite GIIG's ownership reducing to 25.2%, Commerce denied GTC's separate rate. *OTR from China*, 82 Fed. Reg. 18,733 (Apr. 21, 2017), P.R.312, IDM (Apr. 21, 2017), P.R.308, at 12-15. Of the four *de facto* criteria in Commerce's separate rate analysis, the denial rested primarily on the "selection of management" (third) factor and to a lesser extent the "disposition of profits" (fourth) factor – without consideration of the "export prices are set by . . . a governmental authority" (first) or "ability to negotiate contracts" (second) factors. IDM at 7, 13-15. Commerce

found that GTC had not rebutted the presumption of state control because, according to

Commerce, GIIG elected managers and approved profit distribution at GTC's 2015 3rd Interim

Shareholders' General Meeting ("July 2015 Meeting"). *Id.*; Commerce Memorandum (Oct. 5,

2016), C.R.225/P.R.281 ("Separate Rate Memo"), at 3.

GTC appealed and demonstrated that evidence rebutted the presumption of state control

for all factors. GTC Memorandum of Law (Jan. 30, 2018), ECF51-52 ("GTC Opening Brief"), at

26-39. This Court in May 2019 granted Defendant's request for a voluntary remand. *GTC v.

United States*, 389 F.Supp.3d 1350, 1359-60 (CIT 2019). Commerce in September 2019 issued

its redetermination acknowledging that GTC's July 2015 Meeting was open to the public, despite

initially finding that meeting was closed – but nonetheless again denied GTC's separate rate.

Final Results of Redetermination (Sept. 23, 2019), ECF74/81 ("1st Remand"), at 16-19, 28.

GTC challenged the redetermination, again demonstrating that evidence rebutted the

presumption of state control with respect to all factors, emphasizing:

- GTC's 2014 Annual General Meeting ("May 2015 Meeting") during the POR where GIIG could not elect managers or approve its profit distribution;

- myriad safeguards afforded to GTC shareholders by GTC's Articles of Association ("AoA"), GTC's 2015 Annual Report, PRC Company Law, and PRC Code of Corporate Governance for Listed Companies ("Code for Listed Companies"); and

- formal confirmation by the Guiyang SASAC that **"it does not have the authority to make decisions for GTC"** and that, despite having an interest in GTC, it **"does not have the right to make a decision on appointment or dismissal of board directors or management of your company."**

Plaintiffs' Comments on 1st Remand (Nov. 22, 2019), ECF84-85 ("GTC 1st Remand

Comments"), at 12-15, 21 (quoting GTC SAQR (May 25, 2016), C.R.123-136/P.R.164-68,

Exhibit 10: Reply of Guiyang Municipal {SASAC} to {GTC} regarding "Request to Clarify and

Explain and Administration Authority of Guiyang Municipal {SASAC} on {GTC}" (Mar. 5,

2016) ("Guiyang SASAC Clarification") (emphases added), 22-24.

This Court in May 2021 again invalidated Commerce's separate rate denial:

**No specific evidence is presented, or addressed, on the critical issue of whether the Chinese government controlled the prices of exports to the United States of GTC's subject merchandise during the POR.** . . .

**Commerce sidestepped the issue of whether the record evidence supported a finding of control of those prices during the POR by GIIG**, the minority shareholder and government-controlled entity. Therefore, the standard of review requires the court to set aside, as **unsupported by substantial record evidence, the denial of separate rate status to GTC** as set forth in the Remand Redetermination.

*GTC v. United States*, 519 F.Supp.3d 1248, 1261 (CIT 2021) (emphases added).

In its second redetermination Commerce now concedes that:

{T}he record evidence provided by . . . GTC demonstrated that the general manager and the export sales manager(s)) set export prices. . . . {T}here was no indication of direct involvement or approval on behalf of any government authority regarding price-setting (the first factor). . . . {GTC} provided sufficient evidence to demonstrate that {the} company has authority to negotiate and sign contracts and other agreements on its own behalf (the second factor). . . . GTC provided sufficient evidence to demonstrate that company officials set export prices, and there is no indication of explicit involvement or approval in this process by any government entities, and no party provided information on the record to contradict this finding.

2nd Remand at 21-23. Commerce nevertheless continued denying GTC's separate rate in AR7.

*Id*. at 4. The denial's gravamen was that the first and second factors undeniably favoring the

grant of separate rate are irrelevant given its finding that GTC did not rebut the presumption for

the third factor – selection of management. *Id*. at 15, 18-21, 23, 34-36, 41-42.

## **STANDARD OF REVIEW**

"The court reviews remand determinations for compliance with the court's remand

order." *Nakornthai Strip Mill Pub. Co. v. United States*, 32 CIT 1272, 1274 (CIT 2008). This

Court must also hold unlawful a remand redetermination that is "unsupported by substantial

evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## **ARGUMENT**

**I.    THE SEPARATE RATE DENIAL DOES NOT COMPLY WITH *GTC***

Commerce's continued separate rate denial for GTC, as well as for Consolidated Plaintiff

Aeolus Tyre Co., Ltd. ("Aeolus"), does not comply with this Court's order because the 2nd

Remand: (a) improperly relies on judicial precedent where there is majority SOE ownership;

(b) does not acknowledge that the presumption of state control has been rebutted, requiring

affirmative evidence of state control to deny separate rates; and (c) fails to provide the necessary

evidence of state control over export prices.

### **A.    Precedent Involving Majority SOE Ownership Is Inapposite**

*GTC* expressly rejected Commerce's attempt to defend its separate rate denials based on

judicial precedent involving respondents who were majority SOE-owned:

> Defendant argues in its response to comments that "Commerce may deny a
> request for a separate rate if an applicant fails to demonstrate separation from the
> government with respect to any one of the *de jure* or *de facto* criteria" and that "if
> an applicant fails to establish any one of the *de jure* or *de facto* criteria,
> **Commerce is not required to continue its analysis and determine whether the
> applicant has, or has not, established the other applicable criteria**." . . . . In
> addition to *Yantai CMC Bearing Co.*, defendant relies on *Advanced Tech. &
> Materials Co. v. United States* . . . . **Neither decision was based on facts
> analogous to those of the review at issue**. In *Advanced Tech. & Materials Co.*,
> the respondent attempting to rebut the Department's presumption was **majority-
> owned** by an entity that was 100% owned by a PRC government entity. . . .
> Similarly, in *Yantai CMC Bearing Co.*, the respondent at issue, Yantai CMC
> Bearing Co. ("Yantai CMC"), had a "chain of ownership" that "extended to the
> Chinese government because Yantai CMC is more than **majority owned** by CMC
> {China National Machinery Import & Export Corporation}, which is, in turn,
> more than **majority owned** by Genertec, and Genertec is wholly-owned by the
> {SASAC}." . . . .
>
> **In contrast, neither Aeolus nor GTC had an ownership structure in which
> government entities owned a majority share during the POR.**

*GTC*, 519 F.Supp.3d at 1255-56 (emphases added) (footnote & citations omitted).

Commerce continues relying on these and other cases involving majority SOE ownership where separate rate denials were affirmed with an abbreviated inquiry into management selection. 2nd Remand at 10-11, 15-16, 37 & nn.44-46, 60-62. Commerce minimizes this critical distinction by claiming that *GTC* "merely concludes that the fact patterns in the cases cited by Commerce (*Advanced Tech.* and *Yantai CMC*) are distinguishable from those here." *Id*. at 35. Yet by rejecting Defendant's reliance on such precedent, this Court reaffirmed the principle that "Commerce has required **additional indicia of control** prior to concluding that a respondent company could not rebut the presumption of de facto government control **where the government owns**, either directly or indirectly, **only a minority of shares** in the respondent company." *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 284 F.Supp.3d 1350, 1359 (CIT 2018) (emphases added).

Commerce claims authority to deny GTC's separate rate based on management selection and profit disposition – without considering other factors. 2nd Remand at 15, 18-21, 23, 34-36, 41-42. While precedent for majority SOE-owned respondents may support this truncated analysis, this Court – **in this appeal** – rejected Commerce's effort to avoid having to consider the first and second *de facto* factors. *GTC*, 519 F.Supp.3d at 1255-56. Commerce, therefore, is "**required to continue its analysis and determine whether the applicant has, or has not, established the other applicable criteria**." *Id*. (emphasis added). Beyond "merely conclud{ing} that the fact patterns . . . are distinguishable," this Court requires that Commerce consider the first and second factors before denying GTC's separate rate on account of its minority SOE ownership. 2nd Remand at 35. By requiring consideration of all factors and additional indicia before denying separate rates for minority SOE-owned respondents, this Court, contrary to

Commerce's claim, has found that "the degree of government ownership is . . . a distinguishing factor in applying the *de facto* analysis." *Id*. at 16, 37.

Commerce purports to have "evaluated the percentage of ownership by the SOE as the largest individual shareholder," but does not address GIIG having a minority ownership interest in GTC. 2nd Remand at 21. By contrast, any obligation to evaluate SOE percentage was denied: "in minority ownership situations, Commerce evaluates evidence relating to the four *de facto* factors to determine whether there are indicia of government control or whether the respondents have established that they operate autonomously from the government." 2nd Remand at 36. Commerce misconstrues judicial precedent in stating that "majority ownership by a government entity is **a consideration only in the sense** that such a fact pattern establishes control of a respondent by a government entity to preclude any further analysis of the *de facto* criteria." *Id*. at 16-17 (emphasis added). Commerce correctly understands that majority SOE ownership makes it easier to deny separate rates as such respondents "cannot demonstrate that they operate autonomously from the government," *id*. at 37 – ignoring that, conversely, minority-owned SOE respondents can only be denied separate rates after considering all factors.

Moreover, Commerce unpersuasively attempts to extend precedent involving majority SOE-ownership to minority SOE-ownership, claiming those cases are devoid of "any mention of a threshold for government ownership in applying this relevant analytical framework." 2nd Remand at 16, 37. This Court, however, has repeatedly found – per Commerce practice – that substantially more evidence is required to deny separate rates for respondents having minority SOE-ownership. For example, this Court when affirming the separate rate denial for a majority SOE-owned respondent distinguished precedent involving minority ownership because "**Commerce views government ownership differently depending on whether the**

**government is a majority or minority owner**.” *Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F.Supp.3d 1308, 1318 (CIT 2018) (emphasis added).

Commerce next belittles the importance of GTC’s minority SOE-ownership by claiming that “in the *Silicon Carbide* decision, which established Commerce’s four factor standard of analysis for *de facto* control, Commerce found certain respondents ineligible . . . without mention of level of government ownership.” 2nd Remand at 17. This claim is misleading. Until its recent change of practice, Commerce applied *Silicon Carbide* by granting separate rates to respondents having significant – even 100 percent – SOE ownership:

- *Hot-Rolled Carbon Steel from China*, 66 Fed. Reg. 49,632 (Sept. 28, 2001), IDM Comment 1 (granting separate rates despite government ownership);

- *Heavy Forged Hand Tools from China*, 71 Fed. Reg. 54,629 (Sept. 14, 2006), IDM Comment 3 (“information submitted by the Petitioner **addresses only potential control by SASAC** . . . , **rather than any actual control** of the PRC government over the numerous individual export decisions . . . during the POR.”) (emphasis added);

- *Circular Welded Carbon Quality Steel Line Pipe from China*, 74 Fed. Reg. 14,514 (Mar. 31, 2009), IDM Comment II (separate rate granted to subsidiary of company directly owned by SASAC);

- *Oil Country Tubular Goods from China*, 75 Fed. Reg. 20,335, 20,338-40 (Apr. 19, 2010) (well-known SOE granted separate rate);

- *Utility Scale Wind Towers from China*, 77 Fed. Reg. 75,992 (Dec. 26, 2012), IDM Comment 6 (“**the Department has previously found an absence of de jure government control for companies with various forms of state ownership**”) (emphasis added); and

- *Small Diameter Graphite Electrodes from China*, 81 Fed. Reg. 62,474 (Sept. 9, 2016) (“*SDGE*”), IDM Comment 1 (“examin{ing} whether the holding of a minority stake of a producing entity which is a subsidiary of the exporter, by a local SASAC entity, amounts to de facto government control . . . . {B}ased on the totality of the circumstances, we find that there is an absence of government control.”).

When Commerce changed its practice to automatically deny separate rates for majority SOE-owned respondents, it improperly denied separate rates for minority SOE-owned GTC without considering factors that favor eligibility. Here, Commerce purported to find the requisite additional indicia from "relevant documents, meeting notes, by-laws, {AoA}, and voting actions suggestive of potential for control, generally, as well as information regarding the influence of the SOE-appointed board in GTC's decisions regarding the disposition of profits." 2nd Remand at 21. Yet these sources, which Commerce "do{es} not further discuss," *id*. n.71, merely refer to Commerce's finding that GTC has not rebutted the presumption of state control by virtue of GIIG's actions at the July 2015 Meeting. *See id*. at 10, 48-49. GTC has repeatedly demonstrated that evidence concerning GIIG's inability to pass resolutions at the May 2015 Meeting and the protections afforded to other shareholders in GTC's AoA rebut the presumption of state control with respect to the third and fourth *de facto* factors. GTC 1st Remand Comments at 15-18, 22-23. Commerce ignores this record evidence.

This Court rejected Commerce's denial of a separate rate for GTC based on distinguishable precedent involving respondents having "**an ownership structure in which government entities owned a majority share during the POR**." *GTC*, 519 F.Supp.3d at 1256 (emphases added). The sparse precedent that Commerce relies upon to deny separate rates for minority SOE-owned respondents without consideration of all factors is not persuasive. All but one of those cases were not subject to judicial review. *See* 2nd Remand at 17 & n.63, 38. Commerce chides "the respondents {for} too quickly dismiss{ing} the relevance of the cases cited with respect to minority ownership, noting that most were not subject to judicial review, without acknowledging . . . one such non-reviewed case was the very *Silicon Carbide* decision which established Commerce's four factor standard of analysis for *de facto* control." *Id*. at 38.

Yet Commerce notes that the *Silicon Carbide* respondents "failed to establish their eligibility for separate rates because, **at verification, these companies failed to produce bank records** necessary to prove their retention of proceeds from export sales." *Id*. n.122 (quoting *Silicon Carbide from China*, 59 Fed. Reg. 22,285, 22,586-87 (May 2, 1994) (emphasis added)). It is disingenuous for Commerce to justify its automatic denial of GTC's separate rate based on a case in which respondents failed verification – an opportunity not extended to GTC.

Commerce heralds this Court's July 2021 decision affirming the separate rate denial for I.D.I. International Development and Investment Corp. ("IDI") in an administrative review of the AD order on Fish Fillets from Vietnam. 2nd Remand at 17-21, 38-39. According to Commerce, "the underlying facts of the *IDI* . . . case mirrored those of the instant litigation, where the largest minority shareholder of the respondent in question was a SOE, and the respondent's separate rate was denied based on a failure to rebut the presumption with respect to autonomy of management selection." 2nd Remand at 21 n.70. Commerce is wrong. IDI's separate rate denial was based on multiple, additional factual findings. For example, "Commerce found that a government official and Communist Party member—referred to as Mr. X—represented the Vietnamese government on the boards of both IDI and its corporate parent, Company Y." *IDI v. United States*, 2021 WL 3082807 *2 (July 6, 2021). These facts were emphasized by this Court's rejection of IDI's claim that Commerce found only the possibility of state control:

> . . . **Commerce{} . . . found that government official Mr. X and his fellow Communist Party members on the boards of IDI and Company Y select company management and make "important decisions,"** . . . . "Mr. X's presence on the board of IDI and Company Y, along with his role in Company Y's management, indicates that the {government of Vietnam} *is involved* in company-level decision making." . . .
>
> **Commerce thus found that the Vietnamese government, through the presence of Mr. X and his party colleagues on the IDI and Company Y boards, controls the selection of IDI's management** and . . . Mr. X himself has **direct involvement in such affairs as an executive** in Company Y. Commerce

> therefore did not rely on just the *ability* of the Vietnamese government to control
> IDI; the Department determined that the Vietnamese government *actually*
> controls IDI through **the involvement of Mr. X and his party colleagues**.

*Id.* *7 (emphasis added) (citations omitted).

Commerce has not and cannot make similar findings with respect to GTC. There is no
evidence that important managerial decisions for GTC during the AR7 POR were made by
Chinese government officials and Communist party members, or that a government official was
an executive for the respondent's parent company. *IDI* is therefore readily distinguishable and
does not "mirror{}" AR7. 2nd Remand at 21 n.70. Commerce asserts that "the fact that the board
members in IDI were party members was not . . . relevant" and emphasizes *dicta* when it claims
"that potential government control suffices to establish the exporter has failed to demonstrate its
independence from *de facto* control." *Id*. at 39. Yet Commerce concedes that *IDI* is not entirely
on-point. *Id*. In any event, IDI is not binding on AR7 – assuming *arguendo* it is not limited to
cases where multiple government and party officials make important decisions for relevant
respondent corporate entities during the POR. *D&L Supply Co. v. United States*, 22 CIT 539, 540
(1998).

Indeed, this Court noted that no decision relied upon by Commerce to deny the AR7
separate rates has precedential effect. *GTC*, 519 F.Supp.3d at 1256 n.6 ("this summary
affirmance . . . is **not a precedential decision**.") (emphases added) (citing *Advanced Tech. &
Materials Co. v. United States*, 581 F.App'x 900 (Fed. Cir. 2014)). The only precedent
governing the 2nd Remand is this Court's remand order. *Nakornthai*, 32 CIT at 1274.

In sum, the 2nd Remand does not comply with this Court's ruling because it:
(1) continues to rely on majority SOE-ownership precedent as a basis for separate rate denial,
without considering the first and second *de facto* factors; and (2) ignores this Court's finding that
GTC rebutted the presumption of state control, thereby requiring Commerce to affirmatively

demonstrate state control over export pricing before denying the separate rate. Neither *IDI* nor

any other argument raised by Commerce justify such failure to comply with judicial instruction.

### B.     GTC Rebutted the Presumption of State Control

Commerce emphasizes "the presumption of government control (which has been upheld

repeatedly by the courts)," through which "it is the *burden of the respondent to rebut the*

*presumption* by providing sufficient evidence to establish that it operates autonomously from the

government in certain key aspects." 2nd Remand at 18-19 (emphasis in original). However, as

the Court of Appeals for the Federal Circuit ("CAFC") explained decades ago:

> . . . {A} presumption is not merely rebuttable but **completely vanishes upon the**
> **introduction of evidence sufficient to support a finding of the nonexistence of**
> **the presumed fact**. . . . {T}he evidence must be sufficient to put the existence of
> a presumed fact into genuine dispute. **The presumption compels the production**
> **of this minimum quantum of evidence from the party against whom it**
> **operates, nothing more**.

*Aukerman Co. v. R.L. Chaides Constr. Co*., 960 F.2d 1020, 1037 (Fed. Cir. 1992) (emphases

added) (citations omitted).

Once GTC submitted the "**minimum quantum of evidence**" creating "genuine dispute"

as to whether it was state-controlled during the POR, the presumption vanished and Commerce

became obligated to affirmatively establish such control by the Chinese government. *Id*.

(emphasis added). GTC's evidence surpassed this minimal evidentiary threshold, proving

independence as to price setting and sales negotiating, 2nd Remand at 21-23, and creating

genuine issues as to management selection and profit disposition. GTC Opening Brief at 26-39;

GTC 1st Remand Comments at 12-28; Section II, *infra*. This Court in *GTC* invalidated the

separate rate denial by finding that GTC had rebutted the applicable presumption:

> Here, not only did both exporters place information on the record from which they
> argue that the Chinese government did not control their activities generally, they
> also introduced evidence to support their specific contentions that they maintained
> control over their own prices for the exported subject merchandise. . . . **Under the**

PUBLIC VERSION

> **Department's "rebuttable presumption" method of determining government control over export functions, the introduction of that evidence was at least sufficient to require Commerce to make retrospective determinations**, based on a full consideration of the entire record, **on the issue of whether the PRC government actually did control these respondents' export pricing decisions during the POR**.

*GTC*, 519 F.Supp.3d at 1259 (emphases added) (citations omitted).

Commerce does not contest GTC carrying its burden for factors one and two, but repeats its mantra that the presumption for each factor is evaluated in isolation. 2nd Remand at 15, 18-21, 23, 34-36, 41-42. While such truncated analysis may be permissible in the majority- SOE context, this Court has found that such precedent is not "based on facts analogous to those of the review at issue"; Commerce here is "**required to continue its analysis and determine whether the applicant has, or has not, established the other applicable criteria**." *GTC*, 519 F.Supp.3d at 1256 (emphases added) (quotation omitted). GTC's extensive information far surpassing the "minimum quantum of evidence . . . **to support a finding of the nonexistence of the presumed fact**" – *i.e.*, creating "genuine dispute" as to whether GTC was state controlled during the AR7 POR. *Aukerman*, 960 F.2d at 1037. Accordingly, the presumption that GTC was state controlled "**completely vanishe{d}**" and Commerce became obligated to affirmatively demonstrate that GTC was state controlled in the AR7 POR before denying its separate rate. *Id*. (emphasis added).

Commerce errs by misconstruing judicial instruction regarding the necessity of evaluating all factors and the operation of presumptions, with multiple statements that incorrectly require GTC to have conclusively established a lack of state control for all factors:

> {I}f a respondent is **unable to establish autonomy** from the government under one the four *de facto* criteria, that company fails to rebut the presumption of government control and is ineligible for a separate rate. . . . Commerce's practice is to deny a request for a separate rate if an applicant **fails to demonstrate separation from the government** . . . .

**Failure to establish this prong of the criteria meant that the respondents failed to rebut the presumption of government control** and, thus, Commerce reasonably determined that record evidence indicated **a measure of control, or potential for control**, of relevant Chinese-government entities over the operations of the companies as a whole, including their export activities. . . .

Commerce found that record evidence indicating a lack of autonomy in management selection **did not satisfy the third prong** of the *de facto* analysis and, thus, that GTC and Aeolus **were unable to rebut the presumption** . . . .

{A} respondent **must satisfy all four factors to rebut the presumption** of government control that applies in NME country proceedings. . . .

{B}ecause **failure to establish autonomy with respect to one prong of the analysis means that a respondent has not met its burden to rebut the presumption of government control**, our findings related to the first factor do not otherwise overcome Commerce's findings that Aeolus and GTC **failed to establish autonomy from government control** in making decisions regarding the selection of management . . . .

{F}ailure to **establish independence from the government in any such factor is sufficient to demonstrate failure to rebut the presumption** of control. . . .

GTC and Aeolus **did not establish that they operated autonomously** from the government in selecting management. The respondents have **therefore not met their burden in rebutting the presumption** of state control, *i.e.*, that **they must demonstrate autonomy from the government** under each of the four *de facto* factors in the separate rate analysis.

2nd Remand at 15-16, 18, 21, 23-24 (emphases added).

GTC need not "establish," "demonstrate," or "satisfy" the presumed fact (*i.e.*, prove separation from government control) for each factor in isolation, as Commerce claims. *Id*. This requirement cannot be reconciled with either the CAFC articulation of how presumptions operate or this Court's order requiring Commerce to address all factors. *Aukerman*, 960 F.2d at 1037; *GTC*, 519 F.Supp.3d at 1259. Commerce lays bare its misconstruction as follows:

Commerce does not affirmatively establish in each instance the government is actually controlling the respondent's export activities, including pricing decisions. Rather, it is **the *burden of the respondent to rebut the presumption* by providing sufficient evidence to establish that it operates autonomously from the government** . . . .

> We continue to find that record information specific to each respondent reflects **a measure of control** on behalf of relevant SOE shareholders in the selection of the board of directors and management for each firm and, thus, **does not adequately substantiate autonomy** of each firm in the selection of directors and management during the POR . . . .

2nd Remand at 18-19, 24 (emphases modified).

Commerce improperly conflates "sufficient evidence" to rebut the presumption – *i.e.*, the "minimum quantum" – with evidence to conclusively "establish" the presumed fact – *i.e.*, that GTC "operates autonomously from the government." *Id*. at 19; *Aukerman*, 960 F.2d at 1037. Moreover, it ignores this Court's finding that GTC provided "sufficient" evidence to cast doubt over state control, such that to deny the separate rate Commerce had to "affirmatively establish in each instance the government is actually controlling the respondent's export activities, including pricing decisions." 2nd Remand at 18; *GTC*, 519 F.Supp.3d at 1259. To deny separate rates per *GTC*, Commerce had to affirmatively demonstrate state control; an amorphous "measure of control" is insufficient because, with the presumption rebutted, Commerce had to "adequately substantiate" state control. 2nd Remand at 18, 24. Commerce unpersuasively resists this Court's finding that GTC rebutted the presumption, effectively maintaining an "irrebuttable presumption" that discounts record evidence. The flawed lynchpin of the 2nd Remand is that "GTC **failed to establish autonomy from government control** in making decisions regarding the selection of management." 2nd Remand at 23 (emphasis added). As discussed above, GTC was under no such obligation.

###   C.   This Court Required Evidence of Government Price-setting

*GTC* found that Commerce unlawfully continued denying separate rates in the 1st Remand based on the absence of evidence indicating that their OTR export prices were set by the Chinese government during the AR7 POR:

**Because Commerce has identified a respondent's "export functions" (or**

PUBLIC VERSION

**"activities") as the subject of its separate rate inquiry, the cour**t, in reviewing a decision placing an exporter within the Department's "PRC-wide" entity consisting of all government-controlled exporters of the subject merchandise, **necessarily must review the Department's factual identification of the price discriminator**, i.e., the party that controlled the setting of the U.S. price of the exported subject merchandise, during the POR. . . .

**{T}he issue this case presents is whether the Department's inclusions of Aeolus and GTC within the PRC-wide entity were supported by valid factual findings that the Chinese government, rather than Aeolus or GTC, controlled the prices** at which these companies' subject off-the-road tires were sold for export during the POR. . . .

The critical flaw was the Department's failure to conduct the review so as to determine **whether the Chinese government, during the POR, controlled the prices of Aeolus's subject merchandise** that was sold for export to the United States and at issue in {AR7}. **If it did not, the inclusion of Aeolus within the PRC-wide entity lacked both an evidentiary basis and sound reasoning** when viewed according to **the Department's own formulation** of its separate rate inquiry, which expressly identifies "export activities" and "export functions." . . .

{T}he Department's analysis of GTC's separate rate application in the {1st Remand} suffers from the same fatal flaws as does its analysis for Aeolus.

*GTC*, 519 F.Supp.3d at 1257-60 (emphases added).

Yet, Commerce's redetermination continued denying GTC's separate rate, despite acknowledging that the record evidenced an absence of state control for *de facto* factors one and two. 2nd Remand at 21-22. Commerce in critical respects misconstrues *GTC* specifically and applicable precedent generally. First, Commerce claimed that this Court misinterpreted the separate rate analysis:

**Implicit in the Court's discussion is the apparent conclusion that the first factor is the preeminent consideration in the *de facto* analysis, and that a lawful finding that a respondent has failed to rebut the presumption of *de facto* government control must necessarily rely upon evidence indicative of government influence on export pricing** (and that affirmative evidence demonstrating a firm's independence in export price setting is alone sufficient to rebut the presumption of control). . . .{H}owever, the four factors, together, relate to the determination of whether a respondent has rebutted the presumption that the Chinese government exerts control over the export functions of a firm.

2nd Remand at 22 (emphases added).

15

The fundamental problem with Commerce's attempt to recast *GTC* is that the focus on exports comes directly from longstanding Department practice. The multi-factor separate rate analysis' purpose – as recognized by Commerce and this Court, over decades through AR7 – has always been, and continues to be, to determine whether respondents can demonstrate the absence of governmental control **over its export activities**. *Sparklers from China*, 56 Fed. Reg. 20,588 (May 6, 1991); *Silicon Carbide*, 59 Fed. Reg. at 22,587; *Furfuryl Alcohol from China*, 60 Fed. Reg. 22,544, 22,545 (May 8, 1995); Separate Rate Memo at 1 ("the Department will assign a separate rate in NME proceedings if a respondent can demonstrate the absence of . . . **government control over its export activities**.") (emphasis added). *Shandong Huanri (Gr.) Gen. Co. v. United States*, 493 F.Supp.2d 1353, 1357 (CIT 2007) (separate rates granted for "an absence of central government control, both in law and in fact, **with respect to exports**."); *Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 519 F.Supp.3d 1224, 1234 (CIT 2021) ("**the fundamental question here concerns state control over *export functions*.**") (emphasis modified); *GTC*, 519 F.Supp.3d at 1257 ("**Commerce has identified a respondent's 'export functions' (or 'activities') as the subject of its separate rate inquiry**.") (emphasis added).

This Court did not graft an additional requirement as Commerce insinuates; it required that separate rate denials be tethered to the respondents' export functions – per longstanding Department practice. Commerce declines to heed what it characterizes as "{i}mplicit in the Court's discussion" – but is actually a clear judicial finding – that GTC's separate rate denial "must necessarily rely upon evidence indicative of government influence on export pricing (and that affirmative evidence demonstrating a firm's independence in export price setting is alone sufficient to rebut the presumption of control)." 2nd Remand at 22. *GTC* required that continued separate rate denials be "**supported by valid factual findings that the Chinese government,**

16

**rather than Aeolus or GTC, controlled the prices at which these companies' subject {OTR}**
**were sold for export during the POR**." 519 F.Supp.3d at 1258 (emphasis added).

Commerce employs a straw-man argument by recasting this Court's finding as "{a}n
approach whereby **the only relevant consideration** is whether export prices are set by, or are
subject to, the approval of a government entity." 2nd Remand at 23 (emphasis added). Rather
than suggest that export pricing is the lone relevant inquiry, this Court found that Commerce
could not ignore this overarching purpose of the separate rate analysis in denying GTC's separate
rate. Commerce concedes that "there is **no evidence that the SOE owners directly exercised**
**their control on the respondents' export activities**" because "GTC provided sufficient
evidence to demonstrate that company officials set export prices, and there is no indication of
explicit involvement or approval authority in this process by any government al entities, and no
party provided information on the record to contradict this finding." *Id*. at 19 (emphasis added),
23. Commerce thereby correctly and candidly "acknowledge{s} that there is **no explicit**
**evidence that the Chinese government 'actually did control' export pricing**." *Id*. at 4
(emphasis added).

Accordingly, there is no basis to deny GTC's separate rate in AR7 per Commerce's
longstanding practice – as this Court recently and repeatedly recognized. *Jilin Forest*, 519
F.Supp.3d at 1234; *GTC*, 519 F.Supp.3d at 1260. *GTC* did not merely request confirmation that
the record is devoid of any indicia of state control with respect to export activities in order to
deny the separate rates; it faulted Commerce for denying the separate rates without "discussion
of specific government control over the setting of prices of exported subject merchandise during
the POR" and "sidestep{ing} the issue of whether the record evidence supported a finding of
control of those prices during the POR." 519 F.Supp.3d at 1260-61. Moreover, *GTC* was clear

Case 1:17-cv-00100-TCS   Document 115   Filed 11/24/21   Page 22 of 36

PUBLIC VERSION

that such findings were a legal prerequisite to denying the separate rates in holding that denials must be "**supported by valid factual findings that the Chinese government, rather than Aeolus or GTC, controlled the prices at which these companies' subject {OTR} were sold for export during the POR**." *Id*. at 1258 (emphases added).

Commerce ignores these passages and misreads this Court's concern that "{b}ecause Commerce, in the {1st Remand}, did not apply the first of its factors—which inquires as to whether the export prices are set by or are subject to the approval of a government authority—the court has no such finding of fact to subject to judicial review under the substantial evidence standard." *Id. GTC*'s clear holding cannot plausibly be construed as merely a request that Commerce should "have been clearer" about no such evidence existing as a basis to deny separate rates. 2nd Remand at 20. Commerce incorrectly recasts "the conclusion in the {1st Remand} that **failure to address** these factors constituted a critical flaw in Commerce's analysis." *Id*. at 21 (emphasis added). In fact, *GTC* required Commerce to find that "the Chinese government, during the POR, controlled the prices" to support treating both respondents being "within the PRC-wide entity." *Id*. The 2nd Remand does not comply with this Court's order since Commerce continued denying separate rates while confirming that it could not find control over export prices by the Chinese government.

### D.    Commerce Does Not Rely on Evidence of Actual State Control

Rather than cite responsive information, Commerce faults the requirement for "evidence of direct government involvement in price setting" as "ignor{ing} other aspects of export activities where the government may exert control." 2nd Remand at 23. Yet Commerce proffers no evidence of state control "such as influence over export quantities/quotas, terms of sale, financing, customer relationships, contract negotiation, transportation, customs requirements, management directives, selection of export markets, export-related investment, *etc*." *Id*. at 23-24.

PUBLIC VERSION

It is improper for Commerce to avoid this Court's requirement to provide affirmative evidence of state control by merely listing potential ways in which state control could be exercised. Indeed, Commerce only identifies "voting actions **suggestive of potential for control**" and other "evidence indicative of **potential for control**." *Id*. at 23, 25 (emphases added). Tellingly, Commerce claims:

> {F}inding that neither Aeolus not GTC has autonomy in the selection of management allows for **the reasonable inference**, in light of the presumption of government control in NME proceedings, **that their respective government shareholders maintain the potential to control the export operations** of each company because the management of a firm controls its operations – including its export functions.

*Id*. at 19 (emphases added).

Such finding of potential control cannot be reconciled with this Court's summary of Department practice: "**Commerce' practice does not require a respondent to rebut the potential for government control, but rather actual control** by the government entity." *An Giang*, 203 F.Supp.3d 1256, 1291-92 (CIT 2017) (emphases added). Indeed, *GTC* rejected the very position which Commerce subsequently adopted in the 2nd Remand:

> {The 1st Remand} **presumes, without evidentiary support, that the Department's finding of a lack of autonomy in the selection of management was the factual equivalent of a finding that the Chinese government controlled what Commerce termed a company's "export activities,"** {*1st Remand*} 6, or "export functions," *id*. at 7, during the POR. **Nor can the court agree that, on this record, Commerce made what can be described as a "reasonable inference."** Under the applicable standard of review, **the court may not sustain a factual finding that ignores record evidence and relies upon speculation**.

519 F.Supp.3d at 1256-57 (emphases added).

Commerce cannot credibly maintain the exact same "reasonable inference" of state control based on the exact same record on which this Court expressly could not "agree that, on this record, Commerce made what can be described as a 'reasonable inference.'" *Id*.; 2nd

Remand at 19. With this Court finding the presumption of state control rebutted and requiring

that finding state control be based on affirmative evidence rather than speculation, Commerce

improperly continues denying GTC's separate rate without providing the necessary evidence. "**It

is well established that speculation does not constitute substantial evidence.**" *Lucent Techs.,

Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009) (emphasis added). Yet Commerce's

separate rate denial is based on rampant conjecture already catalogued by GTC. GTC 1st

Remand Comments at 24 (quoting 1st Remand at 17, 20, 24-25, 29, 40). For example,

Commerce reiterates that "**we would expect** any large shareholder, including a government

entity, to control the operations of the company" and purports to have provided sufficient

"evidence of **the potential for GIIG to control** GTC's board." 2nd Remand at 50, 59

(quotations omitted) (emphases added).

This Court has repeatedly held that separate rate denials must be based on actual

government control as opposed to mere potential to control:

> {T}hese facts alone are not dispositive of the *de facto* autonomy inquiry, because
> they speak solely to the *possibility* for governmental control over export activities
> through these persons, not whether such control was in fact reasonably likely to
> have been exercised . . . .
>
> {I}n an NME country, there will usually be state involvement and *authority* to
> intervene in commercial affairs. But this fact alone does not necessarily lead to
> the conclusion that all NME producers and exporters should be categorically
> treated as in fact setting their prices according to some centralized strategy.

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 28 F.Supp.3d 1317, 1348-50 (CIT

2014) (footnotes omitted). This judicial holding is based on Commerce's own findings:

> Commerce' practice does not require a respondent to rebut the potential for
> government control, but rather actual control by the government entity. . . .
>
> {I}f Commerce relied solely upon the government's potential to nominate a
> manager or a board member with control over day-to-day company operations, it
> would be deviating from its practice of requiring that the government either

> actually appoint management or be directly or indirectly involved in the
> management of the company.

*An Giang*, 203 F.Supp.3d at 1291-92 (footnote omitted).

These decisions cannot be reconciled with Commerce's separate rate denial based on speculation that GIIG's participation as an ordinary GTC shareholder somehow constituted control over export decisions. Commerce found that – at most – GIIG's voting raised "the *possibility* for governmental control over export activities," when agency practice prevents such "reli{ance} solely upon the government's potential" to control. *Jiasheng*, 28 F.Supp.3d at 1348-50. Uncontroverted evidence shows that GTC: (1) independently sets export prices; (2) has negotiating authority; (3) selects management; and (4) retains export sale proceeds, making independent decisions regarding the disposition of profits. AQR at 10, 12, 18, Exhibits A-11, A-14; SAQR Exhibits 5, 16. In fact, Commerce "**has not pointed to any specific evidence that, in influencing the companies' operations pursuant to their duties as *company* officials** (including through the selection of management and preparation of profit distribution plans), **these persons were directing the companies' export pricing decisions based on the will of the PRC government**." *Jiasheng*, 28 F.Supp.3d at 1348-50 (emphases added).

Commerce unpersuasively complains of difficulties finding state control after the presumption is rebutted: "A standard requiring evidence of direct government involvement in price-setting before finding government control would be almost impossible to meet, requiring that a 'smoking gun' document exist on the record showing direct involvement on behalf of as government authority in price-setting for an individual firm." 2nd Remand at 24. Yet *GTC* correctly found that with the presumption rebutted, Commerce became affirmatively obligated to establish state control. 519 F.Supp.3d at 1255-61. Since GTC provided more than the requisite minimum quantum of evidence to rebut finding state control, requiring that "Commerce would

need to rely on direct evidence unambiguously demonstrating government involvement in price-setting" is an accurate summary of controlling law – not "an unreasonable threshold" as claimed. 2nd Remand at 40.

Commerce's complaint about supposed difficulties obtaining the requisite evidence to deny separate rates is both incorrect and irrelevant. Commerce claims that, even "where the government involvement is price-setting is direct and unambiguous, actual affirmative documentation is unlikely to exist, and the ability of Commerce to compel that any such information to be provided to the record extremely limited." 2nd Remand at 24. Commerce is wrong. It can readily solicit information regarding price in response to questionnaires – in the form of narrative responses, in the event documentation does not exist. Indeed, Commerce acknowledges its "authority to solicit such information and gather evidence." *Id*. at 40. Because respondents such as GTC must certify the accuracy of information submitted to Commerce, those falsely stating they could set prices free of government interference or control are subject to severe penalties. 19 C.F.R. § 351.303(g). GTC certified to the accuracy of its representations regrading price setting and other indicia of state control when submitting sufficient evidence to rebut the presumption. That contrary evidence may be difficult to obtain does not relieve Commerce from its obligation to affirmatively demonstrate state control before denying separate rates for respondents such as GTC, who:

- are not majority SOE-owned;

- fully cooperated with Commerce; and

- provided evidence to establish a negative (*i.e.*, absence of state control) – always a difficult task. *GTC*, 519 F.Supp.3d at 1257-59.

## II.     THE SEPARATE RATE DENIAL IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

Commerce erred by denying GTC's separate rate based on selected facts and speculation, while failing to meaningfully consider contrary evidence.

### A.     The 2012 Meeting Does Not Evidence Government Control

Commerce misplaces reliance on GTC's Third Interim Shareholders' Meeting ("2012 Meeting"), when GTC's 6th Board was elected – which was substantially similar to the GTC board during the AR7 POR.[1] 2nd Remand at 45-47; 1st Remand at 17-18. Commerce concedes that "GIIG had no direct role in the nomination process." 2nd Remand at 45; 1st Remand at 27. Rather, "the 6th session of board of **directors of GTC were nominated by** the Nomination Committee under **the Board of Directors of GTC**; **GIIC did not have any involvement in the nomination stage of election of GTC's 6th session** of the board of directors." 2SAQR (Aug. 8, 2016), C.R.166-70/P.R.204-05, at 9 (emphases added).

Commerce overlooks the lack of GIIG involvement in the nomination process by denying GTC's separate rate "based on its finding that the board [                    ] and was then elected at a meeting where GIIG comprised [                              ]." 2nd Remand at 46. Yet the extent to which other shareholders participated does not change the facts that: (1) shareholders were not involved in the nomination process; and (2) the 2012 Meeting election complied with

---

[1]     GTC's board members selected Ma Shichun as chairman at the 2012 Meeting. While he did not work for GIIG or any other governmental entity, Commerce relied upon his service as GIIG's proxy to deny GTC's separate rate. 1st Remand at 20. Yet Commerce long ago conferred separate rate status on a company whose board chairman served as proxy for the SOE shareholder. *Cased Pencils from China*, 59 Fed. Reg. 55,625, 55,628 (Nov. 8, 1994). Commerce concedes that this is not "sufficient to deny a separate rate" and "{t}hat GTC's Chairman's status as proxy does not constitute overlapping management." 2nd Remand at 51. Because he personally owns GTC shares and is not beholden to any other shareholder, 2SAQR Exhibit 7A, Commerce misplaced reliance on GTC's AoA giving emergency authority to the board chairman. 1st Remand at 20.

all legal requirements proscribed by GTC's AoA, the PRC Law, and Code for Listed Companies – including protections against domination by any one shareholder. Rather than indicate impropriety, the 2012 Meeting reveals GTC acting as an ordinary publicly listed company operating transparently and democratically through normal procedures, subject to legal restrictions. One critical legal protection refutes Commerce's theory that GIIG controls GTC:

> **The board of directors** . . . of a listed company **shall operate in an independent manner. There shall be no subordination relationship between, on the one hand, a listed company . . . and, on the other hand, the company's controlling shareholders** . . . and the latter shall not give plans or instructions concerning the listed company's business operation to the former, nor shall the latter interfere with the **independent operation** of the former in any other manner.

SAQR Exhibit 9: Code for Listed Companies Art. 26 (emphases added).

Commerce acknowledges the legality of the 2012 Meeting but wrongly claims state control because "an SOE exerted state control over board selection and, by extension, the selection of management." 2nd Remand at 48. That GIIG comprised the majority of shareholders participating in the 2012 Meeting does not mean that it selected those board members, particularly since shareholders do not select management. These board members do not have any position in GIIG or SASAC or any other government agency – they GTC directors who act on behalf of GTC. *See* SAQR Exhibits 3, 6; 3SAQR Exhibit 10. Moreover, GTC management conducts the day-to-day operation of GTC, not board members. While managers are selected by the board, they must work for the best interests of GTC; board members and management owe fiduciary duties to GTC and **all** of its shareholders. SAQR Exhibit 1: AoA Arts. 98-99. The SOE shareholder voting for board members who served in the POR does not make GTC management "beholden" to the Chinese government, as Commerce claims. 1st Remand at 29. Assuming *arguendo* that "GIIG effectively selected GTC's board," 2nd Remand at 46, GTC's 6th Board and management operate the company independently from shareholders including GIIG.

Commerce's reliance on the 2012 Meeting presumes perpetual government control over GTC by virtue of a vote by GIIG years before the POR. This presumption constitutes an unreasonable fiction that defies Commerce's own findings. After conferring separate rate status on GTC in 2015, *AR5 Final*, 80 Fed. Reg. at 20,197-200, it is disingenuous for Commerce to deny GTC separate rate status in AR7 – particularly GIIC's investment in GTC since AR5 **was reduced** from 33.36% to 25.2% and Guiyang's SASAC no longer conducted GTC performance reviews. RFI at 2, 6, Exhibit 1. Commerce in AR7 recognized that events such as the 2012 Meeting, which "pre-date the POR . . . are thus not pertinent to this review." IDM at 15. While Commerce claims that this pre-POR election is necessarily "relevant" and that its separate rate analysis has "evolve{ed}" since AR5, 2nd Remand at 47, such selective reliance on its prior findings invalidates the continued GTC separate rate denial.

### B.   The 2015 Meetings Do Not Evidence Government Control

GTC's May 2015 Meeting disproves GIIG control during the POR, as the managerial candidates advocated by GIIG were **not** elected "**due to dissenting votes from shareholders other than GIIC**." 2SAQR at 9 (emphasis added), Exhibit 7C; *see* SAQR Exhibit 7. Commerce denied GTC's separate rate through speculation that GIIG "force{d} an interim meeting to re-vote on its favored proposal." 2nd Remand at 49. Yet despite Commerce's initial factual error, the July 2015 Meeting was conducted transparently in compliance with all legal requirements, including the AoA which Commerce recognizes "**appears on its face to place safeguards against undue influence by large shareholders in the selection of GTC's senior managers**." *Id*. at 19 (emphasis added). That GIIG was then able to achieve what it could not at the May 2015 Meeting – through a democratic and legal process – demonstrates only "**that GIIC may only participate in GTC's decision making through the normal courses available to all**

**shareholders. There is absolutely no record evidence of any instance of 'control' by GIIC**." 2SAQR at 10 (emphasis added).

At the May 2015 Meeting, where GIIC's proposals were rejected, participating shareholders accounted for 58.4416% of total voting shares. SAQR Exhibit 7. This vote explicitly shows that **all GTC shareholders** are on equal footing with respect to voting, and that the 75% of ownership of GTC by non-GIIC shareholders can readily overturn a proposal made by GIIG. It is irrelevant that proposals were accepted at the July 2015 meeting; the point is that GTC demonstrated that all management decisions are made through shareholders' meetings, which are open to all shareholders – including the shareholders that comprise the 75% of GTC not held by GIIG. The May 2015 Meeting establishes that GIIG has no ability to control GTC.

GIIG's success in July 2015 does not mean it can always have its way; other shareholders can, and during the POR did, vote down proposals favored by GIIG. Moreover, GIIG is **not** the only shareholder authorized to convene shareholders meetings. Commerce itself recognized that: (1) "Article 49 of GTC's AoA allows: '[



];'" and (2) "the second-largest shareholder owned 9.87 percent of shares and the third largest owned 7.74 percent of GTC shares." 1st Remand at 28 (quoting SAQR Exhibit 1), 30 (citing AQR Exhibit A-8). Commerce unpersuasively maintains that the second and third largest shareholders are SOEs to discount their ability to jointly convene a shareholders meeting. 2nd Remand at 50-51. These shareholders are the individual fund shareholders – not the fund managers having custodial functions. RFI at 3-4, Exhibits 3-6. They and other minority shareholders, besides not being SOEs, have all rights afforded by GTC's AoA, the PRC Law,

and Code for Listed Companies. Commerce therefore erroneously denied GTC's separate rate based on "GIIG's sole ability to convene interim shareholders meetings." 1st Remand at 28.

### C. Record Evidence Rebuts the Presumption of State Control

The record contains extensive evidence rebutting the presumption of state control. For example, the Guiyang SASAC Clarification provides that, as to GTC, the SOE "**which has an interest in your company, does not have the right to make a decision on appointment or dismissal of board directors or management of your company**." SAQR Exhibit 10 (emphasis added). Similarly, GTC's 2015 Annual Report states:

- minority shareholders have the opportunity to fully express their opinions and claims;

- the Company strictly abides by relevant provisions of laws, statutes and rules and regulations; and

- The Company . . . completely separates from the controlling shareholder {GIIC} in personnel, assets and finance, etc., with independent organization and independent business. The controlling shareholder strictly abides by the provisions of laws and regulations and exercise shareholders' rights pursuant to laws.

*Id*. Exhibit 3 at 19, 46, 49.

Commerce discounts this evidence through its mantra that "GIIG, an SOE, was involved in making decisions at GTC" and the extensive minority shareholder "protections were ineffective at GIIG's control." 2nd Remand at 51-52. Again, GIIG's participation in the 2012 and 2015 Meetings does not evidence state control; GIIG merely acted as an ordinary shareholder subject to legal restraints, as proven by its inability to pass preferred proposals at the May 2015 Meeting. Section II.A/B, *supra*. GTC was only required to rebut the presumption of state control and submitted overwhelming evidence – far surpassing the requisite "minimum quantum," *Aukerman*, 960 F.2d at 1037, Section I.B, *supra* – including extensive legal requirements and safeguards for minority shareholders such as:

- AoA Article 40 together with PRC Company Law Articles 37 & 99 provide strict election procedures – through which GTC board members were democratically elected by shareholders, and its chairman was elected by board;

- AoA Article 43 together with PRC Company Law Article 100 provide for interim meetings to address management selection, as occurred in July 2015;

- Code for Listed Companies Articles 20-21 limit controlling shareholders, prohibiting GIIC from: circumventing shareholders' meetings or the board of directors in selecting management; or interfering with GTC or other shareholders;

- AoA Article 83 limits GIIG from nominating more than one third of GTC's directors; the 6th Board was nominated in 2012 by the previous board – without the involvement of GIIG or Guiyang SASAC;

- AoA Articles 57 & 88 provide strict voting procedures, with Article 83 allowing for cumulative voting to prevent GIIC from controlling the GTC election, and GTC's allowance for internet voting further maximizing participation; and

- AoA Articles 124, 130, 132 & 134 provide strict election procedures for senior management, through which GTC's management was selected by board members.

AQR Exhibit 3-A; SAQR Exhibits 1,[2] 9.

## III.   COMMERCE UNLAWFULLY IMPLEMENTED A NEW ANALYSIS

Commerce incorrectly claims the GTC separate rate denial is supported by "long-standing practice." 2nd Remand at 4. Rather, the denial directly contradicts Commerce's separate rate analysis followed since *Sparklers* and *Silicon Carbide*. First, Commerce myopically fixates on management selection and to a lesser extent profit distribution. 2nd Remand at 18-21, 34-36.

---

[2]      Commerce misreads GTC's AoA in claiming that Article 130 means that "GIIG ultimately controls the selection of GTC's senior management" 1st Remand at 19. All candidates are voted on at meetings open to all shareholders per GTC AoA Article 40 and PRC Company Law Articles 37, 99. AoA Article 161 does not allow GIIG to control profit distribution as Commerce claims. 1st Remand at 19. Such proposals are voted on at meetings open to all shareholders, and only pass upon receiving the necessary percentage of votes per GTC AoA Articles 76-77. Commerce conflates GIIG with all shareholders in justifying its separate rate denial because "Article 32(3) of GTC's AoA **allows individual shareholders, including GTC, the ability to supervise** the operations of the Company and put forward suggestions and raise inquiries." 1st Remand at 18 (emphasis added). Rights afforded to all shareholders and the safeguards enshrined in GTC's AoA against domination by any one shareholder refute – rather than support – Commerce's separate rate denial.

Commerce's conclusion that "if a respondent is unable to rebut one of the four *de facto* criteria, the company is ineligible for a separate rate," *id*. at 15, is anathema to agency practice that considers the "totality of the circumstances." *Id*. at 41; *SDGE* IDM Comment 1; *Jiasheng*, 28 F.Supp.3d at 1339 n.160. Commerce provides no support for its claim that when the first two factors prove independence from state control, the remaining factors "establishing the potential to control is sufficient to sustain the denial of separate rates" for minority SOE-owned respondents. 2nd Remand at 42. *GTC* found that Commerce failed to "examine{} the totality of the circumstances" in its 1st Remand, and that failure continues. 519 F.Supp.3d at 1256.

Commerce's new approach disregards the critical nexus to assess whether a respondent shows an absence of governmental control **over its export activities**. *Sparklers*, 56 Fed. Reg. at 20,588; Section I.C, *supra*. Commerce in AR7 explained that it: "will assign a separate rate in NME proceedings if a respondent can demonstrate the absence of . . . **government control over its export activities**." Separate Rate Memo at 1 (emphasis added). As this Court recognized, GTC's "inclusion . . . within the PRC-wide entity lacked both an evidentiary basis and sound reasoning when viewed according to the Department's own formulation of its separate rate inquiry, which expressly identifies 'export activities' and 'export functions.'" *GTC*, 519 F.Supp.3d at 1260.

Commerce treated government ownership as dispositive, using a truncated analysis that equated GIIG's 25.2% ownership with government control. Yet Commerce previously found that such a consideration "**cannot be considered as dispositive**." *Silicon Carbide*, 59 Fed. Reg. at 22,586 (emphasis added); *De Facto Criteria for Establishing a Separate Rate in AD Proceedings Involving NME Countries*, 78 Fed. Reg. 40,430, 40,433 (July 5, 2013). Indeed, Commerce specifically reversed course on this point. *Tapered Roller Bearings from China*, 62 Fed. Reg.

6173, 6174 (Feb. 11, 1997) ("*TRBs*") ("we have modified our separate-rates policy . . . .
{O}wnership 'by all the people' in and of itself cannot be considered dispositive in establishing
whether a company can receive a separate rate."). Commerce further reversed practice by
denying GTC's separate rate based on the mere potential for government control. Section I.D,
*supra*.

Commerce only has "discretion to change its policies . . . so long as the agency's
decisions are explained," *Nakornthai*, 32 CIT at 1276, but failed to provide the requisite
"adequate explanation for the change." *SKF USA, Inc. v. United States*, 630 F.3d 1365, 1373
(Fed. Cir. 2011). Where – as in AR7 – "the Department provides no reasonable explanation for
changing a practice that it has consistently followed, **such a change in an unacceptable agency
practice**." *WelCom Prods., Inc. v. United States,* 865 F.Supp.2d 1340, 1344 (CIT 2012)
(emphasis added). Indeed, agencies must show "a **more detailed justification** . . . when, for
example, its **new policy rests upon factual findings that contradict those which underlay its
prior policy**." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis added).

GTC's separate rate denial rests on findings that contradict those made by Commerce
pursuant to *Sparklers* and *Silicon Carbide*, including Commerce granting GTC's separate rate in
AR5 with greater GIIG ownership. RFI at 6; *AR5 Final*, 80 Fed. Reg. at 20,198-99. Commerce
also contradicted its extensive investigation findings detailing separate rate propriety based on
verification, despite 33.84% GIIG ownership. *LTFV Final* IDM Comment 25. By feigning
adherence to Department practice while reaching diametrically opposite results, *see* 2nd Remand
at 61-63, Commerce in AR7 arbitrarily "offer{ed} insufficient reasons for treating similar
situations differently." *SKF*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

PUBLIC VERSION

It strains credulity to accept that "Commerce has not changed its separate rate practice, but rather examined the level of government ownership more closely in light of the *Diamond Sawblade*s proceedings." 1st Remand at 40. That *Diamond Sawblades* rejected Commerce's separate rate conclusion for a respondent with 100% SASAC ownership does support separate rate denial based on a 25.2% SOE ownership. Commerce incorrectly claims that the GTC separate rate denial "reflect{s} the reasonable evolution of Commerce's analysis in response to court decisions" involving majority SOE-ownership. 2nd Remand at 63. Implementing a practice that Commerce expressly disavowed decades ago, *TRBs*, 62 Fed. Reg. at 6174, is neither reasonable nor an evolution – but instead an unlawful and unexplained contradiction of practice.

## **CONCLUSION**

Based on the foregoing, GTC requests that this Court direct Commerce to grant its separate rate in AR7.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

*/s/ Jordan C. Kahn*
Ned H. Marshak
Jordan C. Kahn
Elaine F. Wang
Brandon M. Petelin
599 Lexington Ave., 36th Floor
New York, New York 10022
**
1201 New York Ave., NW, Suite 650
Washington, DC 20005

*Counsel for Plaintiffs*
*Guizhou Tyre Co., Ltd. and*
*Guizhou Tyre Import and Export Co., Ltd.*

Dated: November 24, 2021

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiffs' Comments on Second Remand Redetermination, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2007, is 9,995 words, less than the 10,000 word limit.

/s/ Jordan C. Kahn
*Counsel for Plaintiffs*
*Guizhou Tyre Co., Ltd. and*
*Guizhou Tyre Import and Export Co., Ltd.*

Dated: November 24, 2021

11373455_1