# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE TIMOTHY C. STANCEU

_____x
:
GUIZHOU TYRE CO., LTD. and GUIZHOU TYRE :
IMPORT AND EXPORT CO., LTD., :
:
Plaintiffs, :        Consol. Court No. 17-00100
:
v. :        **PUBLIC**
:        **VERSION**
UNITED STATES, :
:
Defendant. :
_____x

## <u>CONSOLIDATED PLAINTIFF'S COMMENTS<br>ON SECOND REMAND REDETERMINATION</u>

Ned H. Marshak
Jordan C. Kahn
Elaine F. Wang
Brandon M. Petelin

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
599 Lexington Ave., 36th Floor
New York, New York 10022
**
1201 New York Ave., NW, Suite 650
Washington, DC 20005

*Counsel for Plaintiffs*
*Guizhou Tyre Co., Ltd. and*
*Guizhou Tyre Import and Export Co., Ltd.*

Dated: November 24, 2021

# **TABLE OF CONTENTS**

**BACKGROUND** ................................................................................................................ 1

**STANDARD OF REVIEW** ............................................................................................. 4

**ARGUMENT** ...................................................................................................................... 4

**I.    THE SEPARATE RATE DENIAL DOES NOT COMPLY WITH *GTC*** ................... 4

    A.    PRECEDENT INVOLVING MAJORITY SOE OWNERSHIP IS
        INAPPOSITE .............................................................................................. 4

    B.    AEOLUS REBUTTED THE PRESUMPTION OF STATE CONTROL ............ 10

    C.    THIS COURT REQUIRED EVIDENCE OF GOVERNMENT PRICE-
        SETTING ................................................................................................. 14

    D.    COMMERCE DOES NOT RELY ON EVIDENCE OF ACTUAL STATE
        CONTROL ............................................................................................... 18

**II.    THE SEPARATE RATE DENIAL IS UNSUPPORTED BY SUBSTANTIAL
     EVIDENCE** ..................................................................................................... 23

    A.    THE BOARD ELECTION DOES NOT EVIDENCE GOVERNMENT
        CONTROL ............................................................................................... 23

    B.    COMMERCE'S SCANT EVIDENCE DOES NOT PROVE STATE
        CONTROL ............................................................................................... 26

**III.    COMMERCE UNLAWFULLY IMPLEMENTED A NEW ANALYSIS** ................. 29

**CONCLUSION** ................................................................................................................. 31

# TABLE OF AUTHORITIES

**Cases**

*Advanced Tech. & Materials Co. v. United States*, 581 F.App'x 900 (Fed. Cir. 2014) .............. 10

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 284 F.Supp.3d 1350
   (CIT 2018) ..................................................................................................... 5

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 203 F.Supp.3d 1256 (CIT
   2017) ................................................................................................... 19, 21

*Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020 (Fed. Cir. 1992) ..................... passim

*D&L Supply Co. v. United States*, 22 CIT 539 (1998) ................................................. 10

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).......................................... 30

*Guizhou Tyre Co. v. United States*, 519 F.Supp.3d 1248 (CIT 2021) .................................. passim

*Guizhou Tyre Co. v. United States*, 389 F.Supp.3d 1350 (CIT 2019) ................................... 2

*I.D.I. International Development and Investment Corp. v. United States*, 2021 WL 3082807
   (July 6, 2021) .................................................................................... 9, 10

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 28 F.Supp.3d 1317 (CIT 2014)
   ........................................................................................... 20, 21, 29

*Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 519 F.Supp.3d 1224 (CIT 2021)
   ............................................................................................ 16, 17

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) ........................... 20, 25, 27

*Nakornthai Strip Mill Pub. Co. v. United States*, 32 CIT 1272 (CIT 2008)..................... 3, 10, 30

*Shandong Huanri (Gr.) Gen. Co. v. United States*, 493 F.Supp.2d 1353 (CIT 2007)................. 16

*SKF USA, Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001).................................. 30

*SKF USA, Inc. v. United States*, 630 F.3d 1365 (Fed. Cir. 2011).................................. 30

*WelCom Prods., Inc. v. United States,* 865 F.Supp.2d 1340 (CIT 2012) ........................... 30

*Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 350 F.Supp.3d 1308 (CIT 2018).. 7


**Statutes**

19 U.S.C. § 1516a.................................................................................. 3

ii

**Regulations**

19 C.F.R. § 351.303 ................................................................................................ 22

**Administrative Decisions & Publications**

*Circular Welded Carbon Quality Steel Line Pipe from China*, 74 Fed. Reg. 14,514
(Mar. 31, 2009) .............................................................................................. 7

*De Facto Criteria for Establishing a Separate Rate in AD Proceedings Involving NME
Countries*, 78 Fed. Reg. 40,430 (July 5, 2013) ......................................... 30

*Furfuryl Alcohol from China*, 60 Fed. Reg. 22,544 (May 8, 1995)............................... 16

*Heavy Forged Hand Tools from China*, 71 Fed. Reg. 54,629 (Sept. 14, 2006) ............................ 7

*Hot-Rolled Carbon Steel from China*, 66 Fed. Reg. 49,632 (Sept. 28, 2001) ............................... 7

*New Pneumatic Off-the-road Tires from China*, 82 Fed. Reg. 18,733 (Apr. 21, 2017) ................ 1

*Oil Country Tubular Goods from China*, 75 Fed. Reg. 20,335 (Apr. 19, 2010) .......................... 7

*Silicon Carbide from China*, 59 Fed. Reg. 22,285 (May 2, 1994)........................................ passim

*Small Diameter Graphite Electrodes from China*, 81 Fed. Reg. 62,474 (Sept. 9, 2016) .............. 8

*Sparklers from China*, 56 Fed. Reg. 20,588 (May 6, 1991) ............................................. 15, 29, 30

*Tapered Roller Bearings from China*, 62 Fed. Reg. 6173 (Feb. 11, 1997) ........................... 30, 31

*Utility Scale Wind Towers from China*, 77 Fed. Reg. 75,992 (Dec. 26, 2012)............................ 7

Consolidated Plaintiff Aeolus Tyre Co., Ltd. ("Aeolus") hereby submits comments opposing the Final Results of Redetermination (Sept. 24, 2021), ECF109-110 ("2nd Remand") filed by the Department of Commerce ("Commerce" or "Department"). Aeolus challenges Commerce's continued separate rate denial in the seventh administrative review ("AR7") of the antidumping duty ("AD") order on new pneumatic off-the-road tires ("OTR") from the People's Republic of China ("China" or "PRC"), a nonmarket economy ("NME"). 2nd Remand at 1-4, 14-25, 33-42, 54-60.

## BACKGROUND

Aeolus in December 2015 timely submitted a separate rate application ("SRA"). GDLSK Letter to Commerce (Dec. 11, 2015), C.R.28-33/P.R.53-55 ("SRA"). Aeolus advised Commerce that it "is a **publicly traded company** listed on the Shanghai Stock Exchange, PRC." *Id*. at 12 (emphasis added). Aeolus reported that it is owned in part by the following state-owned enterprises ("SOE") that "are ultimately supervised by local {State-owned Assets Supervision and Administration Commission ("SASAC")}":

- China Chemical Rubber Co., Ltd. (aka China National Tire & Rubber Corp.) ("China National Tire"): **42.58%**. China National Tire is 100% owned by China National Chemical Corporation ("ChinaChem"), which is a state-owned company supervised by the SASAC of the State Council.

- Henan Tyre Group Co., Ltd., Jiaozuo Tongliang Assets Management Co., Ltd., and Xiamen Haiyi International Trade Co., Ltd. held **4.58%, 1.16%** and **0.74%** shares of Aeolus, respectively.

*Id*. at 13. Thus, SOEs owned 49.06% of the shares of Aeolus.

For the AR7 period of review ("POR") spanning September 1, 2014 – August 31, 2015, Commerce denied Aeolus' separate rate. *OTR from China*, 82 Fed. Reg. 18,733 (Apr. 21, 2017), P.R.312, IDM (Apr. 21, 2017), P.R.308, at 10-12. Of the four *de facto* criteria in Commerce's separate rate analysis, the denial rested entirely on the "selection of management" (third) factor –

without consideration of the "export prices are set by . . . a governmental authority" (first),

"ability to negotiate contracts" (second), or "disposition of profits" (fourth) factors. IDM at 7,

10-12. Commerce found that Aeolus had not rebutted the presumption of state control: "Because

Aeolus' controlling shareholders are wholly-owned SOEs, they have the ability to nominate a

majority of Aeolus' board members, and in turn control decisions regarding the selection of

management." *Id*. at 11. Aeolus appealed and demonstrated that evidence rebutted the

presumption of state control for all factors. Aeolus Memorandum of Law (Jan. 30, 2018),

ECF55-56 ("Aeolus Opening Brief"), at 20-31.

One document relied upon by Aeolus to demonstrate its independence from state control

was a "Rectification Report" from January 2014 – *i.e.*, before the AR7 POR – evidencing a

formal cessation of previously intertwined operations between Aeolus and both ChinaChem and

China National Tire. *Id*. at 12, 27. GDLSK Letter to Commerce (Jan. 8, 2016), C.R.39/P.R.79

("RFI"), Exhibit 1A. This Court in May 2019 ordered remand because Commerce failed to

address the Rectification Report. *Guizhou Tyre Co. v. United States*, 389 F.Supp.3d 1350, 1357-

58 (CIT 2019). Commerce in September 2019 issued its redetermination acknowledging the

Rectification Report, but nonetheless again denying Aeolus' separate rate. Final Results of

Redetermination (Sept. 23, 2019), ECF74/81 ("1st Remand"), at 4-14, 32-37.

Aeolus challenged the redetermination, again demonstrating that evidence rebutted the

presumption of state control with respect to all factors, emphasizing its SRA and the

Rectification Report, as well as the myriad safeguards afforded to Aeolus shareholders by

Aeolus' Articles of Association ("AoA"), PRC Company Law, and PRC Code of Corporate

Governance for Listed Companies ("Code for Listed Companies"). Aeolus' Comments on 1st

Remand (Nov. 22, 2019), ECF84-85 ("Aeolus 1st Remand Comments"), at 1-11, 15-24.

This Court in May 2021 again invalidated Commerce's separate rate denial for Aeolus as well as for another minority SOE-owned respondent, Plaintiff Guizhou Tyre Co., Ltd. ("GTC"):

> As to the issue of a separate rate for Aeolus, all of the Department's findings in the {1st Remand} pertained to the issue of selection of directors and management and to government influence generally. There is no discussion of specific government control over the setting of prices of exported subject merchandise during the POR. Nor does the {1st Remand} point to specific record evidence contradicting the evidence Aeolus put forth in its separate rate application on the issues of independence from the government in the setting of export prices, the negotiating of contracts, the retention of export sales proceeds, and the disposition of profits. *See* Aeolus's {1st Remand} Comments at 2, 26–27. Without deciding whether Commerce permissibly reached findings under its third factor, autonomy in selection of management, **the court concludes that Commerce reached an ultimate decision on Aeolus's separate rate application that was unsupported by substantial record evidence on the whole. The critical flaw was the Department's failure to conduct the review so as to determine whether the Chinese government, during the POR, controlled the prices of Aeolus's subject merchandise that was sold for export to the United States and at issue in {AR7}. If it did not, the inclusion of Aeolus within the PRC-wide entity lacked both an evidentiary basis and sound reasoning when viewed according to the Department's own formulation of its separate rate inquiry, which expressly identifies "export activities" and "export functions.**

*GTC v. United States*, 519 F.Supp.3d 1248, 1261 (CIT 2021) (emphasis added).

In its second redetermination Commerce now concedes that:

> {T}he record evidence provided by Aeolus . . . demonstrated that the general manager and the export sales manager(s) set export prices. . . . {T}here was no indication of direct involvement or approval on behalf of any government authority regarding price-setting (the first factor). . . . Aeolus provided sufficient evidence to demonstrate that {the} company has authority to negotiate and sign contracts and other agreements on its own behalf (the second factor). Further, the record with respect to Aeolus reflected that the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses (*i.e.*, the fourth factor). . .
>
> Aeolus . . . provided sufficient evidence to demonstrate that company officials set export prices, and there is no indication of explicit involvement or approval in this process by any government entities, and no party provided information on the record to contradict this finding.

2nd Remand at 21-23 (footnotes omitted). Commerce nevertheless continued denying Aeolus' separate rate in AR7, claiming that the first, second, and third factors undeniably favoring the

separate rate are irrelevant – given its finding that Aeolus did not rebut the presumption for the third factor, selection of management. *Id.* at 15, 18-21, 23, 34-36, 41-42.

## STANDARD OF REVIEW

"The court reviews remand determinations for compliance with the court's remand order." *Nakornthai Strip Mill Pub. Co. v. United States*, 32 CIT 1272, 1274 (CIT 2008). This Court must also hold unlawful a remand redetermination that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## ARGUMENT

## I.    THE SEPARATE RATE DENIAL DOES NOT COMPLY WITH *GTC*

Commerce's continued separate rate denial for Aeolus, as well as for GTC, does not comply with this Court's order because the 2nd Remand: (a) improperly relies on judicial precedent where there is majority SOE ownership; (b) does not acknowledge that the presumption of state control has been rebutted, requiring affirmative evidence of state control to deny separate rates; and (c) fails to provide the necessary evidence of state control over export prices.

### A.    Precedent Involving Majority SOE Ownership Is Inapposite

This Court in *GTC* expressly rejected Commerce's attempt to defend its separate rate denials based on judicial precedent involving respondents who were majority SOE-owned:

> Defendant argues in its response to comments that "Commerce may deny a request for a separate rate if an applicant fails to demonstrate separation from the government with respect to any one of the *de jure* or *de facto* criteria" and that "if an applicant fails to establish any one of the *de jure* or *de facto* criteria, **Commerce is not required to continue its analysis and determine whether the applicant has, or has not, established the other applicable criteria**." . . . . In addition to *Yantai CMC Bearing Co.*, defendant relies on *Advanced Tech. & Materials Co. v. United States* . . . . **Neither decision was based on facts analogous to those of the review at issue**. In *Advanced Tech. & Materials Co.*, the respondent attempting to rebut the Department's presumption was **majority-owned** by an entity that was 100% owned by a PRC government entity. . . .

4

Similarly, in *Yantai CMC Bearing Co.*, the respondent at issue, Yantai CMC Bearing Co. ("Yantai CMC"), had a "chain of ownership" that "extended to the Chinese government because Yantai CMC is more than **majority owned** by CMC {China National Machinery Import & Export Corporation}, which is, in turn, more than **majority owned** by Genertec, and Genertec is wholly-owned by the {SASAC}." . . . .

**In contrast, neither Aeolus nor GTC had an ownership structure in which government entities owned a majority share during the POR.**

*GTC*, 519 F.Supp.3d at 1255-56 (emphases added) (footnote & citations omitted).

Commerce continues relying on these and other cases involving majority SOE ownership where separate rate denials were affirmed with an abbreviated inquiry into management selection. 2nd Remand at 10-11, 15-16, 37 & nn.44-46, 60-62. Commerce minimizes this critical distinction by claiming that *GTC* "merely concludes that the fact patterns in the cases cited by Commerce (*Advanced Tech.* and *Yantai CMC*) are distinguishable from those here." *Id.* at 35. Yet by rejecting Defendant's reliance on such precedent, this Court reaffirmed the principle that "Commerce has required **additional indicia of control** prior to concluding that a respondent company could not rebut the presumption of de facto government control **where the government owns**, either directly or indirectly, **only a minority of shares** in the respondent company." *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 284 F.Supp.3d 1350, 1359 (2018) (emphases added).

Commerce claims authority to deny Aeolus' separate rate based on management selection and profit disposition – without considering other factors. 2nd Remand at 15, 18-21, 23, 34-36, 41-42. While precedent for majority SOE-owned respondents may support this truncated analysis, this Court – **in this appeal** – rejected Commerce's effort to avoid having to consider the first and second *de facto* factors. *GTC*, 519 F.Supp.3d at 1255-56. Commerce, therefore, is t "**required to continue its analysis and determine whether the applicant has, or has not,**

**established the other applicable criteria**." *Id*. (emphasis added). Beyond "merely conclud{ing} that the fact patterns . . . are distinguishable," this Court requires that Commerce consider the first and second factors before denying Aeolus' separate rate on account of its minority SOE ownership. 2nd Remand at 35. By requiring consideration of all factors and additional indicia before denying separate rates for minority SOE-owned respondents, this Court, contrary to Commerce's claim, has found that "the degree of government ownership is . . . a distinguishing factor in applying the *de facto* analysis." *Id*. at 16, 37.

Commerce purports to have "evaluated the percentage of ownership by the SOE as the largest individual shareholder," but does not address SOEs having a minority ownership interest in Aeolus. 2nd Remand at 21. By contrast, any obligation to evaluate SOE percentage was denied: "in minority ownership situations, Commerce evaluates evidence relating to the four *de facto* factors to determine whether there are indicia of government control or whether the respondents have established that they operate autonomously from the government." 2nd Remand at 36. Commerce misconstrues judicial precedent in stating that "majority ownership by a government entity is **a consideration only in the sense** that such a fact pattern establishes control of a respondent by a government entity to preclude any further analysis of the *de facto* criteria." *Id*. at 16-17 (emphasis added). Commerce correctly understands that majority SOE ownership makes it easier to deny separate rates as such respondents "cannot demonstrate that they operate autonomously from the government," *id*. at 37 – ignoring that, conversely, minority-owned SOE respondents can only be denied separate rates after considering all factors.

Moreover, Commerce unpersuasively attempts to extend precedent involving majority SOE-ownership to minority SOE-ownership, claiming those cases are devoid of "any mention of a threshold for government ownership in applying this relevant analytical framework." 2nd

Remand at 16, 37. This Court, however, has repeatedly found – per Commerce practice – that

substantially more evidence is required to deny separate rates for respondents having minority

SOE-ownership. For example, this Court when affirming the separate rate denial for a majority

SOE-owned respondent distinguished precedent involving minority ownership because

"**Commerce views government ownership differently depending on whether the

government is a majority or minority owner**." *Zhejiang Quzhou Lianzhou Refrigerants Co. v.

United States*, 350 F.Supp.3d 1308, 1318 (CIT 2018) (emphasis added).

Commerce next belittles the importance of Aeolus' minority SOE-ownership by claiming

that "in the *Silicon Carbide* decision, which established Commerce's four factor standard of

analysis for *de facto* control, Commerce found certain respondents ineligible . . . without mention

of level of government ownership." 2nd Remand at 17. This claim is misleading. Until its recent

change of practice, Commerce applied *Silicon Carbide* by granting separate rates to respondents

having significant – even 100 percent – SOE ownership:

- *Hot-Rolled Carbon Steel from China*, 66 Fed. Reg. 49,632 (Sept. 28, 2001), IDM Comment 1 (granting separate rates despite government ownership);

- *Heavy Forged Hand Tools from China*, 71 Fed. Reg. 54,629 (Sept. 14, 2006), IDM Comment 3 ("information submitted by the Petitioner **addresses only potential control by SASAC** . . . , **rather than any actual control** of the PRC government over the numerous individual export decisions . . . during the POR.") (emphasis added);

- *Circular Welded Carbon Quality Steel Line Pipe from China*, 74 Fed. Reg. 14,514 (Mar. 31, 2009), IDM Comment II (separate rate granted to subsidiary of company directly owned by SASAC);

- *Oil Country Tubular Goods from China*, 75 Fed. Reg. 20,335, 20,338-40 (Apr. 19, 2010) (well-known SOE granted separate rate);

- *Utility Scale Wind Towers from China*, 77 Fed. Reg. 75,992 (Dec. 26, 2012), IDM Comment 6 ("**the Department has previously found an absence of de jure government control for companies with various forms of state ownership**") (emphasis added); and

- *Small Diameter Graphite Electrodes from China*, 81 Fed. Reg. 62,474 (Sept. 9, 2016) ("*SDGE*"), IDM Comment 1 ("examin{ing} whether the holding of a minority stake of a producing entity which is a subsidiary of the exporter, by a local SASAC entity, amounts to de facto government control . . . . {B}ased on the totality of the circumstances, we find that there is an absence of government control.").

When Commerce changed its practice to automatically deny separate rates for majority SOE-owned respondents, it improperly denied separate rates for minority SOE-owned Aeolus without considering factors that favor eligibility. Here, Commerce purported to find the requisite additional indicia, but only references information specific to GTC. 2nd Remand at 21.

This Court rejected Commerce's denial of a separate rate for Aeolus based on distinguishable precedent involving respondents having "**an ownership structure in which government entities owned a majority share during the POR**." *GTC*, 519 F.Supp.3d at 1256 (emphases added). The sparse precedent that Commerce relies upon to deny separate rates for minority SOE-owned respondents without consideration of all factors is not persuasive. All but one of those cases were not subject to judicial review. *See* 2nd Remand at 17 & n.63, 38. Commerce chides "the respondents {for} too quickly dismiss{ing} the relevance of the cases cited with respect to minority ownership, noting that most were not subject to judicial review, without acknowledging . . .  one such non-reviewed case was the very *Silicon Carbide* decision which established Commerce's four factor standard of analysis for *de facto* control." *Id*. at 38. Yet Commerce notes that the *Silicon Carbide* respondents "failed to establish their eligibility for separate rates because, **at verification, these companies failed to produce bank records** necessary to prove their retention of proceeds from export sales." *Id*. n.122 (quoting *Silicon Carbide from China*, 59 Fed. Reg. 22,285, 22,586-87 (May 2, 1994) (emphasis added)). It is disingenuous for Commerce to justify its automatic denial of Aeolus' separate rate based on a case in which respondents failed verification – an opportunity not extended to Aeolus.

Commerce heralds this Court's July 2021 decision affirming the separate rate denial for I.D.I. International Development and Investment ("IDI") in an administrative review of the AD order on Fish Fillets from Vietnam. 2nd Remand at 17-21, 38-39. According to Commerce, "the underlying facts of the *IDI* . . . case mirrored those of the instant litigation, where the largest minority shareholder of the respondent in question was a SOE, and the respondent's separate rate was denied based on a failure to rebut the presumption with respect to autonomy of management selection." 2nd Remand at 21 n.70. Commerce is wrong. IDI's separate rate denial was based on multiple, additional factual findings. For example, "Commerce found that a government official and Communist Party member—referred to as Mr. X—represented the Vietnamese government on the boards of both IDI and its corporate parent, Company Y." *IDI v. United States*, 2021 WL 3082807, *2 (July 6, 2021). These facts were emphasized by this Court's rejection of IDI's claim that Commerce found only the possibility of state control:

> . . . **Commerce{}** . . . **found that government official Mr. X and his fellow Communist Party members on the boards of IDI and Company Y select company management and make "important decisions,"** . . . . "Mr. X's presence on the board of IDI and Company Y, along with his role in Company Y's management, indicates that the {government of Vietnam} *is involved* in company-level decision making." . . .
>
> **Commerce thus found that the Vietnamese government, through the presence of Mr. X and his party colleagues on the IDI and Company Y boards, controls the selection of IDI's management** and . . . Mr. X himself has **direct involvement in such affairs as an executive** in Company Y. Commerce therefore did not rely on just the *ability* of the Vietnamese government to control IDI; the Department determined that the Vietnamese government *actually* controls IDI through **the involvement of Mr. X and his party colleagues**.

*Id.* *7 (emphasis added) (citations omitted).

Commerce has not and cannot make similar findings with respect to Aeolus. There is no evidence that important managerial decisions for Aeolus during the AR7 POR were made by Chinese government officials and Communist party members, or that a government official was

an executive for the respondent's parent company. *IDI* is therefore readily distinguishable and does not "mirror{}" AR7. 2nd Remand at 21 n.70. Commerce asserts that "the fact that the board members in IDI were party members was not . . . relevant" and emphasizes *dicta* when it claims "that potential government control suffices to establish the exporter has failed to demonstrate its independence from *de facto* control." *Id*. at 39. Yet Commerce concedes that *IDI* is not entirely on-point. *Id*. In any event, IDI is not binding on AR7 – assuming *arguendo* it is not limited to cases where multiple government and party officials make important decisions for relevant respondent corporate entities during the POR. *D&L Supply Co. v. United States*, 22 CIT 539, 540 (1998).

Indeed, this Court noted that no decision relied upon by Commerce to deny the AR7 separate rates has precedential effect. *GTC*, 519 F.Supp.3d at 1256 n.6 ("this summary affirmance . . . is **not a precedential decision**.") (emphasis added) (citing *Advanced Tech. & Materials Co. v. United States*, 581 F.App'x 900 (Fed. Cir. 2014)). The only precedent governing the 2nd Remand is this Court's remand order. *Nakornthai*, 32 CIT at 1274.

In sum, the 2nd Remand does not comply with this Court's ruling because it: (1) continues to rely on majority SOE-ownership precedent as a basis for separate rate denial, without considering the first and second *de facto* factors; and (2) ignores this Court's finding that Aeolus rebutted the presumption of state control, thereby requiring Commerce to affirmatively demonstrate state control over export pricing before denying the separate rate. Neither *IDI* nor any other argument raised by Commerce justify such failure to comply with judicial instruction.

**B.      Aeolus Rebutted the Presumption of State Control**

Commerce emphasizes "the presumption of government control (which has been upheld repeatedly by the courts)," through which "it is the *burden of the respondent to rebut the presumption* by providing sufficient evidence to establish that it operates autonomously from the

government in certain key aspects." 2nd Remand at 18-19 (emphasis in original). However, as

the Court of Appeals for the Federal Circuit ("CAFC") explained decades ago:

> . . . {A} presumption is not merely rebuttable but **completely vanishes upon the introduction of evidence sufficient to support a finding of the nonexistence of the presumed fact**. . . . {T}he evidence must be sufficient to put the existence of a presumed fact into genuine dispute. **The presumption compels the production of this minimum quantum of evidence from the party against whom it operates, nothing more**.

*Aukerman Co. v. R.L. Chaides Constr. Co*., 960 F.2d 1020, 1037 (Fed. Cir. 1992) (emphases

added) (citations omitted).

Once Aeolus submitted the "**minimum quantum of evidence**" creating "genuine

dispute" as to whether it was state-controlled during the POR, the presumption vanished and

Commerce became obligated to affirmatively establish such control by the Chinese government.

*Id*. (emphasis added). Aeolus's evidence surpassed this minimal evidentiary threshold, proving

independence as to price setting, sales negotiating, and profit disposition, 2nd Remand at 21-23,

and creating genuine issues as to management selection. Aeolus Opening Brief at 4-13, 23-32;

Aeolus 1st Remand Comments at 2-10, 15-29; Section II, *infra*. This Court in *GTC* invalidated

the Aeolus separate rate denial by finding that Aeolus had rebutted the applicable presumption:

> Here, not only did both exporters place information on the record from which they argue that the Chinese government did not control their activities generally, they also introduced evidence to support their specific contentions that they maintained control over their own prices for the exported subject merchandise. . . . **Under the Department's "rebuttable presumption" method of determining government control over export functions, the introduction of that evidence was at least sufficient to require Commerce to make retrospective determinations**, based on a full consideration of the entire record, **on the issue of whether the PRC government actually did control these respondents' export pricing decisions during the POR**.

*GTC*, 519 F.Supp.3d at 1259 (emphases added) (citations omitted).

Commerce does not contest Aeolus carrying its burden for factors one, two, and four –

but repeats its mantra that the presumption for each factor is evaluated in isolation. 2nd Remand

at 15, 18-21, 23, 34-36, 41-42. While such truncated analysis may be permissible in the majority-SOE context, this Court has found that such precedent is not "based on facts analogous to those of the review at issue"; Commerce here is "**required to continue its analysis and determine whether the applicant has, or has not, established the other applicable criteria**." *GTC*, 519 F.Supp.3d at 1256 (emphasis added) (quotation omitted). Aeolus' extensive information far surpassed the "minimum quantum of evidence . . . **to support a finding of the nonexistence of the presumed fact**" – *i.e.*, creating "genuine dispute" as to whether Aeolus was state controlled during the AR7 POR. *Aukerman*, 960 F.2d at 1037 (emphasis added). Accordingly, the presumption that Aeolus was state controlled "**completely vanishe{d}**" and Commerce became obligated to affirmatively demonstrate that Aeolus was state controlled in the AR7 POR before denying its separate rate. *Id*. (emphasis added).

Commerce errs by misconstruing judicial instruction regarding the necessity of evaluating all factors and the operation of presumptions, with multiple statements that incorrectly require Aeolus to have conclusively established a lack of state control for all factors:

> {I}f a respondent is **unable to establish autonomy** from the government under one the four *de facto* criteria, that company fails to rebut the presumption of government control and is ineligible for a separate rate. . . . Commerce's practice is to deny a request for a separate rate if an applicant **fails to demonstrate separation from the government** . . . .

> **Failure to establish this prong of the criteria meant that the respondents failed to rebut the presumption of government control** and, thus, Commerce reasonably determined that record evidence indicated **a measure of control, or potential for control**, of relevant Chinese-government entities over the operations of the companies as a whole, including their export activities. . . .

> Commerce found that record evidence indicating a lack of autonomy in management selection **did not satisfy the third prong** of the *de facto* analysis and, thus, that GTC and Aeolus **were unable to rebut the presumption** . . . .

> {A} respondent **must satisfy all four factors to rebut the presumption** of government control that applies in NME country proceedings. . . .

> {B}ecause **failure to establish autonomy with respect to one prong of the analysis means that a respondent has not met its burden to rebut the presumption of government control**, our findings related to the first factor do not otherwise overcome Commerce's findings that Aeolus and GTC **failed to establish autonomy from government control** in making decisions regarding the selection of management . . . .

> {F}ailure to **establish independence from the government in any such factor is sufficient to demonstrate failure to rebut the presumption** of control. . . .

> GTC and Aeolus **did not establish that they operated autonomously** from the government in selecting management. The respondents have **therefore not met their burden in rebutting the presumption** of state control, *i.e.*, that **they must demonstrate autonomy from the government** under each of the four *de facto* factors in the separate rate analysis.

2nd Remand at 15-16, 18, 21, 23-24 (emphases added).

Aeolus need not "establish," "demonstrate," or "satisfy" the presumed fact (*i.e.*, prove separation from government control) for each factor in isolation, as Commerce claims. *Id.* This requirement cannot be reconciled with either the CAFC articulation of how presumptions operate or this Court's order requiring Commerce to address all factors. *Aukerman*, 960 F.2d at 1037; *GTC*, 519 F.Supp.3d at 1259. Commerce lays bare its misconstruction as follows:

> Commerce does not affirmatively establish in each instance the government is actually controlling the respondent's export activities, including pricing decisions. Rather, it is **the *burden of the respondent to rebut the presumption* by providing sufficient evidence to establish that it operates autonomously from the government** . . . .

> We continue to find that record information specific to each respondent reflects **a measure of control** on behalf of relevant SOE shareholders in the selection of the board of directors and management for each firm and, thus, **does not adequately substantiate autonomy** of each firm in the selection of directors and management during the POR . . . .

2nd Remand at 18-19, 24 (emphases modified).

Commerce improperly conflates "sufficient evidence" to rebut the presumption – *i.e.*, the "minimum quantum" – with evidence to conclusively "establish" the presumed fact – *i.e.*, that

Aeolus "operates autonomously from the government." *Id*. at 19; *Aukerman*, 960 F.2d at 1037. Moreover, it ignores this Court's finding that Aeolus provided "sufficient" evidence to cast doubt over state control, such that to deny the separate rate Commerce had to "affirmatively establish in each instance the government is actually controlling the respondent's export activities, including pricing decisions." 2nd Remand at 18; *GTC*, 519 F.Supp.3d at 1259. To deny separate rates per *GTC*, Commerce had to affirmatively demonstrate state control; an amorphous "measure of control" is insufficient because, with the presumption rebutted, Commerce had to "adequately substantiate" state control. 2nd Remand at 18, 24. Commerce unpersuasively resists this Court's finding that Aeolus rebutted the presumption, effectively maintaining an "irrebuttable presumption" that discounts record evidence. The flawed lynchpin of the 2nd Remand is that "Aeolus . . . **failed to establish autonomy from government control** in making decisions regarding the selection of management." 2nd Remand at 23 (emphasis added). As discussed above, Aeolus was under no such obligation.

### C.   This Court Required Evidence of Government Price-setting

This Court in *GTC* found that Commerce unlawfully continued denying separate rates in the 1st Remand based on the absence of evidence indicating that their OTR export prices were set by the Chinese government during the AR7 POR:

> **Because Commerce has identified a respondent's "export functions" (or "activities") as the subject of its separate rate inquiry, the cour**t, in reviewing a decision placing an exporter within the Department's "PRC-wide" entity consisting of all government-controlled exporters of the subject merchandise, **necessarily must review the Department's factual identification of the price discriminator**, i.e., the party that controlled the setting of the U.S. price of the exported subject merchandise, during the POR. . . .
>
> **{T}he issue this case presents is whether the Department's inclusions of Aeolus and GTC within the PRC-wide entity were supported by valid factual findings that the Chinese government, rather than Aeolus or GTC, controlled the prices** at which these companies' subject {OTR} were sold for export during the POR. . . .

The critical flaw was the Department's failure to conduct the review so as to determine **whether the Chinese government, during the POR, controlled the prices of Aeolus's subject merchandise** that was sold for export to the United States and at issue in {AR7}. **If it did not, the inclusion of Aeolus within the PRC-wide entity lacked both an evidentiary basis and sound reasoning** when viewed according to **the Department's own formulation** of its separate rate inquiry, which expressly identifies "export activities" and "export functions." . . .

{T}he Department's analysis of GTC's separate rate application in the {1st Remand} suffers from the same fatal flaws as does its analysis for Aeolus.

*GTC*, 519 F.Supp.3d at 1257-60 (emphases added).

Yet, Commerce's redetermination continued denying Aeolus' separate rate, despite acknowledging that the record evidenced an absence of state control for *de facto* factors one, two, and four. 2nd Remand at 21-22. Commerce in critical respects misconstrues *GTC* specifically and applicable precedent generally. First, Commerce claimed that this Court misinterpreted the separate rate analysis:

> **Implicit in the Court's discussion is the apparent conclusion that the first factor is the preeminent consideration in the *de facto* analysis, and that a lawful finding that a respondent has failed to rebut the presumption of *de facto* government control must necessarily rely upon evidence indicative of government influence on export pricing** (and that affirmative evidence demonstrating a firm's independence in export price setting is alone sufficient to rebut the presumption of control). . . .{H}owever, the four factors, together, relate to the determination of whether a respondent has rebutted the presumption that the Chinese government exerts control over the export functions of a firm.

2nd Remand at 22 (emphases added).

The fundamental problem with Commerce's attempt to recast *GTC* is that the focus on exports comes directly from longstanding Department practice. The multi-factor separate rate analysis' purpose – as recognized by Commerce and this Court, over decades through AR7 – has always been, and continues to be, to determine whether respondents can demonstrate the absence of governmental control **over its export activities**. *Sparklers from China*, 56 Fed. Reg. 20,588 (May 6, 1991); *Silicon Carbide*, 59 Fed. Reg. at 22,587; *Furfuryl Alcohol from China*, 60 Fed.

Reg. 22,544, 22,545 (May 8, 1995); Separate Rate Memo at 1 ("the Department will assign a separate rate in NME proceedings if a respondent can demonstrate the absence of . . . **government control over its export activities**.") (emphasis added); *Shandong Huanri (Gr.) Gen. Co. v. United States*, 493 F.Supp.2d 1353, 1357 (CIT 2007) (separate rates granted for "an absence of central government control, both in law and in fact, **with respect to exports**.") (emphasis added); *Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 519 F.Supp.3d 1224, 1234 (CIT 2021) ("**the fundamental question here concerns state control over *export functions*.**") (emphasis modified); *GTC*, 519 F.Supp.3d at 1257 ("**Commerce has identified a respondent's 'export functions' (or 'activities') as the subject of its separate rate inquiry**.") (emphasis added).

This Court did not graft an additional requirement as Commerce insinuates; it required that separate rate denials be tethered to the respondents' export functions – per longstanding Department practice. Commerce declines to heed what it characterizes as "{i}mplicit in the Court's discussion" – but is actually a clear judicial finding – that Aeolus' separate rate denial "must necessarily rely upon evidence indicative of government influence on export pricing (and that affirmative evidence demonstrating a firm's independence in export price setting is alone sufficient to rebut the presumption of control)." 2nd Remand at 22. *GTC* required that continued separate rate denials be "**supported by valid factual findings that the Chinese government, rather than Aeolus or GTC, controlled the prices at which these companies' subject {OTR} were sold for export during the POR**." 519 F.Supp.3d at 1258 (emphasis added). This clear judicial instruction refutes the claim that "Commerce's analysis of Aeolus's autonomy in selecting management was itself an analysis of whether the government controls Aeolus's export functions." Remand at 20. This flawed conflation was correctly rejected when this Court

required that Commerce's separate rate denial for Aeolus necessarily must be supported by affirmative findings that "**the Chinese government, during the POR, controlled the prices of Aeolus's subject merchandise** that was sold for export to the United States and at issue in {AR7}." *Id.* at 1257-60 (emphases added).

Commerce employs a straw-man argument by recasting this Court's finding as "{a}n approach whereby **the only relevant consideration** is whether export prices are set by, or are subject to, the approval of a government entity." 2nd Remand at 23 (emphasis added). Rather than suggest that export pricing is the lone relevant inquiry, this Court found that Commerce could not ignore this overarching purpose of the separate rate analysis in denying Aeolus' separate rate. Commerce concedes that "there is **no evidence that the SOE owners directly exercised their control on the respondents' export activities**" because "Aeolus . . . provided sufficient evidence to demonstrate that company officials set export prices, and there is no indication of explicit involvement or approval authority in this process by any governmental entities, and no party provided information on the record to contradict this finding." *Id.* at 19 (emphasis added), 23. Commerce thereby correctly and candidly "acknowledge{s} that there is **no explicit evidence that the Chinese government 'actually did control' export pricing**." *Id.* at 4 (emphasis added).

Accordingly, there is no basis to deny Aeolus' separate rate in AR7 per Commerce's longstanding practice – as this Court recently and repeatedly recognized. *Jilin Forest*, 519 F.Supp.3d at 1234; *GTC*, 519 F.Supp.3d at 1260. *GTC* did not merely request confirmation that the record is devoid of any indicia of state control with respect to export activities in order to deny the separate rates; it faulted Commerce for denying the separate rates without "discussion of specific government control over the setting of prices of exported subject merchandise during

the POR" and "sidestep{ing} the issue of whether the record evidence supported a finding of

control of those prices during the POR." 519 F.Supp.3d at 1260-61. Moreover, *GTC* was clear

that such findings were a legal prerequisite to denying the separate rates in holding that denials

must be "**supported by valid factual findings that the Chinese government, rather than**

**Aeolus or GTC, controlled the prices at which these companies' subject {OTR} were sold**

**for export during the POR**." *Id*. at 1258 (emphases added).

Commerce ignores these passages and misreads this Court's concern that "{b}ecause

Commerce, in the {1st Remand}, did not apply the first of its factors—which inquires as to

whether the export prices are set by or are subject to the approval of a government authority—the

court has no such finding of fact to subject to judicial review under the substantial evidence

standard." *Id*. *GTC's* clear holding cannot plausibly be construed as merely a request that

Commerce should "have been clearer" about no such evidence existing as a basis to deny

separate rates. 2nd Remand at 20. Commerce incorrectly recasts "the conclusion in the {1st

Remand} that **failure to address** these factors constituted a critical flaw in Commerce's

analysis." *Id*. at 21 (emphasis added). In fact, *GTC* required Commerce to find that "the Chinese

government, during the POR, controlled the prices" to support treating both respondents being

"within the PRC-wide entity." *Id*. The 2nd Remand does not comply with this Court's order

since Commerce continued denying separate rates while confirming that it could not find control

over export prices by the Chinese government.

### D.     Commerce Does Not Rely on Evidence of Actual State Control

Rather than cite responsive information, Commerce faults the requirement for "evidence

of direct government involvement in price setting" as "ignor{ing} other aspects of export

activities where the government may exert control." 2nd Remand at 23. Yet Commerce proffers

no evidence of state control "such as influence over export quantities/quotas, terms of sale,

financing, customer relationships, contract negotiation, transportation, customs requirements,

management directives, selection of export markets, export-related investment, *etc*." *Id*. at 23-24.

It is improper for Commerce to avoid this Court's requirement to provide affirmative evidence of

state control by merely listing potential ways in which state control could be exercised. Indeed,

Commerce only identifies "voting actions **suggestive of potential for control**" and other

"evidence indicative of **potential for control**." *Id*. at 23, 25 (emphases added). Tellingly,

Commerce claims:

> {F}inding that neither Aeolus not GTC has autonomy in the selection of
> management allows for **the reasonable inference**, in light of the presumption of
> government control in NME proceedings, **that their respective government
> shareholders maintain the potential to control the export operations** of each
> company because the management of a firm controls its operations – including its
> export functions.

*Id*. at 19 (emphases added).

Such finding of potential control cannot be reconciled with this Court's summary of

Department practice: "**Commerce' practice does not require a respondent to rebut the

potential for government control, but rather actual control** by the government entity." *An

Giang*, 203 F.Supp.3d 1256, 1291-92 (CIT 2017) (emphases added). Indeed, *GTC* rejected the

very position which Commerce subsequently adopted in the 2nd Remand:

> {The 1st Remand} **presumes, without evidentiary support, that the
> Department's finding of a lack of autonomy in the selection of management
> was the factual equivalent of a finding that the Chinese government
> controlled what Commerce termed a company's "export activities,"** {*1st
> Remand*} 6, or "export functions," *id*. at 7, during the POR. **Nor can the court
> agree that, on this record, Commerce made what can be described as a
> "reasonable inference."** Under the applicable standard of review, **the court may
> not sustain a factual finding that ignores record evidence and relies upon
> speculation**.

519 F.Supp.3d at 1256-57 (emphases added).

Commerce cannot credibly maintain the exact same "reasonable inference" of state

control based on the exact same record on which this Court expressly could not "agree that, on this record, Commerce made what can be described as a 'reasonable inference.'" *Id*.; 2nd Remand at 19. With this Court finding the presumption of state control rebutted and requiring that finding state control be based on affirmative evidence rather than speculation, Commerce improperly continues denying Aeolus' separate rate without providing the necessary evidence.

"**It is well established that speculation does not constitute substantial evidence.**" *Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301, 1327 (Fed. Cir. 2009) (emphasis added). Yet Commerce's separate rate denial is based on rampant conjecture already catalogued by Aeolus. Aeolus 1st Remand Comments at 25 (quoting 1st Remand at 10-13). For example, Commerce reiterates that "'**we would expect** any large shareholder, including a government entity, to control the operations of the company'" and purports to have "considered the state-owned entity's **ability to control** Aeolus{} . . . ." 2nd Remand at 59 (quoting 1st Remand at 25) (emphases added).

This Court has repeatedly held that separate rate denials must be based on actual government control as opposed to mere potential to control:

> {T}hese facts alone are not dispositive of the *de facto* autonomy inquiry, because they speak solely to the *possibility* for governmental control over export activities through these persons, not whether such control was in fact reasonably likely to have been exercised . . . .

> {I}n an NME country, there will usually be state involvement and *authority* to intervene in commercial affairs. But this fact alone does not necessarily lead to the conclusion that all NME producers and exporters should be categorically treated as in fact setting their prices according to some centralized strategy.

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 28 F.Supp.3d 1317, 1348-50 (CIT 2014) (footnotes omitted). This judicial holding is based on Commerce's own findings:

> Commerce' practice does not require a respondent to rebut the potential for government control, but rather actual control by the government entity. . . .

> {I}f Commerce relied solely upon the government's potential to nominate a
> manager or a board member with control over day-to-day company operations, it
> would be deviating from its practice of requiring that the government either
> actually appoint management or be directly or indirectly involved in the
> management of the company.

*An Giang*, 203 F.Supp.3d at 1291-92 (footnote omitted).

These decisions cannot be reconciled with Commerce's separate rate denial based on speculation that SOE participation as ordinary Aeolus shareholders somehow constituted control over export decisions. Commerce found that – at most – SOE voting raised "the *possibility* for governmental control over export activities," when agency practice prevents such "reli{ance} solely upon the government's potential" to control. *Jiasheng*, 28 F.Supp.3d at 1348-50. Uncontroverted evidence shows that Aeolus: (1) independently sets export prices; (2) has negotiating authority; (3) selects management; and (4) retains export sale proceeds, making independent decisions regarding the disposition of profits. SRA at 13, 15, 19, 22, Exhibits 10, 12, 13A, 14; RFI at 2-4, Exhibit 1; Aeolus Supplemental SRA (Aug. 2, 2016), C.R.156/P.R.201 ("SSRA"), Exhibit 2. In fact, Commerce "**has not pointed to any specific evidence that, in influencing the companies' operations pursuant to their duties as *company* officials** (including through the selection of management and preparation of profit distribution plans), **these persons were directing the companies' export pricing decisions based on the will of the PRC government**." *Jiasheng*, 28 F.Supp.3d at 1348-50 (emphases added).

Commerce unpersuasively complains of difficulties finding state control after the presumption is rebutted: "A standard requiring evidence of direct government involvement in price-setting before finding government control would be almost impossible to meet, requiring that a 'smoking gun' document exist on the record showing direct involvement on behalf of as government authority in price-setting for an individual firm." 2nd Remand at 24. Yet *GTC*

correctly found that with the presumption rebutted, Commerce became affirmatively obligated to establish state control. 519 F.Supp.3d at 1255-61. Since Aeolus provided more than the requisite minimum quantum of evidence to rebut finding state control, requiring that "Commerce would need to rely on direct evidence unambiguously demonstrating government involvement in price-setting" is an accurate summary of controlling law – not "an unreasonable threshold" as claimed. 2nd Remand at 40.

Commerce's complaint about supposed difficulties obtaining the requisite evidence to deny separate rates is both incorrect and irrelevant. Commerce claims that, even "where the government involvement is price-setting is direct and unambiguous, actual affirmative documentation is unlikely to exist, and the ability of Commerce to compel that any such information to be provided to the record extremely limited." 2nd Remand at 24. Commerce is wrong. It can readily solicit information regarding price in response to questionnaires – in the form of narrative responses, in the event documentation does not exist. Indeed, Commerce acknowledges its "authority to solicit such information and gather evidence." *Id*. at 40. Because respondents such as Aeolus must certify the accuracy of information submitted to Commerce, those falsely stating they could set prices free of government interference or control are subject to severe penalties. 19 C.F.R. § 351.303(g). Aeolus certified to the accuracy of its representations regrading price setting and other indicia of state control when submitting sufficient evidence to rebut the presumption. That contrary evidence may be difficult to obtain does not relieve Commerce from its obligation to affirmatively demonstrate state control before denying separate rates for respondents such as Aeolus, who:

- are not majority SOE-owned;

- fully cooperated with Commerce; and

- provided evidence to establish a negative (*i.e.*, absence of state control) – always a difficult task. *GTC*, 519 F.Supp.3d at 1257-59.

## II. THE SEPARATE RATE DENIAL IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

Commerce erred by denying Aeolus' separate rate based on selected facts and

speculation, while failing to meaningfully consider contrary evidence.

### A. The Board Election Does Not Evidence Government Control

Commerce provides no support for the lynchpin of its separate rate denial, that Aeolus'

"AoA **allows its majority shareholders to control the selection of its board** of directors,

which in turn selects Aeolus' general manager and deputy manager." 2nd Remand at 6 (emphasis

added). SOEs have minority ownership in Aeolus and therefore are not "majority shareholders."

*Id*. Moreover, Commerce does not support its claim that Aeolus is controlled by any particular

shareholders. *Id*. n.21 (citing Separate Rate Memo at 2). Aeolus' AoA in fact refute Commerce's

assertion that "ChinaChem, an SOE . . . **controls Aeolus' Board selection process**." 1st Remand

at 7 (citing SRA Exhibit 11). Aeolus' AoA allow board members or shareholders to nominate

board members, who must be voted upon at a shareholders meeting and passed with the requisite

percentage of votes. SRA Exhibit 11: AoA Arts. 53, 56, 83. Commerce erroneously denied

Aeolus' separate rate by conflating actions by the board with actions by an SOE shareholder.

Neither ChinaChem nor any Aeolus shareholder controlled the board member selection process;

applicable legal requirements ensure that Aeolus' board "**shall be elected democratically and

lawfully through a meeting open to all shareholders**." SRA at 13-14 (emphasis added).

Commerce unpersuasively emphasized that "no public shareholder has ever nominated a

director to the board, despite mechanisms that may be in place in Aeolus' AoA [

]." 2nd Remand at 56. Yet neither ChinaChem nor any

shareholder played a role in nominating Aeolus Board members: "**No public shareholders have**

**ever nominated any board members or supervisors.** . . . **{B}oard member candidates were nominated by the existing board of directors**." SSRA at 1 (emphasis added). Commerce disingenuously denied Aeolus' separate rate based on the lack of public shareholder involvement with the nomination process, while at the same time ignoring the absence of any SOE shareholder involvement in that process. That Aeolus board members nominated board candidates is a neutral occurrence that does not evidence government control. While acknowledging that it "mistakenly conflated board nomination with selection," Commerce maintained its denial merely because ChinaChem voted to elect the board in effect during the POR. 2nd Remand at 54. Since Aeolus' board candidates are nominated by the board and not shareholders, Commerce incorrectly found "that an SOE effectively selects its board of directors." 1st Remand at 13.

Commerce speculates when it equates SOE shareholder voting to elect board members with the ability of the SOE to control management. According to Commerce, "SOE made up [                  ] of all shares to elect Aeolus' Board during the POR, with ChinaChem itself making up [                ] of all shares voted to choose Aeolus' Board." 1st Remand at 34. This Commerce calculation conflates the shareholder vote conducted on December 12, 2014, with shareholder information provided as of December 31, 2014. *Id*.; *compare* SRA Exhibit 13A with SRA Exhibit 6. **[   ] shareholders participating in that election** [                  ] voted to elect the board. SRA Exhibit 13A. Commerce concedes it does not know if the shareholder percentage changed in the 19 days between the vote and year-end, wrongly faulting Aeolus for Commerce's  failure to have requested ownership data at the vote to support its denial. 2nd Remand at 55. Without such data, Commerce improperly made assumptions "about

ChinaChem's presence at the vote." *Id*. "It is well established that speculation does not constitute substantial evidence." *Lucent Techs., Inc.*, 580 F.3d at 1327.

Moreover, that SOE shareholders voted alongside others to elect the board does not change the fact that the process was democratic – subject to myriad protections afforded by Aeolus' AoA, the PRC Company Law, and Code for Listed Companies that include:

- Aeolus AoA Article 40 and together with PRC Company Law Articles 37 & 99 provide strict election procedures, through which Aeolus board members were democratically elected by shareholders, and its chairman elected by the board;

- Code for Listed Companies Articles 20 & 21 limit controlling shareholders, prohibiting Aeolus' SOE shareholders from: circumventing the shareholders' meetings or the board in selecting management; or interfering with Aeolus or other shareholders;

- Aeolus AoA Articles 57 & 88 provide for strict voting procedures, with Article 83 allowing for: cumulative voting to prevent SOE shareholders from controlling the election of Aeolus' board; and internet voting further maximizing participation; and

- Aeolus AoA Articles 119, 147, 149 &151 provide strict election procedures for senior management, through which Aeolus' management was selected by board members – not by shareholders or any governmental entity.

SRA Exhibits 11, 8A, 8B.

Commerce mischaracterized Aeolus meetings as those where "votes are dominated by an SOE." 1st Remand at 34. Meetings featuring participation by the non-SOE shareholders representing 51% ownership cannot be so characterized. The extent to which other shareholders participated does not change the facts that: (1) shareholders were not involved in the nomination process; and (2) the board election complied with all legal requirements – including protections against domination by any one shareholder. Rather than indicate impropriety, the board election reveals that Aeolus is an ordinary publicly listed company operating transparently through normal procedures, subject to legal restrictions.

Commerce misplaces reliance on AoA provisions allowing for [

]. 1st Remand at 8. Aeolus' AoA [

]" *Id*. Per AoA Article 97: "**A director may continue to serve his post if he is re-elected** upon the expiration of his term." SRA Exhibit 11 (emphasis added). All Aeolus board members must therefore be re-elected to maintain their position, and this ordinary feature of Aeolus' management does not evidence government control. "Commerce clarified its understanding that non-independent directors must be re-elected to continue serving" – *i.e.*, at a shareholder's meeting available to all shareholders and passing by the requisite vote threshold. 2nd Remand at 55; *see* SRA Exhibit 11: AoA Arts. 53, 56, 83. Such a constrained legal process does not constitute domination by any one shareholder, let alone the Chinese government. Finally, Commerce overlooks the AoA term that the percentages required to nominate non-independent directors can be achieved "individually or **collectively**." SRA Exhibit 11: AoA Arts. 53 (emphasis added), 56, 128 ("directly or indirectly"). Multiple shareholders could satisfy these percentages, themselves or by joining together. *Id*. Exhibit 6. This AoA protection precludes domination by ChinaChem.

**B.     Commerce's Scant Evidence Does Not Prove State Control**

Commerce's discussion of  the Rectification Report, containing evidence of a cessation of intertwined operations between ChinaChem and Aeolus **before the AR7 POR**, does not make sense**.** First, Commerce mischaracterizes the Rectification Report as an "apparently voluntary restraint promised by ChinaChem" and "an unenforceable promise by an SOE," 1st Remand at 11. In fact, this Report was expressly entered into as a means of compliance. RFI Exhibit 1A. An agreement forbidding and guarantying against improper conduct cannot reasonably be construed as sanctioning  the very behavior that it plainly espouses to prohibit.

26

The record evidences that "**ChinaChem . . . has never inquired about financial information of** the Company (**Aeolus**). *Id*. (emphases added). Yet in twisted logic, Commerce reasons that evidence that an Aeolus employee "is not allowed to get access to the system of other companies such as ChinaChem" establishes that ChinaChem continues to "have access to Aeolus's financial system." *Id*. at 12-13; RFI at 3. Such baseless speculation contradicts the record and does not evidence government control, *Lucent Techs.*, 580 F.3d at 1327.

The Rectification Report does not prove government control. Its reference to ChinaChem as the "controlling shareholder" merely connotes that it is the largest shareholder which must act in accord with strict legal requirements, not that it is able to dominate Aeolus as it sees fit. RFI Exhibit 1A. Commerce unreasonably discredits the Report's formal demarcation of separation between Aeolus and ChinaChem before the POR based on an absence of "reviewable steps that the Henan SRC took to monitor and ensure compliance." 1st Remand at 36. This "report was passed by the . . . Board of Directors and the . . . Board of Supervisors," and unequivocally concludes: "**Rectification Status: Completed**." RFI Exhibit 1A (emphasis added). That consequences for non-compliance are not spelled out and Aeolus continues using the system with safeguards do not make the Report any less compelling evidence that ChinaChem and Aeolus took affirmative and effective steps before the POR to ensure that they, in fact, were separate entities, and that ChinaChem no longer had the right or ability to control Aeolus.

Commerce's overarching response is that the Rectification Report did not prevent ChinaChem from voting to elect Aeolus' board – a point already discredited. 2nd Remand at 57; Section II.A, *supra*. The only other documentation relied upon by Commerce were "website printouts provided by the petitioner in which Aeolus states that it is under the control of an SOE, specifically under the control of ChinaChem." 1st Remand at 5. These printouts do not provide

context for the term "control"; ChinaChem's 42.58% ownership stake in Aeolus may result in it being a "controlling" shareholder, but it does mean that ChinaChem "controls" Aeolus's export activities – the control needed to deny separate rate eligibility. Moreover, "the website the Department references is primarily **for advertisement purposes**; it is not an official business document objectively demonstrating 'control' in the manner considered by the Department under its separate rate test." Case Brief (Dec. 14, 2016), P.R.292, at 7 (emphasis added). Commerce concedes that "the website statements alone" do not "demonstrate control." 2nd Remand at 57. Indeed, Aeolus certified that it "independently operates its business and its intermediate and ultimate shareholders cannot direct or dictate the company's operations and business decisions." SRA at 13, 19. Commerce failed to justify its elevation of an advertisement over Aeolus' certified statement.

That Aeolus Chairman Wang Feng serves as a board member of China National Tire does not support the separate rate denial. The record confirms that he is not a representative of China National Tire. SSRA at 2. Government control is not evidenced merely because "Aeolus's AoA grants its Chairman [

].". 1st Remand at 9. That the Chairman can take such unspecified actions does not make Aeolus controlled by the Chinese government. Aeolus AoA Article 98(9) provides that the Chairman "**shall not harm interest of the company using their affiliation relationship**." SRA Exhibit 11 (emphasis added). This disproves Commerce's theory that Aeolus' Chairman is beholden to the government merely because he sits on a board owned by an SOE entity. Commerce strains to imply state control in those instances where this "fiduciary relationship could influence the chairman's action where it is in the interest of both companies." 2nd Remand at 58. Finally, Wang Feng serving as [

] does not support the separate rate denial because – as Commerce concedes – he held that position "within the company, not the Chinese government." 2nd Remand at 58.

## III.    COMMERCE UNLAWFULLY IMPLEMENTED A NEW ANALYSIS

Commerce incorrectly claims the Aeolus separate rate denial is supported by "long-standing practice." 2nd Remand at 4. Rather, the denial directly contradicts Commerce's separate rate analysis followed since *Sparklers* and *Silicon Carbide*. First, Commerce myopically fixates on management selection. 2nd Remand at 18-21, 34-36. Commerce's conclusion that "if a respondent is unable to rebut one of the four *de facto* criteria, the company is ineligible for a separate rate," *id*. at 15, is anathema to agency practice that considers the "totality of the circumstances." *Id*. at 41; *SDGE* IDM Comment 1; *Jiasheng*, 28 F.Supp.3d at 1339 n.160. Commerce provides no support for its claim that when three of the four factors prove independence from state control, one factor alone "establishing the potential to control is sufficient to sustain the denial of separate rates" for minority SOE-owned respondents. 2nd Remand at 42. This Court in *GTC* found that Commerce failed to "examine{} the totality of the circumstances" in its 1st Remand, and that failure continues. 519 F.Supp.3d at 1256.

Commerce's new approach disregards the critical nexus to assess whether a respondent shows an absence of governmental control **over its export activities**. *Sparklers*, 56 Fed. Reg. at 20,588; Section I.C, *supra*. Commerce in AR7 explained that it: "will assign a separate rate in NME proceedings if a respondent can demonstrate the absence of . . . **government control over its export activities**." Separate Rate Memo at 1 (emphasis added). As this Court recognized, Aeolus' "inclusion . . . within the PRC-wide entity lacked both an evidentiary basis and sound reasoning when viewed according to the Department's own formulation of its separate rate inquiry, which expressly identifies 'export activities' and 'export functions.'" *GTC*, 519 F.Supp.3d at 1260.

Commerce treated government ownership as dispositive, using a truncated analysis that equated minority SOE ownership with government control. Yet Commerce previously found that such a consideration "**cannot be considered as dispositive**." *Silicon Carbide*, 59 Fed. Reg. at 22,586 (emphasis added); *De Facto Criteria for Establishing a Separate Rate in AD Proceedings Involving NME Countries*, 78 Fed. Reg. 40,430, 40,433 (July 5, 2013). Indeed, Commerce specifically reversed course on this point. *Tapered Roller Bearings from China*, 62 Fed. Reg. 6173, 6174 (Feb. 11, 1997) ("*TRBs*") ("we have modified our separate-rates policy . . . . {O}wnership 'by all the people' in and of itself cannot be considered dispositive in establishing whether a company can receive a separate rate."). Commerce further reversed practice by denying Aeolus' separate rate based on the mere potential for government control. Section I.D, *supra*.

Commerce only has "discretion to change its policies . . . so long as the agency's decisions are explained," *Nakornthai*, 32 CIT at 1276, but failed to provide the requisite "adequate explanation for the change." *SKF USA, Inc. v. United States*, 630 F.3d 1365, 1373 (Fed. Cir. 2011). Where – as in AR7 – "the Department provides no reasonable explanation for changing a practice that it has consistently followed, **such a change in an unacceptable agency practice**." *WelCom Prods., Inc. v. United States,* 865 F.Supp.2d 1340, 1344 (CIT 2012) (emphasis added). Indeed, agencies must show "a **more detailed justification** . . . when, for example, its **new policy rests upon factual findings that contradict those which underlay its prior policy**." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis added).

Aeolus' separate rate denial rests on findings that contradict those made by Commerce pursuant to *Sparklers* and *Silicon Carbide*. By feigning adherence to Department practice while reaching diametrically opposite results, *see* 2nd Remand at 61-63, Commerce in AR7 arbitrarily

"offer{ed} insufficient reasons for treating similar situations differently." *SKF*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).

It strains credulity to accept that "Commerce has not changed its separate rate practice, but rather examined the level of government ownership more closely in light of the *Diamond Sawblade*s proceedings." 1st Remand at 40. That *Diamond Sawblades* rejected Commerce's separate rate conclusion for a respondent with 100% SASAC ownership does support separate rate denial based on minority SOE ownership. Commerce incorrectly claims that the Aeolus separate rate denial "reflect{s} the reasonable evolution of Commerce's analysis in response to court decisions" involving majority SOE-ownership. 2nd Remand at 63. Implementing a practice that Commerce expressly disavowed decades ago, *TRBs*, 62 Fed. Reg. at 6174, is neither reasonable nor an evolution – but instead an unlawful and unexplained contradiction of practice.

## **CONCLUSION**

Based on the foregoing, Aeolus requests that this Court direct Commerce to grant its separate rate in AR7.

Respectfully submitted,

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

*/s/ Jordan C. Kahn*
Ned H. Marshak
Jordan C. Kahn
Elaine F. Wang
Brandon M. Petelin
599 Lexington Ave., 36th Floor
New York, New York 10022
**
1201 New York Ave., NW, Suite 650
Washington, DC 20005

*Counsel for Consolidated Plaintiff
Aeolus Tyre Co. Ltd.*

Dated: November 24, 2021

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Consolidated Plaintiff's Comments on Second Remand Redetermination, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2007, is 9,956 words, less than the 10,000 word limit.

/s/ Jordan C. Kahn
*Counsel for Plaintiffs*
*Guizhou Tyre Co., Ltd. and*
*Guizhou Tyre Import and Export Co., Ltd.*

Dated: November 24, 2021

11373535_1