## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

_____
                                                                )
GUIZHOU TYRE CO., LTD. AND                )
GUIZHOU TYRE IMPORT AND EXPORT    )
CO., LTD.,                                                       )
                                                                )
                              Plaintiffs,            )          Consol. Court No. 17-00100
                                                                )
            v.                                             )          **PUBLIC VERSION**
                                                                )           Business Proprietary Information
UNITED STATES,                                       )          redacted on pp. 20, 22-25, 28-29
                                                                )
                              Defendant.          )
_____ )


## DEFENDANT'S RESPONSE TO COMMENTS ON REMAND RESULTS

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:                                      JOHN J. TUDOR
PAUL KEITH                                         Senior Trial Counsel
Attorney                                               U.S. Department of Justice
Office of Chief Counsel                         Civil Division
   For Trade Enforcement and Compliance      Commercial Litigation  Branch
U.S. Department of Commerce               P.O. Box 480
Washington,  DC  20230                         Ben Franklin Station
                                                           Washington,  D.C. 20044
                                                           Tel:  (202) 616-2382
                                                           Fax:  (202) 307-0972
                                                           Email:  john.tudor@usdoj.gov


January 24, 2022                                  Attorneys for Defendant

## **<u>TABLE OF CONTENTS</u>**

<u>PAGE</u>

DEFENDANT'S RESPONSE TO COMMENTS ON REMAND RESULTS ................. 1

FACTUAL AND PROCEDURAL BACKGROUND ................................................. 2

    I.     Proceedings Before Commerce .............................................................. 2

    II.    The Court's *First Remand Order* ........................................................ 3

    III.   Commerce's *First Remand Results* ..................................................... 4

    IV.   The Court's *Second Remand Order* ...................................................... 6

    V.    Commerce's *Second Remand Results* ................................................... 7

ARGUMENT ...................................................................................................... 9

    I.     Standard Of Review ............................................................................. 9

         A.     Review Of Commerce's Remand Redeterminations .................... 9

         B.     Legal Framework For Establishing  An Absence Of
              Government Control In Proceedings Involving  Non-Market
              Economy Countries ................................................................... 9

    II.    Commerce's Finding  That Aeolus And GTC Were Ineligible  For
        Separate Rates Complies  With The *Second Remand Order* And Is
        Supported By Substantial Evidence ....................................................... 12

    III.   Aeolus's And GTC's Objections Are Unavailing ................................... 16

         A.     Commerce Reasonably Found That Aeolus And GTC Failed
              To Rebut The Presumption Of Government Control Despite
              Minority Ownership ................................................................. 16

         B.     Commerce Reasonably Found That Aeolus Failed To Rebut
              The Presumption Of Government Control Regarding Autonomy
              In The Selection Of Management ............................................... 19

         C.     Commerce Reasonably Found That GTC Failed To Rebut The
              Presumption Of Government Control Regarding Autonomy In
              The Selection Of Management ................................................... 23

D.      Aeolus And GTC Incorrectly Argue That Commerce Applied A New Separate Rate Methodology................................................. 29

CONCLUSION ........................................................................................................... 30

## TABLE OF AUTHORITIES

**CASES**                                                                                                    **PAGES**

*Ad Hoc Shrimp Trade Action Comm. v. United States,*
 925 F. Supp. 2d 1315 (Ct. Int'l Trade 2013) .................................................... 10

*Advanced Tech. & Materials Co. v. United States,*
 938 F. Supp. 2d 1342 (Ct. Int'l Trade 2013) .................................................... 11

*Advanced Tech. & Materials Co. v. United States,*
 581 F. App'x 900 (Fed. Cir. 2014) .................................................................. 11

*AMS Assocs. v. United States,*
 719 F.3d 1376 (Fed. Cir. 2013) ............................................................. 9, 10, 11

*Bristol Metals L.P. v. United States,*
 703 F. Supp. 2d 1370 (Ct. Int'l Trade 2010) ..................................................... 9

*China Manufacturers Alliance, LLC v. United States,*
 1 F.4th 1028 (Fed. Cir. 2021) ......................................................................... 14

*Consolo v. Fed. Mar. Comm'n,*
 383 U.S. 607 (1966) ......................................................................................... 9

*Diamond Sawblades Mfrs. Coalition v. United States,*
 866 F.3d 1304 (Fed. Cir. 2017) ............................................................... 5, 6, 10

*I.D.I. International Development And Investment Corporation v. United States,*
 Court No. 20-00107, Slip Op. 21-82 (Ct. Int'l Trade July 6, 2021) .............. 14, 30

*Jiangsu Jiasheng Photovoltaic Technology Co., Ltd. v. United States,*
 121 F. Supp. 3d 1263 (Ct. Int'l Trade 2015) .................................................... 12

*Michaels Stores, Inc. v. United States,*
 766 F.3d 1388 (Fed. Cir. 2014) ...................................................................... 10

*Sigma Corp. v. United States,*
 117 F.3d 1401 (Fed. Cir. 1997) ............................................................. 9, 10, 11

*Tianjin Magnesium Int'l Co., Ltd. v. United States,*
 836 F. Supp. 2d 1377 (Ct. Int'l Trade 2012) ..................................................... 9

*Yantai CMC Bearing Co. v. United States,*
 203 F. Supp. 3d 1317 (Ct. Int'l Trade 2017) ............................................... 11, 12

## STATUTES

19 U.S.C. § 1561a(b)(1)(B)(i) ................................................................................ 9

## ADMINISTRATIVE DETERMINATIONS

*53-Foot Domestic Dry Containers from the People's Republic of China*,
    80 Fed. Reg. 21,203 (Dep't Commerce April 17, 2015) .................................... 13

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*,
    85 Fed. Reg. 23,756 (Dep't Commerce April 29, 2020) .................................... 13

*Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*,
    81 Fed. Reg. 71,068 (Dep't of Commerce Oct. 14, 2016) ................................... 2

*Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*,
    82 Fed. Reg. 18,733 (Dep't of Commerce Apr. 21, 2017) ................................... 1

*Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*,
    82 Fed. Reg. 27,224 (Dep't of Commerce June 14, 2017) ................................... 1

*Diamond Sawblades from China*,
    71 Fed. Reg. 29,303 (Dep't of Commerce May 22, 2006) ................................. 11

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
    80 Fed. Reg. 69,193 (Dep't of Commerce Nov. 9, 2015) (P.R. 11) ..................... 2

*Silicon Carbide from the People's Republic of China Republic of China*,
    59 Fed. Reg. 2,585 (Dep't of Commerce May 2, 1994) ...............................10, 11

*Sparklers from the People's Republic of China*,
    56 Fed. Reg. 20,588 (Dep't of Commerce May 6, 1991) ..............................10, 11

## MISCELLANEOUS AUTHORITIES

Policy Bulletin on the Topic of Separate Rates Practice and Application of Combination
Rates in Antidumping Investigations Involving Non-Market Economy Countries
(April 5, 2005) (Policy Bulletin 05.1), available at
http://enforcement.trade.gov/policy/bull05-1.pdf (last visited Jan. 19, 2022) ................... 4

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

_____
                                                           )
GUIZHOU TYRE CO., LTD. and                )
GUIZHOU TYRE IMPORT AND EXPORT     )
CO., LTD.,                                                 )
                                                           )
              Plaintiffs,                 )          Consol. Court No. 17-00100
                                                           )
          v.                               )          **PUBLIC VERSION**
                                                           )          Business Proprietary Information
UNITED STATES,                                   )          redacted on pp. 20, 22-25, 28-29
                                                           )
            Defendant.               )
_____)

## DEFENDANT'S RESPONSE TO COMMENTS ON REMAND RESULTS

Pursuant to the Court's opinion and order of May 14, 2021, defendant, the United States, respectfully submits this response to the comments filed by Aeolus Tyre Co., Ltd. (Aeolus), and Guizhou Tyre Co., Ltd., and Guizhou Tyre Import and Export Co., Ltd. (collectively GTC), regarding the United States Department of Commerce's redetermination pursuant to remand. *See* Opinion and Order, May 14, 2021, ECF No. 102 (*Second Remand Order*); Final Results of Redetermination Pursuant to Court Remand, Sept. 24, 2021, ECF No. 109-1 (*Second Remand Results*).

The *Second Remand Results* involve challenges to the final results in the administrative review of the antidumping duty order covering off-the-road (OTR) tires from the People's Republic of China (China) for the period of review of September 1, 2014, through August 31, 2015. *See Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*, 82 Fed. Reg. 18,733 (Dep't of Commerce Apr. 21, 2017) (final results admin. rev.) (P.R. 312), and accompanying Issues and Decision Memorandum (P.R. 308) (Final IDM), amended by *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*, 82 Fed. Reg. 27,224

(Dep't of Commerce June 14, 2017) (amended final results admin. rev.) (P.R. 319).  Aeolus and GTC each respectively challenge Commerce's determinations that they are not eligible for separate rates.  Aeolus Remand Cmts., Nov. 24, 2021, ECF No. 116 (Aeolus Cmts.); GTC Remand Cmts., Nov. 24, 2021, ECF No. 114 (GTC Cmts.).

As discussed below, we respectfully request that the Court sustain Commerce's *Second Remand Results*.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Proceedings Before Commerce

In response to requests from interested parties, Commerce initiated a review of the antidumping duty order covering OTR tires from China on November 9, 2015.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 80 Fed. Reg. 69,193 (Dep't of Commerce Nov. 9, 2015) (P.R. 11).  On December 15, 2015, Commerce selected GTC and Xugong for individual examination.  *See* Respondent Selection Memorandum (P.R. 56). Between December 2015 and September 2016, Commerce issued, and respondents timely responded to, initial and subsequent supplemental questionnaires.

On October 14, 2016, Commerce published the preliminary results of review in the *Federal Register*.  *Certain New Pneumatic Off-the-Road Tires From the People's Republic of China*, 81 Fed. Reg. 71,068 (Dep't of Commerce Oct. 14, 2016) (prelim. admin review) (*Preliminary Results*) (P.R. 284), and accompanying Preliminary Decision Memorandum (PDM) (P.R. 269).  In the *Preliminary Results*, Commerce determined not to grant GTC and Aeolus, which were not selected for individual examination but had submitted a separate rate certification, separate rates, finding that each respondent had failed to rebut the presumption *de facto* government control.  PDM (P.R. 269) at 16.

2

On April 21, 2017, Commerce published the *Final Results* in the *Federal Register*. *Final Results* (P.R. 312) and accompanying IDM (P.R. 308). For the *Final Results*, Commerce continued to find that Aeolus and GTC had failed to rebut the presumption of *de facto* control by the Chinese government and, thus, denied both respondents' requests for separate rates. IDM (P.R. 308) at 10-15. On June 14, 2017, Commerce amended the *Final Results* in light of certain ministerial errors present in the *Final Results*. *Amended Final Results* (P.R. 319).

## II.   The Court's *First Remand Order*

In this consolidated action, Aeolus challenged Commerce's finding that Aeolus had failed to demonstrate independence from the Chinese government and was therefore ineligible for a separate rate. Aeolus Mem. in Support of Mot. Judgment on Agency Record, Jan. 30, 2018, ECF No. 55 (Aeolus Br.). Aeolus argued that Commerce had failed to consider important contrary record evidence in its determination not to grant Aeolus a separate rate. *Id.* at 27. Specifically, Aeolus asserted that Commerce did not consider the Rectification Report that Aeolus placed on the record. *Id.* This Court agreed, holding that, in light of Commerce's failure to discuss or refer to the Rectification Report in the *Final Results*, it could not "conclude that Commerce considered the report or the evidence therein when determining that Aeolus was not independent of government control." Opinion and Order, at 13, May 24, 2019, ECF No. 68 (*First Remand Order*). The Court ordered Commerce to reconsider its separate rate determination as to Aeolus in light of all evidence on the record, including the Rectification Report. *Id.* The Court did not address Aeolus's remaining arguments.

GTC challenged Commerce's finding that it had failed to demonstrate independence from the Chinese government and was therefore ineligible for a separate rate. GTC Mem. in Support of Mot. Judgment on Agency Record, Jan. 30, 2018, ECF No. 51 (GTC Br.). In its brief, GTC

identified a particular shareholders' meeting of Guizhou Tyre Co., Ltd. that Commerce had found was not available to all shareholders but GTC argued was, in fact, publicly noticed and available to all shareholders. *Id.* at 27. The United States requested a voluntary remand on this issue, noting that "Commerce's understanding of such record evidence has the potential to impact the analysis concerning whether to grant GTC a separate rate." Def. Resp. to Mots. Judgment on Agency Record at 21, June 1, 2018, ECF No. 58. The Court granted our request for a voluntary remand and ordered that Commerce "reconsider its separate rate determination as to GTC in the entirety, *i.e.*, in light of all record evidence." *First Remand Order* at 16. The Court did not reach any conclusions regarding GTC's other arguments.

**III.   Commerce's *First Remand Results***

On September 23, 2019, Commerce published its remand redetermination pursuant to the *First Remand Order*. *See* Final Results of Redetermination Pursuant to Court Remand, Sept. 23, 2019, ECF No. 74 (*First Remand Results*). In its *First Remand Results*, Commerce reconsidered its separate rate determination for Aeolus in light of all record evidence, including the Rectification Report, and continued to find Aeolus ineligible for a separate rate. Specifically, Commerce found that Aeolus had not demonstrated its *de facto* independence from government control because the Chinese government, through a state-owned enterprise (SOE), ChinaChem, exerted control over Aeolus's selection of management, through control of its board member selection process. *First Remand Results* at 6-14. In considering the impact of the Rectification Report, Commerce found that although the report indicated how certain connections between ChinaChem and Aeolus were addressed, the report did not address or mitigate the issue that an SOE effectively selected Aeolus's board of directors. *First Remand Results* at 13. Ultimately, Commerce found that even though the Rectification Report shows certain government control

4

issues as being "rectified," *de facto* government control still exists because Aeolus's board of directors, which selects management, was elected by its SOE shareholders. *Id*. at 14.

Commerce also reconsidered its separate rate determination for GTC in light of all record evidence, including that the shareholders' meeting previously thought to be not available to all shareholders was, in fact, publicly announced and open to all shareholders. *First Remand Results* at 16-20. Considering the record as a whole, however, Commerce continued to find GTC ineligible for a separate rate because Guiyang Industry Investment Group Co., Ltd. (GIIG), an SOE, had control over GTC's board selection process. *Id*. at 17-18. Regarding the shareholders' meeting in question, Commerce considered that only GIIG individually has the requisite number of shares to convene a shareholders meeting, and that GIIG can therefore effectively convene meetings on GIIG's favored proposals until they prevail, which they did in the July 2015 meeting. *Id*. at 19, 28-29. Commerce considered the remaining evidence relating to GIIG's ownership stake in GTC and its consequent level of control over board selection and profit distribution, in addition to connections between GTC's board chairman and GIIG, and concluded that GTC continued to be ineligible for a separate rate. *Id*. at 18-20.

Finally, Commerce addressed together arguments from GTC and Aeolus that Commerce's separate rate analysis contradicts its longstanding practice. *Id*. at 38-42. Commerce provided the criteria it examines to determine whether a company has demonstrated *de jure* and *de facto* independence. *Id*. at 38-39. Commerce explained that it continues to evaluate its practice in light of *Diamond Sawblades Mfrs. Coalition v. United States*, 866 F.3d 1304 (Fed. Cir. 2017). *Id*. at 39. As a result, Commerce has concluded that majority ownership by a government entity in and of itself indicates control over a company's operations generally. *Id*. Thus, although Commerce maintains that it has not changed its separate rate practice

generally, Commerce explained that it has examined the level of government control more closely since *Diamond Sawblades*. *Id.* at 40.

**IV.**     **The Court's *Second Remand Order***

On May 14, 2021, this Court remanded for a second time Commerce's determinations that Aeolus and GTC are each ineligible for a separate rate. *See Second Remand Order* at 21-27. Regarding both Aeolus and GTC, the Court stated that Commerce did not make "actual findings, supported by substantial record evidence, on whether the {Chinese} government, and not the respondents, controlled the prices of the exported merchandise subject to the review." *Second Remand Order* at 21-22. The Court stated that both respondents "introduced evidence to support their specific contentions that they maintained control over their own prices for the exported subject merchandise." *Id.* at 22. The Court thus found that "the introduction of that evidence was at least sufficient to require Commerce to make retrospective determinations, based on a full consideration of the entire record, on the issue of whether the {Chinese} government actually did control these respondents' export pricing decisions during the {period of review}." *Id.*

Regarding Aeolus, this Court found that, although Commerce detailed its findings regarding Aeolus's management selection process and the impact of the Rectification Report, "{t}he critical issue of control over pricing of subject exports during the {period of review} was left to speculation." *Id.* at 24. The Court observed that "all of {Commerce's} findings in the Remand Redetermination pertained to the issue of selection of directors and management and to government influence generally. There is no discussion of specific government control over the setting of prices of exported subject merchandise during the {period of review}." *Id.* The Court found that Commerce did not point to specific evidence contradicting Aeolus's evidence regarding the setting of export prices, the negotiating of contracts, the retention of export sales

proceeds, and the disposition of profits, and therefore, "{w}ithout deciding whether Commerce permissibly reached findings under its third factor, autonomy in selection of management, the court conclude{d} that Commerce reached an ultimate decision on Aeolus's separate rate application that was unsupported by substantial record evidence on the whole." *Id*. at 25.

Regarding GTC, this Court found that Commerce's determination "suffers from the same fatal flaws as does its analysis for Aeolus." *Id*. at 26. Specifically, the Court found that Commerce did not present evidence regarding the Chinese government control over prices of exports, and instead "{a}lmost all of {Commerce's discussion in the Remand Redetermination pertained to the factor addressing autonomy in selection of management." *Id*. Therefore, as with Aeolus, this Court found Commerce's presumption that the Chinese government set or controlled GTC's prices during the period of review insufficiently supported by substantial evidence, "{w}ithout deciding whether Commerce was correct in its finding under its third factor, autonomy in selection of management." *Id*. at 27.

## V.   Commerce's *Second Remand Results*

To comply with the *Second Remand Order*, Commerce "reconsidered the record evidence with respect to each prong of the enumerated *de facto* separate rate criteria, including the first prong which concerns whether the Chinese government, during the POR, controlled the prices of subject merchandise that was sold for export to the United States by Aeolus and GTC." *Second Remand Results* at 3 (citation omitted). For issues where the Court did not discuss the merits of Commerce's previous factual findings in the *Second Remand Order*, Commerce incorporated those findings into the *Second Remand Results*. *See Second Remand Results* at 21 n.71 (stating that because "the Court did not take up the merits of the factual findings with respect to Commerce's analysis of the third factor for each respondent, the fourth factor with respect to

7

GTC, nor the level of relative government ownership or record information otherwise indicative of potential for control, generally, we do not further discuss these findings in this redetermination and instead incorporate the relevant discussion from the *Final Results* and *First Remand Redetermination* by reference, herein.").

Upon reconsideration, Commerce concluded that the record "does not contain affirmative evidence that the Chinese government 'actually did control' the respondents' export pricing decisions (*i.e.*, the first prong)." *Second Remand Results* at 3. Commerce further stated "that there is no evidence to contradict statements and information in support of claims that Aeolus and GTC have authority to negotiate and sign contracts and other agreements (*i.e.*, the second prong) and, for Aeolus, no explicit evidence to contradict a finding that the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses (*i.e.*, the fourth prong)." *Id.* at 3-4. Accordingly, Commerce stated that it made an "explicit finding on each of the four prongs of the standard analysis with respect to *de facto* government control, in accordance with the {*Second*} *Remand Order*, acknowledging that there is no explicit evidence that the Chinese government 'actually did control' export pricing." *Id.* at 4.

Commerce continued to find, however, that both GTC and Aeolus "failed to establish autonomy in their selection of management (*i.e.*, the third prong), and that GTC further failed to rebut the presumption of control with respect to independent decision-making regarding disposition of its profits (*i.e.*, the fourth prong)." *Id.* Therefore, because "Commerce's long-standing practice holds that if a respondent is unable to rebut one of the four *de facto* criteria, the company is ineligible for a separate rate," Commerce "continue{d} to deny Aeolus and GTC a separate rate" in the *Second Remand Results. Id.*

## ARGUMENT

I.    ## Standard Of Review

A.    ### Review Of Commerce's Remand Redeterminations

This Court sustains Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *Bristol Metals L.P. v. United States*, 703 F. Supp. 2d 1370, 1373 (Ct. Int'l Trade 2010). This standard applies equally to remand redeterminations. *See, e.g.*, *Tianjin Magnesium Int'l Co., Ltd. v. United States*, 836 F. Supp. 2d 1377, 1380 (Ct. Int'l Trade 2012) (applying the standard of review to Commerce's remand redetermination). Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

B.    ### Legal Framework For Establishing An Absence Of Government Control In Proceedings Involving Non-Market Economy Countries

In proceedings involving non-market economy countries, Commerce uses a rebuttable presumption that all companies within the country are subject to government control over their export activities and should be assigned a single antidumping duty rate. *See, e.g.*, *AMS Assocs. v. United States*, 719 F.3d 1376, 1379 (Fed. Cir. 2013) (citing *Sigma Corp. v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997)). Under this presumption, an exporter receives the non-market economy countrywide rate unless it affirmatively demonstrates an absence of government control, both in law (de jure) and in fact (de facto), with respect to exports. *Id*. The burden of rebutting the presumption of government control rests solely with the exporter. *Sigma Corp.*,

117 F.3d at 1405-06 (affirming Commerce's authority to place burden of proof on respondents, as they have the best access to necessary information).

If the company fails to rebut the presumption of government control, it continues to receive the single, country-wide, dumping rate. *See Diamond Sawblades*, 866 F.3d at 1311 (citing *Michaels Stores, Inc. v. United States*, 766 F.3d 1388 (Fed. Cir. 2014)). That is, the company applying for a separate rate bears the burden to demonstrate that its export activities are free from *de jure* and *de facto* government control. *AMS Assocs.*, 719 F.3d at 1379-80; *Sigma Corp.*, 117 F.3d at 1405-06.

A company that receives a company-specific rate separate from the China-wide entity is referred to as having "separate rate status." *See, e.g., Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F. Supp. 2d 1315, 1320 (Ct. Int'l Trade 2013). To establish whether a company is sufficiently independent to be entitled to a separate rate, Commerce applies a test first established in a proceeding concerning sparklers from China, and further developed during a proceeding concerning silicon carbide from China. *See Sparklers from the People's Republic of China*, 56 Fed. Reg. 20,588 (Dep't of Commerce May 6, 1991) (final determ.); *Silicon Carbide from the People's Republic of China*, 59 Fed. Reg. 22,585 (Dep't of Commerce May 2, 1994) (final determ.).

Pursuant to this test, Commerce considers the following *de jure* criteria in determining whether an individual company may be granted a separate rate: (1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses; (2) any legislative enactments decentralizing control of companies; and (3) any other formal measures by the government decentralizing control of companies. *See Sparklers*, 56 Fed. Reg. at 20,588; Policy Bulletin on the Topic of Separate Rates Practice and Application of Combination Rates in

10

Antidumping Investigations Involving Non-Market Economy Countries (April 5, 2005) (Policy Bulletin 05.1), *available at http://enforcement.trade.gov/policy/bull05-1.pdf* (last visited Jan. 19, 2022). Commerce's analysis of the *de jure* factors, and its conclusion that GTC and Aeolus rebutted the presumption of *de jure* government control, is not at issue in this case.

Separately, Commerce generally considers four factors in evaluating whether each respondent is subject to *de facto* government control of its export functions: (1) whether the export prices are set by or are subject to the approval of a government authority; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses. *See AMS Assocs.*, 719 F.3d at 1379 (citing *Sigma Corp.*, 117 F.3d at 1405); *Diamond Sawblades from China*, 71 Fed. Reg. 29,303, 29,307 (Dep't of Commerce May 22, 2006) (final determ.); *Silicon Carbide*, 59 Fed. Reg. at 22,585; *Sparklers*, 56 Fed. Reg. at 20,589; Policy Bulletin 05.1.

Commerce may deny a request for a separate rate if an applicant fails to demonstrate separation from the government with respect to any one of the *de jure* or *de facto* criteria. *Yantai CMC Bearing Co. v. United States*, 203 F. Supp. 3d 1317, 1326 (Ct. Int'l Trade 2017) (*Yantai CMC Bearing*); *see also Advanced Tech. & Materials Co. v. United States*, 938 F. Supp. 2d 1342, 1345 (Ct. Int'l Trade 2013) (*Advanced Tech. II*); *aff'd*, 581 F. App'x 900 (Fed. Cir. 2014) (upholding a determination where Commerce did not make a *de facto* finding on two of the four criteria). Further if an applicant fails to establish any one of the *de jure* or *de facto* criteria, Commerce is not required to continue its analysis and determine whether the applicant has, or has not, established the other applicable criteria. *Yantai CMC Bearing*, 203 F. Supp. 3d at 1326.

II.   **Commerce's Finding That Aeolus And GTC Were Ineligible For Separate Rates Complies With The *Second Remand Order* And Is Supported By Substantial Evidence**

Commerce's finding that Aeolus and GTC were ineligible for separate rates addresses the issues that the Court ordered Commerce to reconsider in the *Second Remand Order* and is supported by substantial evidence. First, the *Second Remand Results* address the Court's statements that the cases relied upon by Commerce for the proposition that "Commerce may deny a request for a separate rate if an applicant fails to demonstrate separation from the government with respect to any one of the *de jure* or *de facto* criteria" apply to situations of majority government ownership. *See Second Remand Order* at 14-15. As Commerce explained, Commerce's framework for analyzing *de facto* government control, and the cases establishing that a respondent must rebut the presumption of government control for all factors, do not rely on any threshold level of government ownership. *Second Remand Results* at 16.

Commerce explained that the level of government ownership "entered into Commerce's overall separate rate analysis following the determination in the *Advanced Tech.* litigation, where the Court held that majority ownership by a government entity, either directly or indirectly, rules out a respondent's ability to demonstrate an absence of *de facto* control." *Id.*; *see also Jiangsu Jiasheng Photovoltaic Technology Co., Ltd. v. United States*, 121 F. Supp. 3d 1263, 1267 (Ct. Int'l Trade 2015) ("This revised practice, which was sustained by this Court and subsequently affirmed by the Court of Appeals, holds that 'where a government entity holds a majority ownership share, either directly or indirectly, in the respondent exporter or producer,' such majority ownership holding 'in and of itself' precludes a finding of *de facto* autonomy."). Commerce further explained that, in various other cases involving non-majority government-owned respondents, Commerce has "denied a separate rate based on the respondent's inability to

12

rebut the presumption of government control with respect to only one factor of the *de facto* criteria." *Id.* at 17. (citing *53-Foot Domestic Dry Containers from the People's Republic of China*, 80 Fed. Reg. 21,203 (Dep't Commerce April 17, 2015) (final determ. of sales at less than fair value), and accompanying IDM at Comment 10; *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 85 Fed. Reg. 23,756 (Dep't Commerce April 29, 2020) (final results admin. rev.), and accompanying IDM at Comment 6).

Next, in the *Second Remand Order*, the Court faulted Commerce for stating that Commerce examined the totality of the circumstances and the four *de facto* criteria, while relying on the lack of autonomy in the selection of management (*i.e.*, only one of the criteria) to deny the respondents a separate rate. *Second Remand Order* at 16. Specifically, the Court stated that Commerce "presume{d}, without evidentiary support, that Commerce's finding of a lack of autonomy in the selection of management was the factual equivalent of a finding that the Chinese government controlled what Commerce termed a company's 'export activities,' . . . during the {period of review}." *Id.*

In the *Second Remand Results*, Commerce clarified that it did not equate lack of autonomy in selection of management to a *direct* finding of government control of export activities. *Second Remand Results* at 18. As Commerce explained:

> under the presumption of government control (which has been upheld repeated by the courts) Commerce does not affirmatively establish in each instance that the government is actually controlling the respondent's export activities, including pricing decisions. Rather, it is the *burden of the respondent to rebut the presumption* by providing sufficient evidence to establish that it operates autonomously from the government in certain key aspects (*i.e.*, those enumerated in the *de facto* criteria)."

*Id.* at 18-19 (citing *China Manufacturers Alliance, LLC v. United States*, 1 F.4th 1028, 1030 (Fed. Cir. 2021) ("Our court has previously approved Commerce's application of a presumption

of government control over exporters in NME countries{.}"); and *IDI v. United States*, Slip Op. 21-82 at 3).

Commerce further explained that, although there is no evidence of government owners *directly* exercising control over export activities, under the presumption of government control and Commerce's separate rate test, it considers "the *de facto* criteria as indicative of whether the government controls or has the potential to control export functions." *Second Remand Results* at 19. Therefore, Commerce's "finding that neither Aeolus nor GTC have autonomy in the selection of management allows for the reasonable inference, in light of the presumption of government control in {non-market economy} country proceedings, that their respective government shareholders maintain the potential to control the export operations of each company because the management of a firm controls its operations—including its export functions." *Id.*

Commerce's explanation is reasonable because of the nature of its separate rate test. Specifically, the *de facto* separate rate test enumerates four distinct factors that Commerce considers, and Commerce's practice is to deny a separate rate if a company fails to rebut the presumption of government control for any one of the factors. *Second Remand Results* at 14-15. If it were the case that a company need only rebut the first factor—whether the export prices are set by or are subject to the approval of a government authority—to receive a separate rate, it would render the remaining factors unnecessary, and the separate rate test would not make sense. Importantly, in the *Second Remand Order*, the Court did not find that Commerce's separate rate test itself is unreasonable, nor did it state that Commerce cannot deny a separate rate based on the failure of a company to rebut one of the four factors. Therefore, Commerce reasonably continued to apply its established separate rate test for the *Second Remand Results* and complied

14

with the *Second Remand Order* by providing additional explanation regarding its analysis of the record evidence, including making specific findings for each factor.

That Commerce ultimately continued to deny separate rates for Aeolus and GTC based on each company's failure to demonstrate autonomy in the selection of management (and, for GTC, the distribution of profits) is consistent with the *Second Remand Order* because this Court did not invalidate Commerce's separate rate test or make any substantive findings regarding Commerce's analysis of the autonomy in management factor. With these findings undisturbed, Commerce provided the additional explanation to make the logical connection deemed missing by this Court. Specifically, Commerce explained that its finding "that neither Aeolus nor GTC have autonomy in the selection of management allows for the reasonable inference, in light of the presumption of government control in NME country proceedings, that their respective government shareholders maintain the potential to control the export operations of each company because the management of a firm controls its operations—including its export functions." *Second Remand Results* at 19.

Commerce also emphasized the totality of the record evidence that Commerce analyzed in reaching its conclusion, stating that, for both Aeolus and GTC, "Commerce evaluated the percentage of ownership by the (state-owned enterprise} as the largest individual shareholder of each respondent and relevant documents, meeting notes, by-laws, articles of association, and voting actions suggestive of potential for control, generally, as well as information regarding the influence of the (state-owned enterprise-appointed} board in GTC's decisions regarding the disposition of profits." *Id.* at 21. Therefore, Commerce has complied with the *Second Remand Order* by addressing the aspects of its determination that the Court found to be unsupported by substantial evidence.

**III.**     **Aeolus's And GTC's Objections Are Unavailing**

In their comments in opposition to the *Second Remand Results*, Aeolus and GTC object to Commerce's findings regarding: (1) the presumption of government control in minority ownership situations; (2) autonomy in the selection of management for their respective firms; and (3) the separate rate analysis applied by Commerce.  Aeolus's and GTC's comments lack merit.

**A.     Commerce Reasonably Found That Aeolus And GTC Failed To Rebut The Presumption Of Government Control Despite Minority Ownership**

Aeolus and GTC each offer the same arguments that precedent involving majority government ownership is inapposite.  Specifically, they each argue that, in minority ownership situations, Commerce cannot rely on a company's failure to rebut only one factor of the *de facto* analysis, emphasizing this Court's statement that Commerce is "required to continue its analysis and determine whether the applicant has, or has not, established the other applicable criteria." *See* Aeolus Cmts. at 5-6; GTC Cmts. at 5.  Aeolus's and GTC's arguments fail for several reasons.

First, Aeolus's and GTC's characterization of Commerce's separate rate evaluations as truncated ignores that Commerce considered all the *de facto* separate rate factors, in compliance with the *Second Remand Order*.  *See* Aeolus Cmts. at 5-6; GTC Cmts. at 5.  Although Commerce, after analyzing all the factors, continued to deny separate rate eligibility based on the third and fourth factors, this does not mean that Commerce failed to conduct a full evaluation, consistent with its separate rate practice.  *See Second Remand Results* at 21-22.  Aeolus's and GTC's assertions would amount to a separate rate test whereby a respondent need only rebut one separate rate factor to be granted a separate rate, because Commerce would not be able to find government control for each factor.  Because Commerce's separate rate test requires companies

to rebut the presumption of government control for each factor, Aeolus's and GTC's arguments erroneously apply the applicable standard.

Next, Aeolus and GTC argue that Commerce has ignored that "minority-owned {state-owned enterprise} respondents can only be denied separate rates after considering all factors." Aeolus Cmts. at 6; GTC Cmts. at 6. Aeolus and GTC acknowledge, however, that majority government-owned companies "cannot demonstrate that they operate autonomously from the government{.}" Aeolus Br. at 6; GTC Br. at 6. Therefore, in some sense the remaining *de facto* factors in majority government-owned situations could be considered irrelevant—because the government ownership itself precludes eligibility for a separate rate. In minority ownership situations, by contrast, Commerce examines the record evidence regarding the *de facto* factors to determine separate rate eligibility. Here, Commerce examined the evidence for all the factors and found that Aeolus failed to rebut the presumption of government control for the third, and GTC failed to rebut the presumption for the third and fourth factors.

Aeolus and GTC assert that, once providing the "'minimum quantum of evidence' creating 'genuine dispute' as to whether {they were} state-controlled during the {period of review}, the presumption vanished and Commerce became obligated to affirmatively establish such control by the Chinese government." Aeolus Cmts. at 11; GTC Cmts. at 11. This argument also relies upon an erroneous interpretation of Commerce's separate rate test. Aeolus and GTC suggest that rebutting any of the factors of Commerce's *de facto* separate rate test amounts to providing the "minimum quantum of evidence" sufficient to place the burden on Commerce. *Id.* Such a standard would require Commerce to affirmatively establish Chinese government control in most cases, rendering Commerce's presumption of government control irrelevant. Moreover, Aeolus and GTC do not elaborate on what would amount to evidence that "affirmatively

17

establishe{s}" state control.  *See id.*  As Commerce explained,  such a standard would  require Commerce to find a "smoking  gun,"  because, "{e}ven in a hypothetical  situation  where government  involvement  in price-setting is direct and unambiguous,  actual affirmative documentation  of such activity  is unlikely  to exist, and the ability  of Commerce to compel that any such information  to be provided  to the record extremely limited."  *Second Remand Results* at 24.  Commerce uses its separate rate test to evaluate autonomy  from government  control to address exactly these issues.

Aeolus and GTC relatedly  argue that this Court required  evidence  of government  price-setting.  Aeolus Cmts. at 14-15;  GTC Cmts. at 14-15.  Aeolus and GTC assert that the *Second Remand Results* misconstrue  this Court's findings,  which were focused on the "overarching purpose of the separate rate analysis."  *Id*.  This Court indeed faulted Commerce for not making findings  regarding government  price-setting for this Court to evaluate.  *See Second Remand Order* at 21-22 (stating that Commerce's "conclusion  rings hollow  in the absence of actual findings . . . on whether the {Chinese}  government,  and not the respondents,  controlled  the prices of the exported merchandise  subject to the review").  To address this issue, however, Commerce has made its findings  explicit  in the *Second Remand Results*.

To address the Court's findings,  Commerce explained  that it did not have evidence  to contradict Aeolus and GTC's claims regarding  the first factor.  *Second Remand Results* at 22.  As explained  above, however, a standard requiring  direct evidence  of government  price-setting would  defeat the purpose of the *de facto* separate rate test.  For this reason, Commerce explained that it is the *de facto* separate rate test—and the four factors enumerated therein—that "together, relate to the determination  of whether a respondent has rebutted the presumption that the Chinese government  exerts control over the export functions  of a firm."  *Second Remand Results* at 22-

23. Moreover, Commerce has set out the basis for its finding of government control over export functions, stating that the finding of lack of autonomy in the selection of management means that "their respective government shareholders maintain the potential to control the export operations of each company because the management of a firm controls its operations—including its export functions." *Second Remand Results* at 19. Therefore, Aeolus and GTC's arguments that Commerce has failed to comply with the *Second Remand Order* are meritless.

### B. Commerce Reasonably Found That Aeolus Failed To Rebut The Presumption Of Government Control Regarding Autonomy In The Selection Of Management

In the *Second Remand Results*, Commerce incorporated its analysis from the *First Remand Results* regarding Aeolus's failure to rebut the presumption of government control over the selection of management because the Court did not address this issue in the *Second Remand Order*. *See Second Remand Results* at 24-25 ("We continue to find that record information specific to each respondent reflects a measure of control on behalf of relevant SOE shareholders in the selection of the board of directors and management for each firm . . . ."); *Second Remand Order* at 25. Commerce's analysis was reasonable and supported by substantial evidence, and Aeolus has offered no new arguments to undermine Commerce's findings.

Specifically, in the *First Remand Results*, Commerce explained that Aeolus is 42.58 percent owned by China Chemical Rubber Co., Ltd, which is 100 percent owned by the state-owned enterprise China National Chemical Corporation and is supervised by "State-owned Assets Supervision and Administration Commission(s)" (SASAC). *First Remand Results* at 7. Commerce therefore determined that China National Chemical Corporation is Aeolus's largest and controlling shareholder. *Id*. Commerce also identified three additional shareholders as state-owned enterprises supervised by local SASACs, Henan Tyre Group Co., Ltd., Jiaozuo Tongliang

Assets Management Co., Ltd., and Xiamen Haiyi International Trade Co., Ltd., which together owned 6.48 percent of Aeolus during the period of review. *Id.* Therefore, Commerce found that, in total, state-owned enterprises owned 49.06 percent of Aeolus during the period of review. Generally, Commerce "expect{s} any large shareholder, including a government entity, to control the operations of the company in which it holds the largest number of shares if its shareholder rights afford it that ability." *Id.* at 17.

Commerce also examined Aeolus's articles of association and found that Aeolus's shareholders have the ability to [

                                                ]. *Id.* at 8.  Commerce determined that the articles of association give board members the authority to [

                                ]. *Id.*  Commerce thus concluded that Aeolus failed to demonstrate an absence of *de facto* government control over its export activities, and therefore found Aeolus ineligible for a separate rate.

Commerce determined that its findings regarding *de facto* government control over Aeolus were further supported by the websites of both China National Chemical Corporation and Aeolus. Final IDM at 11. Specifically, China National Chemical Corporation's website, examined during the period of review, stated that "China National Tire & Rubber Co., Ltd. is a wholly owned specialized subsidiary of {China National Chemical Corporation}," and that "China National Tire & Rubber Co., Ltd. controls Aeolus Tire Ltd. (a listed company)." Letter from William A. Fennell, counsel for the petitioners, to Penny Pritzker, Secretary of Commerce, (Dec. 30, 2015) (comments on Aeolus separate rate application) (P.R. 75, C.R. 38), at Exhibit 3. Aeolus's website stated that Aeolus is a "model state-owned enterprise." *Id.* Commerce found the website information credible and probative as to Aeolus's ownership structure, and

supportive of Commerce's finding that Aeolus is subject to government control through the ownership interests of China National Tire & Rubber Co., Ltd., Henan Tyre Group, Jiaozuo Tongliang Assets Management, and Xiamen Haiyi International Trade. *Id.* at 11-12.

Finally, Commerce considered the evidence provided by the Rectification Report, consistent with the *First Remand Order*. Specifically, Commerce considered Aeolus's assertions that the Rectification Report described past issues that had been identified as improper connections between Aeolus and ChinaChem that were rectified. *First Remand Results* at 10. Commerce noted that "the Rectification Report contains no details about any structural changes that would address the independence issues identified, and relies instead on the apparently voluntary restraint promised by ChinaChem." *Id.* at 11. Commerce explained that the Rectification Report contains no details about consequences or enforcement mechanisms to ensure that its terms are followed. *Id.* Commerce also considered that, guarantees of separation notwithstanding, the Rectification Report shows that Aeolus uses the same SAP enterprise resource planning system as ChinaChem. *Id.* Finally, Commerce considered the Rectification Report's evidence that investment, key projects, and tender process are now reviewed and approved by the internal management of Aeolus unpersuasive because of ChinaChem's control over board selection. *Id.* at 13. After analyzing the Rectification Report, Commerce concluded that it "does not address or otherwise mitigate the issue that an SOE effectively selects its board of directors." *Id.*

Although Commerce did not revisit its analysis concerning independence in selection of management, Commerce did respond to Aeolus's arguments. *Second Remand Results* at 54-60. Regarding Aeolus's assertions that Commerce misconstrued Aeolus's board nomination process,

*see* Aeolus Cmts. at 23-24, Aeolus fails to undermine the crux of Commerce's analysis—that "the board elected during the period of review [

]." *Second Remand Results* at 58. Regarding Aeolus's argument that Commerce relied on voting information from December 12, 2014, and shareholder information from December 31, 2014, *see* Aeolus Cmts. at 24, Aeolus has not asserted, and there is no record evidence to suggest, that ChinaChem's ownership percentage dropped or changed drastically during the period of review such that it would undermine Commerce's conclusion about ChinaChem's presence at the vote. *See Second Remand Results* at 55 ("Aeolus points to no evidence of any change and, moreover, Commerce only relied on those specific calculations in establishing that ChinaChem was present at the vote in question."). Therefore, Commerce's conclusion about ChinaChem's participation in the vote remains supported by the information on the record, with no record evidence to contradict Commerce's finding.

Aeolus asserts that Commerce misplaced emphasis on website printouts that identified China National Tire & Rubber Co., Ltd. as controlling Aeolus because the website is primarily for advertising purposes. Aeolus Cmts. at 28. Commerce did not, however, take the website statements alone to demonstrate control. Rather, as explained above, Commerce considered these website printouts as additional evidence corroborating its findings. *Second Remand Results* at 6.

Aeolus argues that the Rectification Report does not prove government control. Aeolus Cmts. at 27. Commerce, however, did not rely on the Rectification report to prove government control. Rather, Commerce explained that, because of "the report's lack of any details about

enforcement mechanisms or compliance, and its mention of ChinaChem as Aeolus's controlling party, it fails to rebut Commerce's findings." *Second Remand Results* at 57.

Finally, regarding the role of Aeolus Chairman Wang Feng, Aeolus's arguments do not undermine Commerce's finding that Wang Feng is "a board member of China National Tire, a [

]." *Second Remand Results* at 57; *see* Aeolus Cmts. at 28. Moreover, Commerce did not rely solely on Wang Feng's role as Aeolus's chairman in finding Aeolus did not rebut the presumption of independence regarding selection of management, but considered his role as part of Commerce's overall analysis of additional indicia of control, consistent with its separate rate practice.

## C.   Commerce's Reasonably Found That GTC Failed To Rebut The Presumption Of Government Control Regarding Autonomy In The Selection Of Management

As with Aeolus, Commerce provided a reasonable analysis supported by substantial evidence regarding GTC's failure to rebut the presumption of government control over the selection of management in the *First Remand Results*, which Commerce incorporated in the *Second Remand Results* because the Court did not reach the merits of Commerce's findings in the *Second Remand Order*. *See Second Remand Results* at 24-25; *Second Remand Order* at 27. GTC has offered no new arguments to undermine Commerce's findings, and the determination from the *First Remand Results* therefore continues to be supported by substantial evidence.

Specifically, Commerce examined the record evidence that an SOE, GIIG, owns 25.20 percent of GTC and is its largest shareholder. *First Remand Results* at 17. Commerce found that GIIG is wholly owned and supervised by the Guiyang State-owned Assets Supervision and Administration Commission (Guiyang SASAC). *Id.* Commerce explained that GIIG's large

ownership stake in GTC gives it control in the selection of GTC's management and its distribution of profits. *Id.*

Examining whether GIIG exercised this control, Commerce considered that [




]. *Id.* at 17-18. With respect to GTC's specific articles of association, Commerce found that the only shareholders who can nominate "non-independent" directors are those with ten percent of more of voting shares held individually or jointly. *Id.* at 18. Commerce also found that GTC's articles of association allow [

]. *Id.* at 28. Commerce determined that GIIG was the only individual shareholder to hold [                ] of voting shares for the majority of the period of review. *Id.* Commerce also considered that GTC's articles of association allow shareholders the ability to supervise GTC's operations, put forward suggestions, and raise inquiries. *Id.* at 18.

Commerce acknowledged that certain articles of association ostensibly placed safeguards against undue influence by large shareholders in the selection of senior management, but ultimately found that the board of directors appoints the general manager and four deputy general managers and that GIIG controls the board selection process. *Id.* Therefore, Commerce concluded that GTC does not have autonomy in the selection of management. Similarly, because the board of directors puts forward an annual profit distribution proposal, Commerce concluded that GIIG could also ultimately control profit distributions through its influence on the board selection process. *Id.* Commerce also reexamined the relationship between GTC's chairman and

24

GIIG, finding that [

       ] *Id.* at 20.

      GTC argues that the 2012 board meeting during which GTC's board, in place during the instant period of review, was elected does not evidence government control.  GTC Cmts. at 24-25.  However, GTC's argument that GIIG did not have any involvement at the nomination stage of election does not undermine Commerce's finding that "GIIG was the dominant voter at the meeting electing the board in place during the period of review."  *Second Remand Results* at 52.  Commerce explained that, under Article 83 of GTC's articles of association, the only shareholders who can nominate directors are those with ten percent or more of shares held individually or jointly.  GTC's argument assumes that Commerce inferred that GIIG was itself involved as a shareholder in nominating directors.  To the contrary, Commerce specifically clarified that the board members elected at the December 2012 meeting [

                                        ].  *First Remand Results* at 27.  Thus, Commerce considered that the "board members [          ] and GIIG had no direct role in the nomination process{.}" *Id.*

      Nevertheless, Commerce emphasized that, once nominated, the candidates were elected by shareholder vote, with [                          ] *Id.*  GTC ignores that Commerce based its finding on the fact that the board [       ] and was then elected at a meeting where GIIG comprised [       ].  *First Remand Results* at 27.  GTC's focus on nomination, rather than the full process of board election, ignores that [                         ] at the meeting electing the nominated candidates.  *See First Remand Results* at 27.

GTC's argument that the 2012 meeting complied with all legal requirements, including protections against domination by any one shareholder, is also without merit. GTC Cmts. at 24. Commerce did not find that GTC has done anything illegal or contrary to its articles of association. Instead, Commerce found that GIIG effectively selected GTC's board. *First Remand Results* at 27. Such a finding need not be inconsistent with relevant Chinese law to evidence a lack of independence from the Chinese government.

GTC argues that Commerce's reliance on the 2012 meeting "presumes perpetual government control over GTC by virtue of a vote by GIIG years before the POR." GTC Cmts. at 25. To follow GTC's logic, however, would leave Commerce unable to consider government involvement in selecting a board if that involvement pre-dated the period of investigation or review at issue, even if the board remains the same. Such a result would curtail Commerce's ability to consider the level of government control in a company—even significant government involvement in the selection of a company's board could not be considered as long as that involvement took place before the period of investigation or review. As Commerce explained, however, the election that took place before the period of review is relevant to Commerce's analysis because it relates to the level of government involvement in the selection of the board members in place during the current period of review. *First Remand Results* at 27. Commerce therefore appropriately considered the level of government involvement in the selection of that board.

Next, GTC states that it is disingenuous for Commerce to deny GTC a separate rate in the seventh administrative review based on a December 2012 meeting when Commerce granted GTC a separate rate in the fifth administrative review, which was also after the December 2012 meeting. GTC Cmts. at 25. GTC, however, ignores the evolution of Commerce's separate rate

analysis since the fifth administrative review.  Commerce explained that, following litigation in this Court and the Court of Appeals for the Federal Circuit, "it is Commerce's practice to examine whether the government might be able to exercise, or have the potential to exercise, control of a company's general operations through *minority* government ownership under certain factual scenarios." *First Remand Results* at 24.  Thus, Commerce's differing conclusions between the fifth and seventh administrative reviews are not unexplained, and instead reflect the reasonable evolution of Commerce's analysis in response to court decisions.  *See First Remand Results* at 40 (explaining evolution of separate rate practice in light of *Advanced Tech* litigation).

GTC's arguments regarding the GTC's 2015 meetings similarly do not undermine Commerce's analysis.  *See* GTC Cmts. at 25-26.  Although GTC focuses on the fact that certain GIIG proposals were rejected at a May 2015 meeting, Commerce considered this factor but explained that, "even though GIIG's proposals initially failed, GIIG was able to convene an interim shareholder meeting only two months later where, representing the vast majority of votes present, GIIG passed the very proposals that failed previously."  *Second Remand Results* at 48-49.

GTC emphasizes that GIIG was only able to enact its preferred proposals through the normal courses available to all shareholders.  GTC Cmts. at 25-26.  Although GIIG did not violate the law or GTC's articles of association, no other shareholder has the requisite shares to individually call an interim meeting—only GIIG.  *First Remand Results* at 28.  Accordingly, although GTC argues that there is no instance of control by GIIG, Commerce concluded that GIIG's ability to force an interim meeting to re-vote on its favored proposals that did not pass was evidence of GIIG's control, and this control related to proposals directly relevant to the factors Commerce considers when evaluating *de facto* independence, *i.e.*, profit distribution and

selection of management.  *Id.*  GTC argues that the fact that in a subsequent meeting GIIG garnered sufficient votes through normal corporate procedures does not mean that GIIG controls the voting process.  GTC Cmts. at 25-26.  The record suggests, however, that GIIG prevailed at the subsequent meeting because it [                                                  ], not because other shareholders who previously opposed GIIG's proposals changed their positions.  *See Remand Results* at 29 (citing GTC's May 25, 2016 Supplemental Section A Questionnaire Response at Exhibit A-7).

GTC next argues that Commerce misconstrued the record because GIIG is not the only shareholder authorized to convene shareholder meetings—GTC's articles of association provide that shareholders holding ten percent individually or jointly can convene meetings, and the second- and third-largest shareholders owned 9.97 and 7.74 percent of shares, respectively.  GTC Cmts. at 26.  This argument mischaracterizes Commerce's statement about GIIG's sole ability to convene meetings and does not, in fact, contradict Commerce's findings.  Commerce correctly understood that "GTC's {articles of association} allow{} '[

].'"  *First Remand Results* at 28 (quoting GTC's May 25, 2016 Supplemental Section A Questionnaire Response at Exhibit 1).  Therefore, even though shareholders can join together to convene meetings, this fact does not contradict Commerce's statements, as GTC contends.  Instead, Commerce accurately concluded that GIIG's status as the only individual shareholder with enough shares to convene interim meetings provided additional evidence of the potential for GIIG to control GTC's board.  *Id.* at 29.

GTC asserts that Commerce "unpersuasively maintains that the second and third largest shareholders are SOEs to discount their ability to jointly convene a shareholders meeting.  GTC

Cmts. at 26.  GTC argues that these shareholders are not SOEs because they are the individual

fund shareholders, not the fund managers having custodial functions.  *Id*.  Commerce found that

these shareholders were SOEs because they were Chinese bank funds, and Commerce considers

Chinese financial institutions to be an arm of the Chinese government.  *First Remand Results* at

30.  Commerce did not consider the SOE ownership together with GIIG's in its SOE ownership

analysis because "the record did not indicate that the funds exercised their shareholder rights{.}"

*Id*.  GTC's distinction about fund shareholders versus fund managers does not disturb

Commerce's finding that only GIIG has the requisite shares to individually call a shareholders

meeting.  Moreover, Commerce only made the point about these shareholders being Chinese

bank funds in response to GTC's suggestion that they could join their shares together to meet the

[            ] threshold.  *First Remand Results* at 30.  That these shareholders are individual fund

shareholders and not fund managers with custodial functions only undermines GTC's argument

that they would jointly convene a shareholders' meeting.

> **D.    Aeolus And GTC Incorrectly Argue That Commerce Applied A New
> Separate Rate Methodology**

Aeolus and GTC reiterate their arguments that Commerce has employed a new approach

to its separate rate test that provides only a truncated analysis.  Aeolus Cmts. at 29-30; GTC

Cmts. at 29.  Because Commerce has explained the evolution of its separate rate test following

decisions from this Court and the Court of Appeal for the Federal Circuit, and has applied the

test in numerous proceedings, Commerce did not apply a new analysis here. *See Second Remand*

*Results* at 63.

Commerce explained that "following litigation before the CIT and the Federal Circuit, 'it

is Commerce's practice to examine whether the government might be able to exercise, or have

the potential to exercise, control of a company's general operations through *minority* government

ownership under certain factual scenarios.'" *Second Remand Results* at 63.  Moreover, Commerce's separate rate methodology as applied to minority government ownership scenarios was recently sustained by this Court.  In *I.D.I. International Development And Investment Corporation v. United States*, Court No. 20-00107, Slip Op. 21-82 (Ct. Int'l Trade July 6, 2021) (*IDI*), this Court sustained Commerce's application of its separate rate test in a minority government ownership situation, confirming both that Commerce's test requires an exporter "to satisfy all four elements to demonstrate independence," *IDI* at 18-19, and that the potential for government control "suffices to establish that the exporter has failed to demonstrate its independence from *de facto* government control."  *Id.* at 20.  Aeolus's and GTC's arguments thus fail.

## **CONCLUSION**

For the above reasons, we respectfully request that the Court sustain Commerce's *Second Remand Results* and enter final judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director


/s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director


OF COUNSEL:                          /s/ John J. Todor
PAUL KEITH                           JOHN. J. TODOR
Attorney                             Senior Trial Counsel
Office of the Chief Counsel          U.S. Department of Justice
    For Trade Enforcement and Compliance   Civil Division
U.S. Department of Commerce          Commercial Litigation Branch
Washington, D.C. 20230               P.O. Box 480
                                     Ben Franklin Station
                                     Washington, D.C. 20044
                                     Tel: (202) 616-2382
                                     Fax: (202) 307-0972
                                     Email: john.todor@usdoj.gov

January 24, 2022                     Attorneys for Defendant

## CERTIFICATE OF COMPLIANCE

Pursuant to paragraph 2(B)(2) of the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in paragraph 2(B)(1)(b) of the Chambers Procedures for a filing under Rule 56.2(h). Specifically, excluding those exempted portions of the brief as set forth in paragraph 2(B)(1) of the Chambers Procedures, I hereby certify that this brief contains 8,786 words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word 2016) used to prepare this brief.

/s/ John J. Todor